6:00.cv.436.ORL.99A
6:00.436

IN THE CIRCUIT COURT OF THE
EIGHTEENTH JUDICIAL CIRCUIT IN
AND FOR SEMINOLE COUNTY,
FLORIDA

CASE NO.   2000.CA-163-16B

SEMINOLE COUNTY, a political
subdivision of the State of
Florida, and the CITY OF
CASSELBERRY, FLORIDA, a
municipal corporation of the
State of Florida,

      Plaintiffs,

v.

PINTER ENTERPRISES, INC.,
MICHAEL E. PINTER, JR.,
MARY C. PINTER and MICHAEL E.
PINTER, JR., as Joint Trustees,

      Defendants.
_____/

RECEIVED
MARYANNE MORSE
Clerk of the Court, Seminole County
By: Conant D.C.
Date: JAN 2 6 2000

## COMPLAINT

     SEMINOLE COUNTY, FLORIDA, a political subdivision of the State
of Florida, and the CITY OF CASSELBERRY, FLORIDA, a municipal
corporation organized under the laws of the State of Florida, sue
PINTER ENTERPRISES, INC., MICHAEL E. PINTER, JR., MARY C. PINTER
and MICHAEL E. PINTER, JR., as Joint Trustees, and allege as
follows:

### I. JURISDICTION AND VENUE

     1.  This is an action for declaratory and other supplemental
relief pursuant to Chapter 86, Florida Statutes.  The amount in
controversy exceeds Fifteen Thousand Dollars ($15,000.00).

Jurisdiction is vested in the Circuit Court pursuant to the provisions of section 26.012, Florida Statutes.

2.    Venue is proper in Seminole County, Florida, pursuant to sections 47.011 and 47.051, Florida Statutes.

## II. **PARTIES**

3.    SEMINOLE COUNTY, FLORIDA (the "County"), is a political subdivision of the State of Florida, duly organized and validly existing under its charter and the laws of the State of Florida.

4.    The CITY OF CASSELBERRY, FLORIDA (the "City") is a municipal corporation of the State of Florida formed pursuant to Article VIII, Section 2 of the Florida Constitution and empowered according to Chapter 166, Florida Statutes.

5.    PINTER ENTERPRISES, INC., MICHAEL E. PINTER, JR., MARY C. PINTER and MICHAEL E. PINTER, JR., as Joint Trustees ("Pinter"), all the owners of certain property located within the boundaries of Seminole County, Florida, and the municipal boundaries of the City of Casselberry, Florida.    Located on the real property is a commercial establishment known as "Club Juana," at which public nudity occurs and alcoholic beverages are served, consumed or sold.

## III. **GENERAL ALLEGATIONS**

6.    Pursuant to Section 2.2(H) of the Seminole County Home Rule Charter ("Charter"), electors of Seminole County sponsored an initiative seeking the County's adoption of an ordinance known as the "Seminole County Public Decency Ordinance."    The sponsors met

2

all provisions of Section 2.2(H) and on August 11, 1998, the Board of County Commissioners of Seminole County ("Board") held a public hearing to consider the enactment of the proposed ordinance. The Board determined to not enact the ordinance and, consistent with Section 2.2(H)(3) of the Charter, by resolution called a referendum on the question. The referendum was scheduled for November 3, 1998, concurrent with the general election. At that election, the initiative was approved by a majority of Seminole County voters participating in the election. On November 10, 1998, the Board, pursuant to the Charter, declared the ordinance effective by resolution and the ordinance was executed by the Chairman of the Board. A true and correct copy of Ordinance 98-49 is attached hereto as Exhibit A and incorporated by reference.

7. Similarly, the City scheduled a referendum election for the 3rd day of November, 1998, to be held concurrent with the general election. At the referendum election a non-binding question was submitted to the electorate of the City requesting whether the City should adopt legislation prohibiting a person from publicly appearing nude in establishments that are licensed by the State of Florida to permit the sale, service or consumption of alcoholic beverages. A majority of the electors participating in that election approved the enactment of such legislation by the City. On January 4, 1999, the City adopted Ordinance 98-922, which prohibited nudity at alcohol licensed premises and bottle clubs as

3

more particularly set forth within the ordinance.   A true and correct copy of Ordinance 98-922 is attached hereto as Exhibit B and incorporated by reference.

8.   On June 7, 1999, the City held its final reading and adopted Ordinance 99-934 which is known and cited as the "City of Casselberry Sexually Oriented Business and Adult Entertainment Establishment Ordinance."  A true and correct copy of Ordinance 99-934 is attached hereto as Exhibit C and incorporated by reference.

9.   On June 22, 1999, the Board of County Commissioners of Seminole County adopted Ordinance 99-21, which is known as "The Seminole County Nudity and Alcohol Separation Ordinance."  A true and correct copy of Ordinance 99-21 is attached hereto as Exhibit D and incorporated by reference.

10.   On or about November 9, 1999, Pinter, pursuant to Chapter 70, Florida Statutes, served a Notice of Intent to File Claim pursuant to The Bert J. Harris, Jr., Private Property Rights Protection Act (the "Act") upon the Office of the Seminole County Administrator, Sanford, Florida.   The Notice of Intent to File Claim alleged that as a result of the adoption of Ordinances 98-49 and 99-21, the County had "inordinately burdened, restricted and limited" their private property such that Pinter is permanently unable to attain the reasonable investment-backed expectations for the existing use of the subject property.  A true and correct copy

4

of the Notice of Intent to File Claim provided to the County is attached hereto as Exhibit E and incorporated by reference.

11.  Similarly, on November 9, 1999, Pinter, pursuant to Chapter 70, Florida Statutes, served a Notice of Intent to File Claim pursuant to the Act upon the Office of the City Manager for the City.  The Notice of Intent to File Claim alleged that as a result of the adoption of Ordinances 98-922 and 99-934, the City had "inordinately burdened, restricted and limited" their private property such that Pinter is permanently unable to attain the reasonable investment-backed expectation for the existing use of the subject property.  A true and correct copy of the Notice of Intent to File Claim provided to the City is attached hereto as Exhibit F and incorporated by reference.

12.  Under the provisions of the Act, certain rights are granted to property owners resulting from the specific action of a governmental entity which has inordinately burdened an existing use of real property.  Section 70.001(2) provides as follows:

> (2) When a specific action of a governmental entity has inordinately burdened an existing use of real property or a vested right to a specific use of real property, the property owner of that real property is entitled to relief, which may include compensation for the actual loss to the fair market value of the real property caused by the action of government, as provided in this section.

13.  The statute then sets forth various definitions and procedures which govern the making of the claim under this Act.  In

5

particular, the Act requires that after a notice of intent to file claim has been served, certain actions must be taken by the governmental entity.  Apart from various notifications that the governmental entity is required to make, the statute requires that a ripeness statement and a settlement offer be provided by the governmental entity to the claimant.  Such actions must occur within 180 days of the service of the notice of intent to file claim.

14.  Under the provisions of the Act, the failure of the governmental entity to provide either the ripeness statement or the settlement offer subjects it to potential penalties.  Section 70.001(6)(c)1, Florida Statutes, provides that should a property owner prevail in the proceedings, the court would then determine whether the settlement offer, including the ripeness decision of the governmental entity or entities, constituted a bona fide offer. Failure to have provided a bona fide offer subjects the governmental entity to the payment of attorney's fees and costs. Further, the amount of settlement is also considered in the court's determination as to whether an inordinate burden has been placed upon a particular property.

15.  The County and the City do not believe that the Act is applicable to the ordinances in question to the extent that they abate, prohibit or prevent certain activities which occur at Club Juana and which have been submitted as a basis for the claim.  In

6

particular, section 70.001(3)(e), Florida Statutes, in defining

inordinate burden, expressly limits its applicability.   That

subsection provides as follows:

> The terms "inordinate burden" or "inordinately
> burdened" do not include temporary impacts to
> real property; impacts to real property
> occasioned by governmental abatement,
> prohibition, prevention, or remediation of a
> public nuisance at common law or a noxious use
> of private property; or impacts to real
> property caused by an action of a governmental
> entity taken to grant relief to a property
> owner under this section.

Section 70.001(3)(e), Fla. Stat. (emphasis added).

16.   The activities abated, prohibited or prevented by County

Ordinances 98-49 and 99-21 and City Ordinances 98-922 and 99-934

were public nuisances at common law and/or are a noxious use of

private property and, therefore, not subject to the provisions of

the Act.

17.   As a result of this dispute the County and the City are

in doubt as to their rights in regard to the application of section

70.001, Florida Statutes, to the ordinances and the property of

Pinter.

18.   There is a bonafide actual present practical need for a

declaration of the County's rights and obligations pursuant to this

law.   Should the County and the City fail to respond based upon

their belief that the Act is not applicable and ultimately it is

determined that it is, they have subjected themselves to

substantial penalties under the provisions of the Act.

7

WHEREFORE the County and the City pray the Court will enter an Order declaring and determining the rights, power and obligations of the County and the City under Florida Law and their ordinances as follows:

a.    Declare and determine that the application of County Ordinance 98-49 and Ordinance 99-21 do not inordinately burden the Pinter property pursuant to the provisions of section 70.001, Florida Statutes, in that County Ordinance 98-49 and Ordinance 99-21 are a governmental abatement, prohibition, prevention, or remediation of a public nuisance at common law or a noxious use of private property.

b.    Declare and determine that City Ordinance 98-922 and Ordinance 99-934 do not inordinately burden the Pinter property pursuant to the provisions of section 70.001, Florida Statues, in that City Ordinance 98-922 and Ordinance 99-934 are a governmental abatement, prohibition, prevention, or remediation of a public nuisance at common law or a noxious use of private property.

c.    Enter an order tolling the 180 day period under section 70.001, Florida Statutes, until such time as a final determination can be made by the Court as to the applicability of the Act to the County and City ordinances.

8

GREGORY T. STEWART
Florida Bar No. 203718
Nabors, Giblin & Nickerson
315 South Calhoun Street
Barnett Bank Building, Suite 800
Post Office Box 11008
Tallahassee, Florida   32302
(850)   224-4070
(850)   224-4073 (Facsimile)

ROBERT A. MCMILLIAN
Florida Bar No. 182655
Seminole County Attorney
1101 East First Street
Sanford, Florida   32771
(407) 665-7254
(407) 665-7259 (Facsimile)


ATTORNEYS FOR PLAINTIFF,
  SEMINOLE COUNTY

F. SCOTT PENDLEY
Florida Bar No. 341347
Dean, Ringers, Morgan & Lawton
200 East Robinson Street
Suite 1020
Post Office Box 2928
Orlando, Florida   32802
(407) 422-4310
(407) 648-0233 (Facsimile)

DONNA L. MCINTOSH
Florida Bar No. 377465
Stenstrom, McIntosh, Colbert,
  Whigham & Simmons
SunTrust Bank, Suite 22
200 West First Street
Post Office Box 4848
Sanford, Florida 32772-4848
(407) 322-2171
(407) 330-2379 (Facsimile)

ATTORNEYS FOR PLAINTIFF,
  CITY OF CASSELBERRY

99157.a2

9



ORDINANCE NO. 98-_49_                    SEMINOLE COUNTY, FLORIDA

> **AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SEMINOLE, STATE OF FLORIDA, TO BE KNOWN AS THE "SEMINOLE COUNTY PUBLIC DECENCY ORDINANCE"; STATING THE INTENT OF THE ORDINANCE; PROVIDING FOR THE DEFINITION OF NUDITY AS PROHIBITED BY THIS ORDINANCE AND PROVIDING FOR OTHER DEFINITIONS; PROVIDING FOR LEGISLATIVE FINDINGS; PROHIBITING NUDITY AND SEXUAL CONDUCT OR THE SIMULATION THEREOF; PROHIBITING NUDITY IN PUBLIC PLACES; PROVIDING FOR ENFORCEMENT AND PENALTIES FOR THE VIOLATION OF THIS ORDINANCE; PROVIDING FOR INJUNCTIVE RELIEF; PROVIDING FOR EFFECTIVENESS IN ALL SEMINOLE COUNTY IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE VIII, SECTION (1)(g), CONSTITUTION OF THE STATE OF FLORIDA; PROVIDING FOR SEVERABILITY; PROVIDING FOR INCLUSION IN THE SEMINOLE COUNTY CODE; PROVIDING FOR CODIFICATION; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, local governments may, by virtue of the Twenty-First (21st) Amendment to the United States Constitution, regulate and prohibit various forms of actual and simulated nude and sexual conduct, and the depiction thereof, see *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed. 2d 342, rehearing denied, 410 U.S. 948, 93 S.Ct. 1351 (1972); and *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed. 2d 357 (1981); and

**WHEREAS**, local governments may prohibit the exposure of certain body parts, see *Geaneas v. Willets,* 911 F.2d 579 (11th Cir. 1990), certiorari denied, 499 U.S. 955, 111 S. Ct. 1431, 113 L.Ed. 2d 484 (1991); and

**WHEREAS**, efforts by the State and Federal governments to apply Florida criminal statutes have been rejected by the courts because, under certain of Florida's criminal laws, nudity alone

CERTIFIED COPY
MARYANNE MORSE
CLERK OF CIRCUIT COURT
SEMINOLE COUNTY, FLORIDA
BY _Eva Poach_
DEPUTY CLERK

1

**Exhibit A**

cannot be prosecuted without proof of lewd and lascivious conduct; and

**WHEREAS**, local governments for other counties have successfully passed and defended regulations relating to public nudity; and

**WHEREAS**, the citizens of Seminole County wish to regulate nudity and sexual conduct, and the citizens of Seminole County believe that nudity and sexual conduct begets undesirable behavior, and that adverse secondary effects such as, but not limited to, prostitution, attempted rape, rape, and assault may occur and have the potential for occurring where nude and sexual conduct is permitted; and

**WHEREAS**, the citizens of Seminole County wish to protect against similar conditions to the end that they not occur in Seminole County; and

**WHEREAS**, the citizens of Seminole County desire to prohib. the public display of nudity and sexual behavior or the simulation thereof; and

**WHEREAS**, the citizens of Seminole County believe that there are increasing incidents of nudity in public places and in other places readily visible to the public; and

**WHEREAS**, the citizens of Seminole County believe that persons who choose to appear nude in public places are engaging in conduct which often serves to impose their nudity on others who did not seek it out, who are not able to reasonably avoid observing it,

2

and who may be offended or distressed thereby; and

**WHEREAS,** appearing nude in public places was a criminal offense at common law and was considered an act *malum en se* (a wrong in itself) and appearing nude in a public place which is not a public place provided or set apart for nudity has been considered improper see *Moffett v. State*, 340 So. 2d 1155, 1156 n.3 (Fla. 1977); and

**WHEREAS,** the citizens of Seminole County desire to protect and ¨preserve the wholesome character of Seminole County as a .family -oriented community with a high quality of life offered for families, tourists and businesses; and

**WHEREAS,** the citizens of Seminole County believe that appearing nude in public places is still contrary to the general societal disapproval that the people of Seminole County have of persons appearing nude among strangers in public places; and

**WHEREAS,** the citizens of Seminole County believe that the appearance of persons in the nude in public places generally increases adverse secondary effects such as, but not limited to, incidents of prostitution, sexual assaults and batteries, attracts other criminal activity to the community, and encourages degrada-tion of women and other activities which break down societal and family structures; and

**WHEREAS,** the citizens of Seminole County believe that without regulation, public nudity constitutes harmful conduct and occurs in a manner which is incompatible with the normal primary activity

3

of a particular place at a particular time; and,

WHEREAS, the citizens of Seminole County's sole intent in enacting this Ordinance is to prohibit the conduct of being nude in public places and to suppress the adverse secondary effects such nudity generates; and

WHEREAS, a requirement that exotic dancers don opaque covering sufficient to cover the genitals, buttocks and the breasts, as such portions of the human anatomy are defined in this Ordinance, does not deprive a dance of whatever erotic message, if any, it may convey, but simply makes such message, if any, slightly less graphic and imposes only an incidental limitation, if any, on the message; and,

WHEREAS, it is the intent of the citizens of Seminole County to protect and preserve the good order, public health, safety, welfare and morals of Seminole County by restricting, to the fullest extent allowed by the United States Constitution and Florida Constitution, the act of being nude in places which are not readily visible to the public; and

WHEREAS, the citizens of Seminole County believe that Seminole County is a county that is, and desires very much to continue to be, a community that contains and is known for traditional and wholesome public recreational activities, natural features and resources, and historic facilities; and

WHEREAS, the citizens of Seminole County believe that the average person applying contemporary Seminole County community

4

standards would find that the public nudity prohibited by this Ordinance, if allowed, when taken as a whole: (i) appeals to the prurient interests, and (ii) lacks serious literary, artistic, political, and scientific value; and

**WHEREAS**, the citizens of Seminole County believe that nonregulation of persons appearing nude in public places within Seminole County encourages persons and entities to advertise outside of Seminole County and the State of Florida by billboard, radio, print and other media the availability of nudity in public places within Seminole County and thus encourages the influx into Seminole County of persons seeking: (i) to observe and/or participate in such nudity, and (ii) to participate in the disorderly, harmful, and illegal conduct that is associated therewith, thereby increasing injuries and damages to the citizens of Seminole County who will be victims of such increased disorderly, harmful, and unlawful conduct and thereby working directly against Seminole County's economic development and tourism development activities; and

**WHEREAS**, the citizens of Seminole County believe that commercial advertising and/or exploitation of nudity encourages escalation of nude and lewd conduct within the competing commercial establishments exploiting such conduct and thereby increases the adverse effects upon public order and the public health; and

**WHEREAS**, the citizens of Seminole County believe that the

5

commercial exploitation of women as exotic dancers and/or exploitation of any gender's nudity encourages escalation of nude and lewd conduct within the competing commercial establishments exploiting such conduct and thereby increases the adverse effects upon public order and the public health; and

**WHEREAS**, the citizens of Seminole County believe that the prohibitions contained herein are the most reasonable and minimal restrictions required so as to regulate conduct which is adverse to public order, health, safety, morality, and decency within Seminole County when such conduct takes place at locations where the public is present or is likely to be present, or where such conduct would be readily visible to the public; and,

**WHEREAS**, the citizens of Seminole County believe that the passage of this Ordinance is necessary to preserve the basic character of Seminole County; and

**WHEREAS**, States may regulate the conduct of appearing nude in public places, see *Michael Barnes v. Glen Theater, Inc.* 501 U.S. 560, 111 S.Ct. 2456 115 L.Ed. 2d 504 (1991) and *Café 207, Inc. v. St. Johns County*, 856 F. Supp. 641 (M.D. Fla. 1994), *aff'd*, 989 F.2d 1136 (11th Cir. 1995); and

**WHEREAS**, the citizens of Seminole County are not hereby prohibiting nudity in private places or prohibiting nudity which is protected by the United States Constitution or Florida Constitution; and

**WHEREAS**, the citizens of Seminole County believe that the

6

express exemptions contained in this Ordinance provide adequate protection to persons who, without such express exemptions, might otherwise be prevented or discouraged by this Ordinance from exercising constitutionally protected rights; and

**WHEREAS**, this Ordinance is intended to regulate conduct, not speech; and

**WHEREAS**, this Ordinance is a general ordinance regulating conduct and is not an ordinance that affects the use of land as contemplated by Section 125.66, Florida Statutes; and

**WHEREAS**, an Economic Impact Statement has been prepared and made available in accordance with the requirements of the Seminole County Home Rule Charter,

**NOW, THEREFORE, THE CITIZENS OF SEMINOLE COUNTY MOVE THE BOARD OF COUNTY COMMISSIONERS OF SEMINOLE COUNTY, FLORIDA, TO ORDAIN AND ENACT, THAT:**

**Section 1.   Title.**   This Ordinance shall be known as the "Seminole County Public Decency Ordinance".

**Section 2.   Intent.**

(a)   It is the intent of this Ordinance to protect and preserve the good order, health, safety, welfare, and morals of the citizens of Seminole County by prohibiting a person from intentionally or recklessly appearing or being nude, or causing another person to appear or be nude, in a public place and in other places which may reasonably be expected to be observed by the public within Seminole County.

(b)   It is the further intention of this Ordinance to

7

accomplish those intents and purposes expressed in the recitals ("Whereas" clauses) of this Ordinance, each of which are incorporated by reference into this Section.

Section 3. **Definitions.**   When used in this Ordinance, the following terms shall have the following meanings:

(a) **Breast.**   A portion of the human female mammary gland (commonly referred to as the female breast) including the nipple and the areola (the darker colored area of the breast surrounding the nipple) and an outside area of such gland wherein such outside area is: (i) reasonably compact and contiguous to the areola, and (ii) contains at least the nipple and the areola and 1/4 of the outside surface area of such gland.

(b) **Buttocks.**   (For a short underline(general) description see the last sentence of this subsection.)   The area at the rear of the human body (sometimes referred to as the gluteus maximus) which lies between two imaginary straight lines running parallel to the ground when a person is standing, the first or top such line being 1/2 inch below the top of the vertical cleavage of the nates (i.e., the prominence formed by the muscles running from the back of the hip to the back of the leg) and the second or bottom such line being 1/2 inch above the lowest point of the curvature of the fleshy protuberance (sometimes referred to as the gluteal fold), and between two imaginary straight lines, one on each side of the body (the "outside lines"), which outside lines are perpendicular to the ground and to the horizontal lines described above and

which perpendicular outside lines pass through the outermost point(s) at which each nate meets the other side of each leg. Notwithstanding the above, buttocks shall not include the leg, the hamstring muscle below the gluteal fold, the tensor fasciae latae muscle or any of the above-described portion of the human body that is between either: (i) the left inside perpendicular line and the left outside perpendicular line, or (ii) the right inside perpendicular line and the right outside perpendicular line.   For the purpose of the previous sentence the left inside perpendicular line shall be an imaginary straight line on the left side of the anus: (i) that is perpendicular to the ground and to the horizontal lines described above, (ii) that is 1/3 of the distance from the anus to the left outside line, and the right inside perpendicular line shall be an imaginary straight line on the right side of the anus (i) that is perpendicular to the ground and to the horizontal lines described above, and (ii) that is 1/3 of the distance from the anus to the right outside line.   (The above description can <u>generally</u> be described as covering 1/3 of the buttocks centered over the cleavage for the length of the cleavage.)

(c)  **Entity**.  Any proprietorship, partnership, corporation, association, business trust, joint venture, joint-stock company or other for profit and/or not for profit organization.

(d)  **Nude**. Any person insufficiently clothed in any manner so that any of the following body parts are not entirely covered

with a fully opaque covering:

        (1)   the male or female genitals, or

        (2)   the pubic area, or

        (3)   the vulva, or

        (4)   the penis, or

        (5)   the female Breast (each female person may determine which ¼ of her breast surface area (see definition of breast) contiguous to and containing the nipple and the areola is to be covered); or

        (6)   the anus, or

        (7)   the anal cleft, or

        (8)   the anal cleavage, or

        (9)   the buttocks. Attire which is insufficient to comply with this requirement includes, but is not limited to, G-Strings, T-Backs, dental floss and thongs.

        (10) For the purposes of this subsection, body paint, body dyes, tattoos, liquid latex whether wet or dried, string and dental floss and similar substances shall not be considered "opaque covering".

    (e) **Person.** Any live human being aged ten (10) years of age or older.

    (f) **Places Provided Or Set Apart For Nudity.** Enclosed single sex public restrooms, enclosed single sex functional shower, single sex locker and/or dressing room facilities, enclosed motel rooms and hotel rooms designed and intended for

sleeping accommodations, doctor's offices, portions of hospitals, the yard area of residences and similar places in which nudity or exposure is necessarily and customarily expected outside of the home and the sphere of privacy constitutionally protected therein. This term shall not be deemed to include places where a person's conduct of being nude is used for his or her profit or where being nude is used for the promotion of business or is otherwise for commercial gain.

.(g)  **Public Place.**  Any location frequented by the public, or where the public is present or likely to be present, or where a person may reasonably be expected to be observed by members of the public.  Public places include, but are not limited to, streets, sidewalks, parks, beaches, business and commercial establishments (whether for profit or not for profit and whether open to the public at large or where entrance is limited by a cover charge or membership requirement or membership fee), bottle clubs, hotels, motels, restaurants, night clubs, country clubs, cabarets, and meeting facilities utilized by any religious, social, fraternal or similar organization.  Premises, or portions thereof such as hotel rooms, used solely as a private residence, whether permanent or temporary in nature shall not be deemed to be a public place.

**Section 4. Findings.**  In addition and supplemental to the findings and determinations contained in the recitals ("Whereas" clauses) of this Ordinance which are incorporated by reference into this Section, it is the intent of the citizens of Seminole

11

County to regulate the conduct of appearing nude in public places for the purpose of regulating nudity and other conduct, that considering what has happened in other communities, the acts prohibited in Section 5 hereinbelow encourage or create the potential for the conduct of adverse secondary effects such as, but not limited to, prostitution, attempted rape, rape, and assault; that actual and simulated nudity and sexual conduct in public places, begets and has the potential for begetting undesirable and unlawful behavior; that sexual, lewd lascivious, and salacious conduct results in violation of law and creates dangers to the health, safety, morals, and welfare of the public and those who engage in such conduct; and, it is the intent of Section 5 of this Ordinance to specifically prohibit nudity, gross sexuality and the simulation thereof.

**Section 5.   Nudity, Sexual Conduct Prohibited.**

(a)   No person shall knowingly, intentionally or recklessly appear, or cause another person to appear, nude, as defined in Section 3(d), or expose to public view his or her genitals, vulva, penis, pubic area, or buttocks, or any simulation thereof;

(b)   No person shall knowingly, intentionally or recklessly expose, or cause a female person to expose her breasts or any simulation thereof to public view;

(c)   No person or entity maintaining, owning, or operating a public place shall encourage, allow or permit any person to appear nude or to expose to public view his or her genitals, pubic area, vulva, penis, anus, or any portion of the buttocks or simulation

12

thereof.   This Section shall be violated if any portion of the buttocks is visible from any vantage point;

(d)   No person shall engage in and no person or entity maintaining, owning, or operating a public place shall encourage, allow or permit any sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, lap dancing, straddle dancing, any sexual act which is prohibited by law, touching, caressing, or fondling of the breasts, buttocks, anus, or genitals, or the simulation thereof;

(e)   The prohibitions of this Section shall not apply when a person appears nude in a place provided or set apart for nudity provided: (i) such person is nude for the sole purpose of performing the legal function(s) that is customarily intended to be performed within such place provided or set apart for nudity, and (ii) such person is not nude for the purpose of obtaining money or other financial gain for such person or for another person or entity;

(f)   Each female person may determine which 1/4 of her breast surface area (see definition of breast) contiguous to and containing the areola is to be covered; and

(g)   This Section shall not be deemed to address photographs, movies, video presentations, or other non live performances.

(h)   It shall be unlawful for any person to knowingly, intentionally, or recklessly appear, or cause another person to appear, nude, as defined in Section 3(d), in a public place or in

13

any other place which is readily visible to the public, except as provided in Section 6.   It shall also be unlawful for any person or entity maintaining, owning, or operating any public place to encourage, suffer or allow any person to appear nude in such public place, except as provided in Section 6.

   **Section 6.  Exemptions.**   The prohibitions of Section 5 of this Ordinance shall not apply:

   (a)  When a person appears nude in a place provided or set apart for nudity, as defined by this Ordinance, provided: (i) such person is nude for the sole purpose of performing the legal function(s) that is/are customarily intended to be performed within such place provided or set apart for nudity, and (ii) such person is not nude for the purpose of obtaining money or other financial gain for such person or for another person or entity.

   (b)  When the conduct of being nude can not legally be prohibited by this Ordinance because: (i) it constitutes a part of a bona fide live communication, demonstration or performance by a person wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression and is not a mere guise or pretense utilized to exploit the conduct of being nude for profit or commercial gain (see for instance *Board of County Commissioners v. Dexterhouse,* 348 So. 2d 916 (Fla. 2nd DCA 1977)), and as such is protected by the United States Constitution or Florida Constitution, or (ii) it is otherwise protected by the United States Constitution or

**14**

Florida Constitution.

(c)   A mother's breastfeeding of her baby does not under any circumstance violate the provisions of this ordinance.

Section 7.  **Enforcement and Penalties.**  Any person or entity violating any of the provisions of this ordinance shall be prosecuted in the same manner as misdemeanors are prosecuted. Such violations shall be prosecuted in the name of the State of Florida in a court having jurisdiction of misdemeanors by the prosecuting attorney thereof and, upon conviction, shall be punished by a fine not to exceed FIVE HUNDRED AND NO/100 DOLLARS ($500.00) or by imprisonment in the County jail not to exceed sixty (60) days or by both such fine and imprisonment as provided in Section 125.69, Florida Statutes, or its successor.   Each incident or separate occurrence of an act that violates this ordinance shall be deemed a separate offense.

Section 8.  **Injunctive Relief.**  In addition to the procedures provided herein, persons and entities that are not in conformity with these requirements shall be subject to appropriate civil action in the court of appropriate jurisdiction for abatement.

Section 9.  **Area of Effectiveness.**  In accordance with the provisions of Article VIII, Section (1)(g), Constitution of the State of Florida, this Ordinance shall have Countywide effect in all areas of Seminole County, Florida unless a City elects to opt out in accordance with the Charter.

Section 10.  **Severability.**  If any section, subsection,

sentence, clause, phrase, word or provision of this Ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, whether for substantive, procedural, or any other reason, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions of this Ordinance.

**Section 11.  Inclusion in the Code**.  It is the intention of the Board and it is hereby provided that the provisions of this Ordinance shall be made a part of the Seminole County Code; that the sections of this Ordinance may be renumbered or relettered to accomplish such intention; and that the word "Ordinance" may be changed to "Section," "Article," or other appropriate designation.

**Section 12. Effective Date**.  This Ordinance shall become effective immediately upon the filing of a certified copy of this Ordinance with the Department of State by the Clerk of the Board of County Commissioners.

**ENACTED** this _10_ day of _November_, 1998.

BOARD OF COUNTY COMMISSIONERS
OF SEMINOLE COUNTY, FLORIDA

BY: _____
RANDALL C. MORRIS, Chairman

LG/gn
7/17/98
PUBDEC1.DOC

16



ORDINANCE NO. 98-922

AN ORDINANCE OF THE CITY COMMISSION OF THE CITY OF
CASSELBERRY, FLORIDA, ADOPTING CITY CODE SECTION 10-8,
MAKING IT UNLAWFUL WITHIN THE CITY OF CASSELBERRY FOR
ANY MANAGER, OFFICER, AGENT, SERVANT, EMPLOYEE,
CONTRACTOR, PERSON IN CHARGE, CUSTOMER, OR INVITEE OF
ANY PREMISES OR BOTTLE CLUB LICENSED UNDER THE LAWS OF
FLORIDA TO SELL OR ALLOW THE CONSUMPTION OF ALCOHOLIC
BEVERAGES TO KNOWINGLY, INTENTIONALLY, OR RECKLESSLY
EXHIBIT, SUFFER, ALLOW, PERMIT, ENGAGE IN, PARTICIPATE IN,
OR BE CONNECTED WITH NUDITY UPON THE LICENSED PREMISES;
PROVIDING DEFINITIONS FOR THE TERMS "BREAST", "BUTTOCKS",
"PERSON", AND "NUDITY" OR "NUDE" WHICH SHALL HAVE THE
SAME MEANINGS AS THOSE TERMS ARE ALSO DEFINED IN SECTION
3 OF THE PUBLIC DECENCY ORDINANCE OF SEMINOLE COUNTY,
FLORIDA; PROVIDING LIMITED EXCEPTIONS STATED HEREIN;
PROVIDING FOR ENFORCEMENT AND PENALTIES FOR VIOLATIONS
OF THIS ORDINANCE; PROVIDING FOR SEVERABILITY; PROVIDING
FOR INCORPORATION INTO THE CODE; AND PROVIDING FOR AN
EFFECTIVE DATE.

WHEREAS, the City Commission of the City of Casselberry, Florida, called and
scheduled a referendum election that was held concurrent with the general election on the 3rd day
of November, 1998; and

WHEREAS, the referendum election presented the following non-binding question to the
electorate of the City of Casselberry, Florida:

Shall the City of Casselberry enact legislation that prohibits a person from publicly
appearing nude in any establishment that is licensed by the State of Florida to
permit the sale, service, or consumption of alcoholic beverages?

_____ Yes
_____ No

WHEREAS, the electors of Casselberry had an opportunity to cast their vote on the
aforementioned question at the ballot box and by absentee ballot; and

WHEREAS, the Seminole County Canvassing Board has certified the election results on

Exhibit B

the aforementioned question to the City of Casselberry; and

**WHEREAS**, City Commission of the City of Casselberry has affirmed and approved the certified results on the aforementioned question for the City of Casselberry; and

**WHEREAS**, the certified election results indicate that 3,202 voters (59.53%) voted "yes" to enacting legislation prohibiting a person from publicly appearing nude in any establishment that is licensed by the State of Florida to permit the sale, service, or consumption of alcoholic beverages, while 2,177 (40.47%) voted "no" to enacting such legislation; and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, finds and declares that the certified election results of the aforementioned referendum establish a community standard within the City of Casselberry that prohibits a person from publicly appearing nude in any establishment that is licensed by the State of Florida to permit the sale, service, or consumption of alcoholic beverages on the licensed premises; and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, desires to enact legislation that codifies this community standard into the City of Casselberry Code of Ordinances; and

**WHEREAS**, the City Commission of the City of Casselberry , Florida, also finds and declares that nudity, coupled with alcohol in public places, encourages undesirable behavior and is not in the best interests of the public health, safety, and welfare of the citizens of the City of Casselberry; and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, has chosen to avoid the disturbances associated with mixing alcohol and nudity by means of a reasonable restriction upon any premises or bottle club licensed under the laws of Florida to sell or allow the consumption of alcoholic beverages on the licensed premises; and

**WHEREAS**, pursuant to Section 562.45, Florida Statutes (1997) and Article VIII, Section 2 of the Florida Constitution, the City of Casselberry has the power and right to enact ordinances regulating the type of entertainment and conduct permitted in any establishment licensed by the State of Florida to sell alcoholic beverages for consumption on the licensed premises or any bottle club which is located within the City of Casselberry, *see* City of Miami Springs v. J.J.T., Inc., 437 So. 2d 200 (Fla. 3rd DCA 1983); Board of County Commissioners of Lee County v. Dexterhouse, 348 So. 2d 916 (Fla. 2d DCA 1977), affirmed 364 So. 2d 449, appeal dismissed 441 U.S. 918 (1979); and

**WHEREAS**, on November 3, 1998, by a duly held referendum on a question which was separate and apart from the aforesaid referendum question called and scheduled by the City of Casselberry, the electors of Seminole County, Florida (residing in unincorporated and incorporated Seminole County, Florida) approved Seminole County's adoption of the "Seminole

2

County Public Decency Ordinance"; and

**WHEREAS**, as of the effective date of the Seminole County Public Decency Ordinance, that Ordinance has been applicable county-wide (including within the City of Casselberry) and is generally intended to prohibit a person from intentionally or recklessly appearing or being nude or causing another person to appear or be nude in a public place and in other places which may reasonably be expected to be observed by the public within Seminole County; and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, hereby finds and declares that this Ordinance is in addition and supplemental to the Seminole County Public Decency Ordinance and the City of Casselberry Adult Entertainment Code and that this Ordinance in no way whatsoever is intended to conflict with the Seminole County Public Decency Ordinance and the City of Casselberry Adult Entertainment Code; and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, finds and declares that this Ordinance shall not be construed as opting the City of Casselberry out of the Seminole County Public Decency Ordinance; and

**WHEREAS**, this Ordinance is a general ordinance regulating conduct and is not an ordinance that affects the use of land as contemplated by Section 166.041, Florida Statutes (1997); and

**WHEREAS**, the City Commission of the City of Casselberry, Florida, finds that this Ordinance is supported by federal and state case law, *see* e.g., California v. La Rue, 409 U.S. 109 (1972); 44 Liquormart, Inc. v. Rhode Island, _____ U.S. _____, 116 S. Ct. 1495 (1996); Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993 (11th Cir. 1998); City of Daytona Beach v. Del Percio, 476 So. 2d 197 (Fla. 1985); and

**WHEREAS**, the City Commission of the City of Casselberry deems that this Ordinance is in the best interests of the public health, safety, welfare, and morals of the citizens of the City of Casselberry, Florida.

**NOW, THEREFORE, BE IT ENACTED BY THE CITY COMMISSION OF THE CITY OF CASSELBERRY, FLORIDA, AS FOLLOWS:**

**Section 1.**     **Sec. 10-8 Adopted**.  The City Commission of the City of Casselberry, Florida, hereby adopts a new Section 10-8 of the Casselberry Code of Ordinances, to fully read as follows:

### SEC. 10-8     Nudity Prohibited Upon Alcohol Licensed Premises and Bottle Clubs.

(a)     *Definitions*.  When used in this section the following terms shall have the following meanings which are intended to have the same meanings as those same terms are

defined in Section 3 of the Public Decency Ordinance of Seminole County, Florida, as follows:

(1)     **"Breast"** shall mean a portion of the human female mammary gland (commonly referred to as the female breast) including the nipple and the areola (the darker colored area of the breast surrounding the nipple) and an outside area of such gland wherein such outside area is: (i) reasonably compact and contiguous to the areola, and (ii) contains at least the nipple and the areola and 1/4 of the outside surface area of such gland.

(2)     **"Buttocks"** shall mean (For a short general description see the last sentence of this subsection) the area at the rear of the human body (sometimes referred to as the gluteus maximus) which lies between two imaginary straight lines running parallel to the ground when a person is standing, the first or top of such line being ½ inch below the top of the vertical cleavage of the nates (i.e., the prominence formed by the muscles running from the back of the hip to the back of the leg) and the second or bottom of such line being ½ inch above the lowest point of the curvature of the fleshy protuberance (sometimes referred to as the gluteal fold), and between two imaginary straight lines, one on each side of the body (the "outside lines"), which outside lines are perpendicular to the ground and to the horizontal lines described above and which perpendicular outside lines pass through the outermost point(s) at which each nate meets the other side of each leg. Notwithstanding the above, buttocks shall not include the leg, the hamstring muscle below the gluteal fold, the tensor fasciae latae muscle or any of the above-described portion of the human body that is between either: (i) the left inside perpendicular line and the left outside perpendicular line, or (ii) the right inside perpendicular line and the right outside perpendicular line. For the purpose of the previous sentence the left inside perpendicular line shall be an imaginary straight line on the left side of the anus: (i) that is perpendicular to the ground and to the horizontal lines described above, (ii) that is 1/3 of the distance from the anus to the left outside line, and the right inside perpendicular line shall be an imaginary straight line on the right side of the anus (i) that is perpendicular to the ground and to the horizontal lines described above, and (ii) that is 1/3 of the distance from the anus to the right outside line. (The above description can generally be described as covering 1/3 of the buttocks centered over the cleavage for the length of the cleavage).

(3)     **"Nudity"** or **"Nude"** shall be used interchangeably and shall mean any person insufficiently clothed in any manner so that any of the following body parts are not entirely covered with a fully opaque covering:

        i.      the male or female genitals, or

4

ii.   the pubic area, or

iii.  the vulva, or

iv.   the penis, or

v.    the female breast (each female person may determine which 1/4 of her breast surface area (see definition of breast) contiguous to and containing the nipple and the areola is to be covered), or

vi.   the anus, or

vii.  the anal cleft, or

viii. the anal cleavage, or

ix.   the buttocks.   Attire which is insufficient to comply with this requirement includes, but is not limited to, G-strings, T-backs, dental floss and thongs.

For purposes of this subsection (3), body paint, body dyes, tattoos, liquid latex whether wet or dried, string and dental floss and similar substances shall not be considered "opaque covering".

(4)   **"Person"** shall mean any live human being aged ten (10) years of age or older.

(b)   *Prohibition.*   It shall be unlawful within the City of Casselberry for any manager, officer, agent, servant, employee, contractor, person in charge, customer, or invitee of any premises or bottle club licensed under the laws of the State of Florida to sell or allow the consumption of alcoholic beverages to knowingly, intentionally, or recklessly exhibit, suffer, allow, permit, engage in, participate in, or be connected with nudity upon the licensed premises.   The combination of nudity and alcoholic beverages at any premises or bottle club licensed under the laws of the State of Florida to allow the sale or consumption of alcoholic beverages within the City of Casselberry is hereby strictly prohibited.

(c)   *Exceptions.*   It is not a violation of this section for any person to engage in the ordinary and customary bona fide use of an enclosed single sex public restroom, enclosed single sex functional shower, or enclosed single sex locker and/or dressing room facilities.   It is also not a violation of this section for a mother to breast feed her baby.

5

(d)     *Enforcement and Penalties.*  Any person violating any of the provisions of this section shall be prosecuted in the same manner as misdemeanors are prosecuted. Such violations shall be prosecuted in the name of the State of Florida in a court having jurisdiction of misdemeanors by the prosecuting attorney thereof and, upon conviction, shall be punished by a fine not to exceed Five Hundred and No/100 Dollars ($500.00) or by imprisonment in the County jail not to exceed sixty (60) days or by both such fine and imprisonment as provided in Section 162.22, Florida Statutes (1997).  Each incident or separate occurrence of any act that violates this section shall be deemed a separate offense.  In addition to the penalties provided under this section, violators of this section shall be subject to any other appropriate civil or criminal action provided by law in a court of competent jurisdiction.

**Section 2.**     **Severability.**  If any section, subsection, sentence, clause, phrase, word or provision of this ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, whether for substantive, procedural, or any other reason, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions of this ordinance.  To that end, the provisions of this Ordinance shall be deemed severable to the maximum extent permitted by law.

**Section 3.**     **Incorporation Into Code.**  This ordinance shall be incorporated into the Casselberry City Code and any section or paragraph number or letter and any heading may be changed or modified as necessary to effectuate the foregoing.

**Section 4.**     **Effective Date.**  This ordinance shall become effective immediately upon adoption by the City Commission of the City of Casselberry, Florida.

     **ADOPTED** by the City Commission of the City of Casselberry, Florida, in a regular meeting assembled on the *4th* day of *January*, 1999.

*Bruce A. Pronovost*
**Bruce A. Pronovost,** Mayor

ATTEST:

*Thelma McPherson*
**Thelma McPherson,** City Clerk

First Reading: *December 7, 1998*

Second Reading
and Public Hearing: *January 4, 1999*

Effective Date: *January 4, 1999*

6



## ORDINANCE NO. 99-934

AN ORDINANCE OF THE CITY OF CASSELBERRY. FLORIDA AMENDING CHAPTER 14.
ARTICLE III OF THE CASSELBERRY CITY CODE PERTAINING TO SEXUALLY ORIENTED
BUSINESSES AND ADULT ENTERTAINMENT ESTABLISHMENTS. AND RELATED
MATTERS; PROVIDING FOR A SHORT TITLE. PROVIDING FOR LEGISLATIVE PURPOSES.
FINDINGS AND INTENT. PROVIDING FOR CONSTRUCTION OF THE ORDINANCE.
RECOGNIZING OBSCENITY AS UNLAWFUL. PROVIDING FOR DEFINITIONS. PROVIDING
FOR NOTICE: PROVIDING FOR PENALTIES. REMEDIES AND RELIEF: PROVIDING FOR
AND REQUIRING LICENSES. PROVIDING FOR LICENSEE APPLICATIONS AND FEES.
PROVIDING FOR CLASSIFICATION OF LICENSES, PROVIDING FOR APPROVAL AND
DENIAL OF LICENSE APPLICATIONS; PROVIDING FOR CONTINUING DUTIES UPON
LICENSED APPLICANTS, PROVIDING FOR INVESTIGATIONS; PROVIDING FOR
REAPPLICATION: PROVIDING FOR TIME PERIODS FOR NOTICES. SUBMITTALS, FILINGS.
AND DECISIONS. PROVIDING FOR RESPONSIBILITIES OF CITY AND GOVERNMENT
OFFICIALS AND DEPARTMENTS; PROVIDING FOR EXPIRATION, LAPSE,
CONTINUATION. TERMS. SUSPENSION. REVOCATION AND ENFORCEMENT OF
LICENSES. PROHIBITING THE TRANSFER OF LICENSES, PROVIDING FOR
ESTABLISHMENT NAME CHANGES; PROVIDING FOR LICENSE SUSPENSION AND
REVOCATION PROCEDURES AND PROCEEDINGS. PROVIDING FOR APPEALS;
PROVIDING FOR WORKER RECORDS. CUSTOMER CONTRACTS AND DAILY REGISTERS
AND INSPECTIONS THEREOF; PROVIDING FOR DUTIES AND OBLIGATIONS; PROVIDING
FOR PROHIBITED ACTIVITIES AND UNLAWFUL ACTS BY ESTABLISHMENTS AND
BUSINESSES, WORKERS, OPERATORS, AND CUSTOMERS. PROVIDING FOR GENERAL
REQUIREMENTS, DUTIES. OBLIGATIONS, REQUIRED ACTS AND PROHIBITIONS;
PROVIDING FOR LICENSEE CONSENT, PROVIDING FOR SPECIFIC PROVISIONS
RELATING TO VARIOUS CATEGORIES OF LICENSEES. PROVIDING REGULATIONS FOR
SEXUALLY ORIENTED BUSINESSES; PROVIDING REGULATIONS FOR ADULT BOOK
STORES/ADULT VIDEO STORES, PROVIDING REGULATIONS FOR ADULT THEATERS;
PROVIDING REGULATIONS FOR ADULT PERFORMANCE ESTABLISHMENTS, PROVIDING
REGULATIONS FOR COMMERCIAL BODILY CONTACT ESTABLISHMENTS; PROVIDING
REGULATIONS FOR ESCORTS AND ESCORT SERVICE PROVIDERS; PROVIDING
REGULATIONS FOR ADULT MODELING OR DISPLAY ESTABLISHMENTS; PROVIDING
REGULATIONS FOR ADULT MODELS; PROVIDING REGULATIONS FOR PROHIBITED ACTS
BY CUSTOMERS; PROVIDING FOR PROHIBITED ACTS BY WORKERS AND OPERATORS;
PROVIDING FOR RECORDS AND REPORTS; PROVIDING OPERATIONAL REQUIREMENTS
AND PROHIBITIONS; PROVIDING FOR USE OF RESTROOMS AND DRESSING ROOMS;
PROVIDING FOR THE PROTECTION OF MINORS; PROVIDING FOR HOURS OF
OPERATION; PROHIBITING SEXUAL ENCOUNTER BUSINESSES; PROVIDING IMMUNITY
FROM PROSECUTION FOR CERTAIN GOVERNMENT OFFICIALS AND ACTS; PROVIDING
FOR REPEAL, SEVERABILITY, CODIFICATION, AND AN EFFECTIVE DATE.

**WHEREAS,** the activities of certain commercial enterprises. that are appropriately included within the

**Exhibit C**

definition of the term "adult entertainment establishment" or "sexually oriented business." have resulted in the necessity for additional Code provisions regulating adult entertainment establishment and sexually oriented business activities and the activities of other similar businesses; and

WHEREAS, failure of the City to ensure that adult entertainment activities and sexually oriented businesses are appropriately regulated would adversely impact the City insomuch as the City is a local government jurisdiction that is very family oriented and encourages economic and tourism development that focuses on and derives its economic growth as a result of family oriented activities and events; and

WHEREAS, the City Commission desires to protect and preserve the unique character of City of Casselberry as a family oriented attraction for families, tourists, and businesses; and

WHEREAS, the City of Casselberry is essentially a suburban community and has a current population of less than 30,000 people, and

WHEREAS, the City of Casselberry is a municipality that is, and desires very much to continue to be, a community that contains and is known for traditional wholesome public recreational activities and is proximate to family oriented theme parks such as Walt Disney World, MGM Studios, Universal Studios, Sea World, and numerous other family vacation destinations; and

WHEREAS, the City Commission finds and determines that the provisions contained herein are the most reasonable and minimal restrictions required so as to regulate conduct which is or could be adverse to public order, health, safety, morals and welfare within the City of Casselberry; and

WHEREAS, the passage of this Ordinance is necessary to preserve the basic character of the community of the City of Casselberry; and

WHEREAS, although the City Commission is of the opinion that this Ordinance is a general ordinance regulating conduct and is not an ordinance that affects the use of land as contemplated by Section 166.041(3)(c), Florida Statutes, the City Commission does not wish to become sidetracked in lengthy and expensive litigation concerning procedural matters that are not relevant to the subject matter of this Ordinance and has, accordingly, determined to enact this Ordinance under the more conservative, expensive, and time consuming land use procedure as well as under the general procedure for ordinances that regulate conduct; and

WHEREAS, sexually oriented businesses and adult entertainment establishments require special supervision from the public safety agencies of the City in order to protect and preserve the health, safety, order and welfare of the workers and patrons of such businesses as well as the citizens of the City; and

WHEREAS, the City Commission finds that sexually oriented businesses and adult entertainment establishments are frequently used for unlawful sexual activities including, but not limited to, prostitution and sexual liaisons of a casual nature; and

**WHEREAS**, the concern over sexually transmitted diseases is a legitimate health concern of the City which demands reasonable regulation of sexually oriented businesses and adult entertainment establishments in order to protect the health and well-being of the citizens of the City of Casselberry; and

**WHEREAS**, licensing is a legitimate and reasonable means of accountability to ensure that operators of sexually oriented businesses and adult entertainment establishments comply with reasonable regulations and to ensure that operators do not knowingly allow their establishments to be used as places of illegal sexual activity or solicitation; and

**WHEREAS**, there is convincing documented evidence that sexually oriented businesses and adult entertainment establishments, because of their very nature, have a deleterious effect on both the existing businesses around them and the surrounding residential areas adjacent to them as well as other public and civic uses, causing increased crime and the downgrading of property values and adverse impacts to economic development and tourist development programs and activities; and

**WHEREAS**, it is recognized that sexually oriented businesses and adult entertainment establishments, due to their nature, have serious objectionable operational characteristics, particularly when they are located in close proximity to each other, thereby contributing to urban blight and downgrading the quality of life in the adjacent area; and

**WHEREAS**, the City Commission desires to minimize and control these adverse effects and thereby protect the health, morals, good order, safety and welfare of the citizenry; protect the citizens from increased crime; preserve the quality of life; preserve the property values and character of surrounding neighborhoods and deter the spread of urban blight; and

**WHEREAS**, the City Commission has determined that locational criteria alone do not adequately protect the health, good order, morals, safety and general welfare of the people of this City; and

**WHEREAS**, it is not the intent of this Ordinance to unreasonably regulate any speech activities protected by the First Amendment, but to enact a content-neutral Ordinance which addresses the adverse secondary effects of sexually oriented businesses and adult entertainment establishments; and

**WHEREAS**, it is not the intent of the City Commission to condone or legitimize obscene material or any other illegal activity and the City Commission recognizes that state and federal law prohibits the distribution of obscene materials and the Commission expects and encourages local and state law enforcement officials to enforce state obscenity statutes and related statutes against any such illegal activities in the City; and

**WHEREAS**, it is not the intent of this Ordinance to regulate the display of specified anatomical areas incidental to a performance offered by a proprietary school licensed by the State of Florida, a college, community college, university supported partly or entirely by taxation or a private college or university which maintains and operates educational programs in which credits are transferable to a college, community college, or university supported partly or entirely by taxation or in any structure owned by a

governmental entity (e.g. a civic center, auditorium) when part of a bona fide artistic display or production; and

WHEREAS, the City Commission finds and determines that this Ordinance is consistent with the goals, policies and objectives of the City's Comprehensive Plan; and

WHEREAS, the City Commission of the City of Casselberry hereby finds and deems that this Ordinance is in the best interests of the public health, safety, welfare, and morals of the citizens of the City of Casselberry

NOW, THEREFORE, BE IT ENACTED by the City Commission of the City of Casselberry, Florida as follows:

SECTION I. AMENDMENT TO CODE. The Code of Ordinances of the City of Casselberry is hereby amended by adding new sections which sections shall read as follows:

Section 14-66. Short title.

This Ordinance shall be known and may be cited as the "City of Casselberry Sexually Oriented Business and Adult Entertainment Establishment Ordinance."

Section 14-67. Purpose, findings and intent/incorporation of whereas clauses.

(a) Purpose. It is the purpose of this Article to regulate sexually oriented businesses and adult entertainment establishments in order to promote and protect the public health, safety, good order, morals and general welfare of the citizens of the City, to establish reasonable and uniform regulations of adult entertainment establishments and sexually oriented businesses within the City. The provisions of this Article have neither the purpose nor effect of imposing an unreasonable limitation or unreasonable restriction on the content of any lawful communicative materials including sexually oriented materials. Similarly, it is not the intent nor effect of this Article to unreasonably restrict or deny access by adults to sexually oriented materials protected by the First Amendment or to deny access by the distributors and exhibitors of sexually oriented entertainment protected by the First Amendment to their intended market. Neither is it the intent nor effect of this Article to condone or legitimize the distribution of obscene or otherwise illegal material.

(b) Findings. Based on evidence concerning the adverse secondary effects of adult uses on the community presented in hearings and in reports made available to the Commission, and on findings incorporated in the cases of *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986); *Young v. American Mini Theaters*, 426 U.S. 50 (1976); *Barnes v. Glen Theater, Inc.*, 501 U.S. 560 (1991), on materials made of record relating to the St. Johns County Public Nudity Ordinance, and on the substance of and findings made or incorporated in studies accomplished in other communities and ordinances enacted in other communities, including, but not limited to, New York, New York; City of Houston Ordinance Number 97-75; Senate Bill Number 232, as passed by the Kansas State Legislature; Phoenix, Arizona; Tucson, Arizona; St. Paul, Minnesota; Minneapolis, Minnesota; Houston, Texas; Indianapolis, Indiana;

Amarillo, Texas; Garden Grove, California; Los Angeles, California; Austin, Texas; Macon-Bibb County, Georgia; Palm Beach County, Florida; Manatee County, Florida; the findings of the Attorney General of the State of Minnesota; the report of United States Attorney General's Commission on Pornography (1986); Jacksonville, Florida; Detroit, Michigan; and "A Summary of a National Survey of Real Estate Appraisers Regarding the Effect of Adult Bookstores on Property Values," conducted by the Division of Planning, Department of Metropolitan Development, Indianapolis, January 1984; the publication entitled "Protecting Communities From Sexually Oriented Businesses" (Southwest Legal Press, Inc.); the publication entitled "Local Regulation Of Adult Businesses" (Clark, Boardman and Callaghan); publications prepared by the Florida Family Association, Inc. (Tampa, Florida) relating to the regulation of sexually oriented businesses and adverse secondary effects of sexually oriented businesses; the "Report to: The American Center for Law and Justice on the Secondary Impacts of Sex Oriented Businesses", Peter R. Hecht, Ph.D. (1996); and the findings of fact relating to the Adult Entertainment Code of Orange County, Florida, a neighboring and contiguous county in Central Florida, and the findings of fact relating to the Sexually Oriented Business and Adult Entertainment Establishment Ordinance of Seminole County, Florida, the county in which the City of Casselberry is located, matters and materials submitted at the public hearings relating to this Ordinance and other matters and documents relating to all of the above; the City Commission finds:

(1) Sexually oriented businesses and adult entertainment establishments lend themselves to ancillary unlawful and unhealthy activities that are presently uncontrolled or not adequately controlled by the operators of the establishments or businesses. Further, there are presently no mechanisms or inadequate mechanisms to make the owners of these businesses or establishments responsible for the activities that occur on their premises.

(2) Certain workers of certain sexually oriented businesses and adult entertainment establishments defined in this Article engage in a higher incidence of certain types of illicit sexual behavior than workers of other business establishments.

(3) Sexual acts, including masturbation, and oral and anal sex, occur at sexually oriented businesses and adult entertainment establishments, especially those which provide private or semi-private areas, booths or cubicles for viewing films, videos, live sex shows and those having physical interaction between workers and customers.

(4) Offering and providing such private spaces encourages such previously mentioned activities, which create unhealthy conditions.

(5) Persons frequent certain adult theaters, adult arcades, and other sexually oriented businesses and adult entertainment establishments for the purpose of engaging in sex within the premises of such businesses and establishments.

(6) At least 50 communicable diseases may be spread by activities occurring in sexually oriented businesses and adult entertainment establishments, including, but not limited to, syphilis, gonorrhea, human immunodeficiency virus infection (HIV-AIDS), genital herpes, hepatitis B, Non A, Non B amebiasis.

salmonella infections and shigella infections.

(7) Since 1981 and to the present, there has been an increasing cumulative number of reported cases of AIDS caused by the human immunodeficiency virus (HIV) in the United States - 600 in 1982, 2,200 in 1983, 4,600 in 1984, 8,555 in 1985 and 253,448 through December 31, 1992.

(8) As of December 31, 1995, there have been 51,838 reported cases of AIDS in the State of Florida.

(9) From 1981 to June 1996, the number of living persons testing positive for the HIV antibody with AIDs symptoms has risen to 73,217 in the 28 states having confidential reporting requirements.

(10) The number of cases of early (less than one year) syphilis in the United States reported annually has risen, with 33,613 cases reported in 1982 and 45,200 through November of 1990

(11) The number of cases of gonorrhea in the United States reported annually remains in a high level, with over one-half million cases being reported in 1990

(12) The surgeon general of the United States, in his report of October 22, 1986, has advised the American public that AIDS and HIV infection may be transmitted through sexual contact, intravenous drug abuse, exposure to infected blood and blood components, and from an infected mother to her newborn.

(13) According to the best scientific evidence, AIDS and HIV infection, as well as syphilis and gonorrhea, are principally transmitted by sexual acts.

(14) Sanitary conditions in some sexually oriented businesses and adult entertainment establishments are unhealthy, in part, because the activities conducted there are unhealthy, and, in part, because of the unregulated nature of the activities and the failure of owners and operators of the facilities to self-regulate those activities and maintain those facilities.

(15) Numerous studies and reports have determined that semen is found in the areas of sexually oriented businesses and adult entertainment establishments where persons view "adult" oriented films.

(16) The findings noted in paragraphs number 1 through 15 and as set forth hereinafter raise substantial governmental concerns.

(17) Sexually oriented businesses and adult entertainment establishments have operational characteristics which should be reasonably regulated in order to protect those substantial governmental concerns.

(18) A reasonable licensing procedure is an appropriate mechanism to place the burden of that reasonable regulation on the owners and the operators of the sexually oriented businesses and adult entertainment establishments. Further, such a licensing procedure will place a heretofore nonexistent incentive on the operators to see that the business or establishment is run in a manner consistent with the

good order, health, safety and welfare of its patrons and workers, as well as the citizens of the City. It is appropriate to require reasonable assurances that the licensee is the actual operator of the business or establishment, fully in possession and control of the premises and activities occurring therein.

(19) Removal of doors on adult booths and requiring sufficient lighting on premises with adult booths advances a substantial governmental interest in curbing the illegal and unsanitary sexual activity occurring in adult theaters.

(20) Requiring licensees of sexually oriented businesses and adult entertainment establishments to keep information regarding current workers and certain past workers will help reduce the incidence of certain types of criminal behavior by facilitating the identification of potential witnesses or suspects and by preventing minors from working at such businesses and establishments.

(21) The disclosure of certain information by those persons ultimately responsible for the day-to-day operation and maintenance of the sexually oriented business and adult entertainment establishments, where such information is substantially related to the significant governmental interest in the operation of such uses, will aid in preventing the spread of sexually transmitted diseases.

(22) It is desirable in the prevention of the spread of communicable diseases to obtain a limited amount of information regarding certain workers who may engage in the conduct which this Article is designed to prevent or who are likely to be witnesses to such activity.

(23) The fact that an applicant for an adult entertainment establishment or sexually oriented business license has been convicted of a sexually related crime leads to the rational assumption that the applicant may engage in that conduct in contravention of this Article.

(24) Commercial establishments exist or may exist within the City and other nearby cities and counties in central Florida where adult entertainment material is possessed, displayed, exhibited, distributed and/or sold for commercial purposes in the form of books, magazines, periodicals or other printer material, or photographs, films, motion pictures, prints, videotapes, slides, computer digital graphic recordings or other visual representations or recordings, or recordings or other audio matter, or instruments, novelties, devices, or paraphernalia which depict, illustrate, describe or relate to specified sexual activities or specified anatomical areas.

(25) Commercial establishments exist or may exist within the City and other nearby cities or counties in central Florida where adult entertainment and sexually oriented commercial activities in the form of nude, semi-nude, or topless dancers, entertainers, performers, or other individuals, who, for commercial gain, perform or are presented while displaying or exposing specified anatomical areas; or engage in straddle dancing or touching with customers.

(26) Commercial sexually oriented businesses exist or operate or may exist or operate within the City or other nearby cities or counties in central Florida where sexually oriented services are offered for commercial or pecuniary gain in the form of commercial physical contact, escort services and other services

providing sexual encounters. The workers of such sexually oriented businesses operating in central Florida engage in physical contact or touching with customers including, but not limited to, acts of prostitution, or encourage or entice the customers to engage in lewdness.

(27) The activities occurring at sexually oriented businesses and adult entertainment establishments occur at establishments and businesses which operate primarily for the purpose of making a profit and, as such, are subject to regulation by the City in the interest of the good order, health, safety, economy, property values, morals and general welfare of the people, businesses and industries of the City. A major industry which is important to the community's economic welfare is tourism by persons seeking to bring children to visit central Florida attractions who wish to stay in a community with a family atmosphere not dominated by commercialized sexual themes.

(28) When the activities occurring at sexually oriented businesses and adult entertainment establishments are present in establishments and businesses, other activities which are illegal, unsafe, or unhealthful tend to accompany them, concentrate around them, and be aggravated by them. Such other activities include, but are not limited to, prostitution, pandering, solicitation for prostitution, lewd and lascivious behavior, exposing minors to harmful materials, possession, distribution and transportation of obscene materials, sale or possession of controlled substances, and violent crimes against persons and property.

(29) When the activities occurring at sexually oriented businesses and adult entertainment establishments are competitively exploited in establishments and businesses, they tend to attract an undesirable number of transients, blight neighborhoods, adversely affect neighboring businesses, lower real property values, promote the particular crimes described above and, ultimately, lead residents and businesses to move to other locations.

(30) Sexually oriented businesses and adult entertainment establishments often have exterior signs or exterior appearance that lower the surrounding property values and contribute to urban decline.

(31) In order to reverse urban blight, the City of Casselberry has established a Community Redevelopment Area pursuant to Chapter 163, Florida Statutes. Sexually oriented businesses and adult entertainment establishments that contribute to urban blight operate at cross-purposes with Community Redevelopment Areas.

(32) The activities occurring at sexually oriented businesses and adult entertainment establishments sometimes occur in establishments and businesses concurrent with the sale and consumption of alcoholic beverages which concurrence leads to a further increase in criminal activity, unsafe activity, and disturbances of the peace and order of the surrounding community and creates additional hazards to the health and safety of customers and workers and further depreciates the value of adjoining real property harming the economic welfare of the surrounding community and adversely affecting the quality of life, commerce, and community environment.

(33) Physical contact or touching within sexually oriented businesses and adult entertainment

establishments between workers exhibiting specified anatomical areas and customers poses a threat to the health of both and promotes the spread of communicable and social diseases.

(34) In order to preserve and safeguard the good order, health, morals, safety, and general welfare of the people of the City it is necessary and advisable for the City to regulate the conduct of owners, managers, operators, agents, workers, entertainers, performers, and customers at sexually oriented businesses and adult entertainment establishments.

(35) The potential dangers to the good order, morals, health, safety, and general welfare of the people of the City posed by permitting a sexually oriented business or adult entertainment establishment to operate without first meeting the requirements for obtaining a license under this Article are so great as to require the licensure of such establishments prior to their being permitted to operate.

(36) Requiring operators of sexually oriented businesses and adult entertainment establishments to keep records of information concerning workers and certain recent past workers as well as customer contracts and other matters and materials will help reduce the incidence of certain types of criminal behavior by facilitating the identification of potential witnesses or suspects and by making it difficult for minors to work at or be customers in such establishments.

(37) Prohibiting sexually oriented businesses and adult entertainment establishments from operating within set distances of educational institutions, religious institutions, residences, areas zoned or designated for residential use, and parks at which minors are customarily found, will serve to protect minors from the adverse affects of the activities that accompany such establishments and businesses.

(38) Straddle dancing, unregulated private performances, and enclosed adult booths in sexually oriented businesses and adult entertainment establishments have resulted in indiscriminate commercial sex between strangers and poses a threat to the health of the participants and promotes the spread of communicable sexually transmitted diseases. Straddle dancing is primarily conduct rather than communication or expression.

(39) Workers at sexually oriented businesses and adult entertainment establishments engage in a higher incidence of certain types of unhealthy or criminal behavior than workers of other establishments and businesses including, but not limited to, a very high incidence of illegal prostitution or engaging in lewdness in violation of Chapter 796 of the *Florida Statutes*, operation without occupational licenses and illegal and unlicensed massage.

(40) Physical contact or touching between workers of sexually oriented businesses and adult entertainment establishments and customers poses a threat to the health of both and promotes the spread of communicable and sexually transmissible diseases.

(41) The practice of not paying workers at sexually oriented businesses and requiring them to earn their entire income from tips or gratuities from their customers who are predisposed to want sexual activity has resulted in a high incidence of prostitution and crimes related to lewdness by workers.

(42) Sexually oriented businesses involve activities that are pure conduct engaged in for the purpose of making a profit, rather than speech or expressive activity and, therefore, are subject to and require increased regulation to protect the health, good order, morals, welfare and safety of the community.

(43) Requiring sexually oriented businesses to post a listing of services provided and restrict services to those listed as well as maintaining a customer contract and transaction record in a daily register will discourage incidents of criminal behavior such as lewdness and prostitution thereby further safeguarding the health of both workers and customers and will assist facilitating the identification of potential witnesses or suspects if criminal acts do occur.

(44) This ordinance shall not be construed as opting the City of Casselberry out of the Seminole County Public Decency ordinance.

(45) The general welfare, health, good order, morals and safety of the citizens of the City will be promoted by the enactment of this Article.

(c) **Intent.** It is the intent of this Article to protect and preserve the good order, health, peace, morals, safety, and welfare of the citizens of the City of Casselberry. This Article regulates conduct and is not an ordinance that affects the use of land as contemplated by Section 166.041, *Florida Statutes* (1997).

(d) **Authority.** This Article is enacted under the constitutionally derived home rule power of the City of Casselberry in the interest of the good order, health, morals, peace, safety, and general welfare of the people of the City.

(e) **"Whereas" Clauses.** It is the City Commission's further intention to accomplish those intents and purposes expressed by the City Commission in the recital ("whereas" clauses) of this Article, each of which are incorporated by reference into this Section.

(f) **Speech Protection.** Nothing herein shall be construed to prohibit constitutionally protected expression or speech. This Article is intended to reasonably regulate the adult entertainment industry and sexually oriented businesses which engage in commercial activities involving acts or services of a sexually explicit nature or which involve acts or services involving matters which are sexual in nature

## Section 14-68.  Construction.

(a) This Article shall be liberally construed to accomplish its purpose of reasonably regulating sexually oriented businesses and adult entertainment establishments in order to reduce or eliminate adverse secondary effects of such businesses and establishments. *Barnes v. Glen Theater, Inc.*, 510 U.S. 560, 111 S. Ct. 2456, 115 L.Ed. 2d 504 (1991), and the recent litigation in St. Johns County (See *Café 20⁷, Inc. v. St. Johns County*, 856 F. Supp. 641 (M.D. Fla. 1994); *affirmed, Café 20⁷, Inc. v. St. Johns County*, 66 F.3d 272 (11th Cir. 1995); cert. denied, 134 L Ed. 2d.647 (U.S. April 22, 1996). This Article shall not be construed to authorize any illegal act under Federal law, State law or City ordinance. This Article is intended to reasonably regulate such matters in order to reduce or eliminate the adverse

secondary effects of commercial establishments and businesses. The provisions of this Article shall not be deemed to authorize a violation of Seminole County's Public Decency ordinance. The provisions of this Article shall be construed to be additional and supplemental to the Seminole County Public Decency ordinance and is in no way whatsoever intended to conflict with the Seminole County Public Decency ordinance. The regulation of alcoholic beverage establishments is also addressed in the City Code of the City of Casselberry and other provisions of law

(b) Unless otherwise indicated, all provisions of this Article shall apply equally to all persons, regardless of sex. Masculine pronouns, such as "he," "his," and "him," as employed in this Article, shall also be construed to apply to feminine pronouns and neutral pronouns, unless the context suggests otherwise. Words used in the singular number shall include the plural number, unless the context suggests otherwise.

## Section 14-69. Obscenity/indecent exposure unlawful.

As a matter of State and Federal law, obscenity is unlawful in the City of Casselberry. Likewise, State law prohibits indecent exposure. Nothing in this Article shall be construed to allow or permit the possession, distribution and transportation of obscene materials; to authorize the exposing of persons under eighteen (18) years of age to motion pictures, exhibitions, shows, representations and presentations of specified sexual activities or persons displaying or exhibiting specified anatomical areas; or the indecent exposure of a person as prohibited by State law

## Section 14-70. Definitions.

The following words and phrases defined in this section and used in this Article shall have the meaning herein prescribed, unless the context clearly suggests otherwise.

### Adult Bookstore/Adult Video Store:
(a) An establishment which, as its principal business purpose, sells or rents adult material or which offers adult materials for sale or rent as a significant portion of its stock and trade.

(b) Any establishment in which any one (1) or more of the following five (5) elements occur shall be presumed to be an adult bookstore/adult video store:

> (1) that the adult material is accessible to customers; "accessible to customers" means that the item can be physically touched, picked up, handled by a customer before being transferred from the control of a worker, or is visually displayed so that an adult or child present in the store can view substantially more than its name alone; or

> (2) that the individual items of adult material offered for sale and/or rental comprise more than twenty-five percent (25%) of the unused individual items publicly displayed at the establishment as stock in trade in the following categories: books, magazines, periodicals, other printed matter, slides, photographs, films, motion pictures, videotapes, compact disks, computer digital graphic recordings, other visual representations, audio recordings and other audio matter, and

more than twenty-five percent (25%) of the total used items publicly displayed at the establishments as stock in trade in each of the same categories set out above; or

(3) the gross income each month from the sale and rental of adult material comprises more than ten percent (10%) of that month's gross income from the sale and rental of the goods and material at the establishment; or

(4) the floor area used to display adult material comprises more than ten percent (10%) of the floor area used for display of all goods and material at the establishment; or

(5) the establishment uses any of the following terms in advertisements or any other promotional activities relating to the adult material: "XXX," "XX," "X," or any series of the letter "X" whether or not interspersed with other letters, figures or characters; "erotic" or deviations of that word; "adult entertainment," "adult books," "adult videos" or similar phases; "sexual acts" or similar phrases; "nude" or "nudies" or similar phrases which letters, words or phrases a reasonable person would believe to be promotional of the purchase or rental of adult material.

(c)  In recognition of the provisions of Sections 847.013 and 847.0133, *Florida Statutes*, which protects minors from exposure to obscene material, any business which is an adult bookstore/adult video store shall have in place at each entrance to such business a sign, no greater than one (1) square foot in size, stating "Persons under 18 years of age not permitted."

**Adult Booth**: A separate booth inside an adult entertainment establishment accessible to any person, regardless of whether a fee is charged for access. The term "adult booth" includes, but is not limited to, a "peep show" booth or arcade, or other booth used to view "adult material." The term "adult booth" does not include a foyer through which any person can enter or exit the establishment or a rest room.

**Adult Entertainment:**
(a)  The display or exposure of any specified anatomical area by a worker to a customer regardless of whether the worker actually engages in performing or dancing or where workers wear or display to a customer any covering, tape, pastie, or other device which simulates or otherwise gives the appearance of the display or exposure of any specified anatomical areas regardless of whether the worker actually engages in performing or dancing.

(b)  Providing adult material for commercial or pecuniary gain.

(c)  The offering, soliciting or contracting to dance or perform by a worker with or for a customer with the acceptance of any consideration, tip, remuneration or compensation from or on behalf of that customer.

(d)  The dancing or performing by a worker with or within three feet (3') of a customer with the

acceptance of any consideration. tip. remuneration. or compensation from or on behalf of that customer.

**Adult Entertainment Establishment**: An adult performance establishment. adult bookstore/adult video store, adult motel, or adult theater as those terms are defined herein. which is operated for commercial or pecuniary gain. An establishment with an adult entertainment license shall be presumed to be an adult entertainment establishment.

**Adult Material**:  One (1) or more of the following, regardless of whether it is new or used:

(a) Books, magazines, periodicals. or other printed matter. photographs. films. motion pictures. videotapes, video cassettes. slides. computer digital graphic recordings, or other visual representations, tape recordings, disks or other audio matter. which have as their primary or dominant theme matters depicting, illustrating, describing or relating to specified sexual activities or specified anatomical areas; or

(b) Instruments. novelties. devices or paraphernalia which are designed for use in connection with specified sexual activities. excluding bona fide birth control devices.

**Adult Model**: Any person who, for commercial or pecuniary gain, offers. suggests. or agrees to engage in a private performance. modeling or display of male or female lingerie. bathing suits. under garments. or specified anatomical areas to the view of a customer.

**Adult Motel**: Any motel. hotel. boarding house. rooming house or similar commercial establishment which offers accommodations to the public for any form of consideration whose advertisements or business name includes the word "adult" or which advertises to the public outside of the premises of the establishment and visible from a public right-of-way the presentation of closed-circuit television transmissions, films, motion pictures, video tapes, video cassettes, slides or other photographic reproductions, which have as their primary or dominant theme matters depicting, illustrating or relating to specified sexual activities or specified anatomical areas. The term "adult motel" is included within the definition of "adult theater."

**Adult Performance Establishment**:
(a)  Any establishment where any worker:

> (1) engages in a private performance. acts as an adult model. or displays or exposes any specified anatomical areas to a customer, regardless of whether the worker engages in dancing or any particular activity; or

> (2) wears and displays to a customer any covering, tape, pastie, or other device which simulates or otherwise gives the appearance of the display or exposure of any specified anatomical areas, regardless of whether the worker actually engages in performing or dancing; or

(3) offers, solicits, or contracts to dance or perform with or for a customer and accepts any consideration, tip, remuneration or compensation from or on behalf of that customer; or

(4) dances or performs with or within three feet (3') of a customer and accepts any consideration, tip, remuneration, or compensation from or on behalf of that customer.

(b) A bona fide private club whose membership as a whole engages in social nudism or naturalism as in a nudist resort or camp and at which specified sexual activities do not occur shall be presumed not to be an adult performance establishment.

(c) It is an affirmative defense to an alleged violation of this Code regarding operating an adult performance establishment without a license if the alleged violator demonstrates that the predominant business or attraction of the establishment is not offering to customers of entertainment which is intended to provide sexual stimulation or sexual gratification to such customers and the establishment and its advertising is not distinguished by an emphasis on or the promotion of matters or persons depicting, describing, displaying, exposing, simulating or relating to specified sexual activities or specified anatomical areas.

**Adult Theater**:  An establishment which consists of an enclosed building, or a portion or part of an enclosed building, or an open-air area used for viewing by persons of films, motion pictures, video cassettes, video tapes, slides, computer digital graphic recordings, or other photographic reproductions which have as their primary or dominant theme, matters depicting, illustrating or relating to specified sexual activities or specified anatomical areas. "Adult motels," and "adult booths" are included within the definition of "adult theater."

**Adult Video Store**:  See "Adult Bookstore."

**Alcoholic Beverages**:  All distilled spirits and all beverages containing one-half (½) of one (1) percent ( 005) or more alcohol by volume. It shall be prima-facie evidence that a beverage is an alcoholic beverage if there is proof that the beverage in question was or is known as beer, wine, whiskey, moonshine whiskey, moonshine, shine, rum, gin, tequila, bourbon, vodka, scotch, scotch whiskey, brandy, malt liquor, or by any other similar name or names, or was contained in a bottle or can labeled as any of the above names, or a name similar thereto, and the bottle or can bears the manufacturer''s insignia, name, or trademark. Any person who, by experience in the handling of alcoholic beverages, or who by taste, smell, or drinking of such alcoholic beverages has knowledge of the alcoholic nature thereof, may testify as to his opinion about whether such beverage is an alcoholic beverage.

**City Commissioner**:  The City Commissioners of the City of Casselberry, Florida.

**Commercial Bodily Contact:**
(a) The manipulation, washing, scrubbing, stroking, or touching, for commercial or pecuniary gain, of the body of another person directly, or indirectly through a medium or using any object, instrument, substance, or device between a worker and a customer.

(b) The following persons engaged in the bona fide performance of the following activities shall not be deemed to be engaging in commercial bodily contact for the purposes of this Article when they are engaged in the bona fide practice of their occupation or profession:

> (1) Persons licensed as a massage therapist or apprentice massage therapist pursuant to Chapter 480, *Florida Statutes*, when providing massage services in an establishment licensed under Chapter 480, *Florida Statutes*
>
> (2) Persons licensed under the laws of the State of Florida to practice medicine, surgery, osteopathy, chiropody, naturopathy, or podiatry
>
> (3) Persons licensed under the laws of the State of Florida as a physician's assistant or nurse.
>
> (4) Persons holding a drugless practitioner's certificate under the laws of the State of Florida.
>
> (5) Persons licensed as barbers or cosmetologists under the laws of the State of Florida.
>
> (6) Persons performing authorized services in a hospital, nursing home, sanitarium, adult congregate living facility, group home, day care center, or similar place of business when owned and operated in accordance with the laws of the State of Florida.
>
> (7) Persons who are instructors, coaches, or athletic trainers employed by, or on behalf of, any professional, amateur, Olympic, or similar athletic team engaging in bona fide athletic events, or when employed by a governmental entity or a bona fide educational institution.
>
> (8) Persons licensed as physical therapists under the laws of the State of Florida.

**Commercial Bodily Contact Establishment:** Any establishment, business, or place operated for commercial or pecuniary gain or where for any form of consideration workers or customers engage in commercial bodily contact or any establishment, business or place any portion of which is set aside, advertised, promoted or used as a place where commercial bodily contact occurs or which is described or depicted as a "body scrub salon," "body wash salon," or "body relaxation salon."

**Commercial or Pecuniary Gain**: Operated for commercial or pecuniary gain shall be presumed for any establishment which has received an occupational license. For the purposes of this Article, operation for commercial or pecuniary gain shall not depend on actual profit or loss. An establishment which has an occupational license or an establishment which advertises itself as a type of adult entertainment establishment shall be presumed to be "operated for commercial or pecuniary gain."

**Commercial Establishment**: Any business, location, or place which conducts or allows to be conducted on its premises any activity for commercial or pecuniary gain.

**Conviction**: A determination of guilt resulting from plea or trial, regardless of whether adjudication was

withheld or whether imposition of sentence was suspended.

**Customer:**
(a) Any person present at an adult entertainment establishment or sexually oriented business, other than operators or workers, regardless of whether the person has given or paid any consideration to be present at the adult entertainment establishment or sexually oriented business and regardless of whether the person has paid any money for goods or services at or to the adult entertainment establishment or sexually oriented business.

(b) Any person, excluding a worker or operator, who has paid, or has offered, agreed, been solicited, or had someone else offer or agree on that person's behalf to pay any consideration, fee, or tip to an operator or worker of an adult entertainment establishment or sexually oriented business.

**Educational institution:** A premises or site upon which there is an institution of learning for minors, whether public or private, which conducts regular classes and/or courses of study required for eligibility to certification by, accreditation to, or membership in the State Department of Education of Florida, Southern Association of Colleges and Secondary Schools, or the Florida Council of Dependent Schools. The term "educational institution" includes a premises or site upon which there is a nursery school, kindergarten, elementary school, junior high school, senior high school, or any special institution of learning, a vocational institution, professional institution, an institution of higher education, a community college, junior college, four (4) year college or university.

**Entity:** Any proprietorship, partnership, corporation, association, business trust, joint venture, joint-stock company or other for profit and/not for profit organization by whatever name, title or description.

**Escort:** Any person who, for commercial or pecuniary gain, compensation or tips, agrees to, offers to go, or goes to any place, including, but not limited to, a business, hotel, motel, residence, boat, vessel, motor vehicle, or other mode of transportation to do any of the following acts:

(a) act as a companion or date for, or converse with a customer;

(b) engage in commercial bodily contact with another person;

(c) engage in a private performance;

(d) engage in adult modeling or act as an adult model;

(e) display specified anatomical areas, strip naked, or go topless; or

(f) engage in any specified sexual activity

Nothing in this definition shall be construed to legalize prostitution or other conduct prohibited by this Code or other law. Workers of a licensed adult performance establishment for whom worker records

are maintained pursuant to this Article are excluded from the definition of escort when engaged in the expressive display of specified anatomical areas at a licensed adult performance establishment.

An escort who is a paid employee type worker of an escort service for whom taxes and social security payments are withheld and paid by the escort service, and who is not an independent contractor, is not required to obtain his or her own sexually oriented business license for activities conducted pursuant to employment with the escort service

**Escort Service:** A person, business, establishment, or place operated for commercial or pecuniary gain, which advertises as an "escort", "escort service" or "escort agency" or otherwise offers or advertises that it can furnish escorts, a private performance, or adult models; or offers or actually provides, arranges, dispatches, or refers workers or themselves to act as an escort or engage in a private performance for a customer.  Defense  A bona fide dating or matching service which arranges social matches or dates for two (2) persons who each wish to meet a compatible companion when neither of said persons solicits, accepts, or receives any financial gain or any monetary tip, consideration, or compensation for the meeting or date is not an escort service.

**Establishment:** Any place, site, or premises, or portion thereof, upon which any person, corporation, or business conducts activities or operations for commercial or pecuniary gain including, but not limited to, any place, site or premises from where an escort service dispatches or refers workers to other locations or at which an escort service receives business calls from customers.

**Law Enforcement Officer:** An officer who is on official duty for any law enforcement agency

**Licensee:** Any person, corporation, partnership, or other entity whose application for an adult entertainment establishment or sexually oriented business license has been granted and any person, corporation, partnership or other entity who owns or operates or controls the establishment or business.

**Operator:** Any person who engages in or performs any activity which is necessary to or which facilitates the operation of a sexually oriented business or an adult entertainment establishment including, but not limited to, the licensee, manager, owner, doorman, bouncer, bartender, disc jockey, sales clerk, ticket taker, movie projectionist, dispatcher, receptionist, attendant or supervisor.

**Park:** A tract of land within any jurisdiction which is kept for ornament or recreation and which is maintained as public property including, but not limited to, a playground, nature trails, swimming pool, reservoir, athletic field, basketball or tennis courts, pedestrian/bicycle paths, wilderness areas or other similar public land.

**Person:** Includes, but is not limited to, an individual, associations, joint ventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and any and all other similar entities and all officers, directors and principal stockholders of such associations, joint ventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations or other similar entities.

**Private Performance**: Modeling, posing, or the display or exposure of any specified anatomical area by a worker to a customer while the customer is in an area not accessible during such display to all other persons in the establishment or, while the customer or worker is in an area which is not on the premises of the establishment, or in which the customer or worker is totally or partially screened or partitioned during such display from the view of persons outside of the area.

**Sexual Encounter Business:**
(a) Any person or entity which for any form of consideration or remuneration or which charges an admission fee and provides a place for the purpose of providing, encouraging or allowing three (3) or more persons to engage in any specified sexual activity among themselves or with other persons.

(b) The following shall be presumed not to be a sexual encounter business: (1) a bona fide private club whose membership as a whole engages in social nudism or naturalism as in a nudist resort or camp and at which specified sexual activities do not occur. (2) a State licensed sexual therapist, and (3) a bona fide hotel or motel licensed by the State.

**Sexually Oriented Business**: A commercial bodily contact establishment, escort service, or sexual encounter business. A business shall be a sexually oriented business, whether services are provided on the premises of an establishment or on an out call basis at any other place and regardless of whether such business is licensed under this Article. A business with a sexually oriented business license shall be presumed to be a sexually oriented business. An individual operating a sexually oriented business is subject to the provisions of this Article notwithstanding the fact that services are being provided at or from a residence, motor vehicle, vessel or any other location and a license pursuant to this Article is required unless the individual is a paid employee for whom taxes and social security payments are withdrawn and paid by the licensed establishment, worker records are maintained, and the individual is not an independent contractor.

**Police Chief**: The Chief of Police of the City of Casselberry, Florida.

**Specified Anatomical Areas**: (Editor's note: The source of the footnotes below is The New Webster's Medical Dictionary (Bolander, 1991). The definitions of terms set forth in the footnotes are a material part of this Article and apply to the use of the term each time it is used in this Article.)

(a)  Any of the following in a state that is less than completely and opaquely covered:

(1)  the male or female genitals[1]:

---

[1]Genitals, Genitalia - Organs of the reproductive system, especially the external organs.

(2) the male or female pubic area[2];

(3) the vulva[3];

(4) the anus[4];

(5) the penis[5];

(6) the scrotum[6];

(7) the cleavage of the buttocks;

(8) the buttocks;

(9) the anal[7] cleft;

(10) the anal cleavage;

(11) the areola[8] on the breast[9] of a female;

(12) the nipple[10] on the breast of a female;

(13) the female breast below a line immediately above the top of the areola said line running horizontal across the top of the entire breast, but shall not include any portion of the cleavage between the human female breasts typically exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided that the areola is not exposed .

(14) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(b) Body paint, body dyes, tattoos, liquid latex whether wet or dried, dental floss, G-Strings, thongs, and similar coverings shall not be considered an opaque covering.

**Specified criminal act:**

(a) A violation of this Article.

(b) Any felony not otherwise specified in this definition;

---

[2] Pubic Area - (1) Pubes, the pubic region; the anterior region of the innominate bone covered with pubic hair; os pubis. (2) Pubic, pertaining to the pubes. (3) Pubis, pubic bone, or the innominate bone.

[3] Vulva - External female genitalia, including the mons pubis, labia majora and minora, clitoris and vestibule of the vagina.

[4] Anus - Outlet of the rectum leading from the bowel.

[5] Penis - The male organ for urination and copulation, a pendulous structure that is suspended from the front and the sides of the pubic arch.

[6] Scrotum - The external double pouch that contains the testicles.

[7] Anal - A ring, pertaining to the rectal opening; near the anus.

[8] Areola - The colored circle surrounding the nipple of the female breast.

[9] Breasts - The upper anterior aspects of the chest of a woman; mammary glands.

[10] Nipple - Mammilla papilla, a protuberance from the mammary gland from which the lactiferous ducts discharge milk in the female.

(c) An offense under Chapter 794. *Florida Statutes* (Sexual Battery);

(d) An offense under Chapter 796. *Florida Statutes* (Prostitution);

(e) An offense under Chapter 800, *Florida Statutes* (Lewdness; Indecent Exposure);

(f) An offense under Chapter 826. *Florida Statutes* (Bigamy; Incest);

(g) An offense under Chapter 847. *Florida Statutes* (Obscene Literature; Profanity); or

(h) An offense against an analogous Federal statute or the statutes of a state other than Florida, or an analogous ordinance of another county or city.

**Specified sexual activities**: (Editor's note: The sources for the footnotes below are (1) Taber's Cyclopedic Medical Dictionary. T.A. Davis Co., Philadelphia, 1997 (ed. 18); (2) Oxford Dictionary of the English Language (multi-volume); (3) *Florida Statutes*. The definitions of terms set forth in the footnotes are a material part of this Article and apply to the use of the term each time it is used.)

(a) human genitals in a state of sexual stimulation, arousal or tumescence; or

(b) acts of human anilingus[11], bestiality[12], buggery[13], cunnilingus[14], coprophagy[15], coprophilia[16], fellatio[17], flagellation[18], masochism[19], masturbation[20], necrophilia[21], pederasty[22], pedophilia[23], sadism[24],

---

[11]Anilingus - Oral stimulation of the anus by use of the tongue or lips.
[12]Bestiality - (1) Use of animals for sexual enjoyment or any sexual act between a person and an animal involving the sex organ of the one and the mouth, anus, penis or vagina of the other.
[13]Buggery - Sodomy.
[14]Cunnilingus - Sexual activity in which the mouth and tongue are used to stimulate the female genitalia.
[15]Coprophagy - The eating of excrement.
[16]Coprophilia - An abnormal interest in feces.
[17]Fellatio - Oral stimulation of the penis.
[18]Flagellation - Whipping or a massage by strokes which is a form of sexual aberration in which the libido is stimulated by whipping oneself, being whipped, or whipping someone else.
[19]Masochism - Sexual excitement by being humiliated or hurt by another or a sexual perversion in which one takes delight in being dominated, even to the extent of violence or cruelty, by another person.
[20]Masturbation - Stimulation of genitals or other erogenous areas by some means other than sexual intercourse, such as a hand or object.
[21]Necrophilia - Sexual intercourse with a dead body.
[22]Pederasty - Anal intercourse between a man and a young boy.
[23]Pedophilia - Fondling of children or any other sexual relations with a child.
[24]Sadism - Sexual pleasure derived from inflicting mental or physical pain on others.

sadomasochism[25]. sapphism[26]. sexual intercourse[27]. sodomy[28]. urolagnia[29]. or zooerasty[30]: or

(c) fondling or other touching of human genitals. pubic region. any part of the buttocks. anus or female breast; or

(d) oral, anal, or vaginal penetration by, or union with, the sexual organ or any other part of the body of another;

(e)  anal or vaginal penetration of another or oneself with any object; or

(f) the handling or fondling of the sexual organ of another for the purpose of masturbation directly or through a medium; or

(g) excretory functions as part of or in connection with any of the activities set forth in subsections (a) through (f).

**Straddle Dance**:
(a) The use by a worker of any part of his or her body to touch the genital or pubic area of another person. or the touching of the genital or pubic area of any worker by another person; or the straddling of the legs of a worker over any part of the body of a customer at the establishment. regardless of whether there is a touch or touching; or the use by a worker. of any part of his or her body to touch the genital. pubic region, buttock. anus or female breast of another person while at the establishment, or the touching of the genital, pubic region, buttock, anus or female breast of any worker by a customer while at the establishment.

(b) Conduct shall be a "straddle dance" regardless of whether the "touch" or "touching" occurs while the worker is displaying or exposing any specified anatomical area.

(c) Conduct shall also be a "straddle dance" regardless of whether the "touch" or "touching" is direct or through a medium.

(d) The terms "lap dance," "table dance," and "face dance" are included within the term "straddle

---

[25]Sadomasochism - Sexual pleasure related to sadism and masochism.
[26]Sapphism - Lesbianism, i.e., the unnatural sexual relationship between women such as cunnilingus, anilingus, masturbation, etc.
[27]Sexual intercourse - Sexual union between a man and a woman by insertion of the penis into the vagina.
[28]Sodomy - Anal intercourse.
[29]Urolagnia - Sexual excitation associated with urination (e.g., watching another person urinate or having another person urinate on one's own body.)
[30]Zooerasty - Bestiality.

dance".

**Worker:** A person who works, performs, or provides services at an adult entertainment establishment or at or for a sexually oriented business, irrespective of whether said person is paid a salary or wage and shall include, but is not limited to, employees, independent contractors, subcontractors, lessees, or sub-lessees who work or perform at an adult entertainment establishment or at or for a sexually oriented business. An operator is a type of worker.

## Section 14-71. Notice.

Any notice required under this Article shall, unless otherwise provided in this Article, be accomplished by posting upon the subject premises and sending a written notification by certified mail to the mailing address set forth on the application for the license or a permit. This mailing address shall be considered the correct mailing address unless the City Manager or his designee has been otherwise notified in writing.

## Section 14-72. Penalties/remedies/relief.

Any person violating any of the provisions of this Article shall be prosecuted in the same manner as misdemeanors are prosecuted. Such violations shall be prosecuted in the name of the State of Florida in a court having jurisdiction of misdemeanors by the prosecuting attorney thereof and, upon conviction, shall be punished by a fine not to exceed Five Hundred and No/100 Dollars ($500.00) or by imprisonment in the County jail not to exceed sixty (60) days or by both fine and imprisonment as provided in Section 162.22, *Florida Statutes* (1997). Each incident or separate occurrence of any act that violates this Article shall be deemed a separate offense. In addition to the penalties provided under this section, violators of this Article shall be subject to any other appropriate civil or criminal action provided by law in a court of competent jurisdiction, including, but not limited to, injunctive relief.

## Section 14-73. License required.

(a) **Requirement.** It is unlawful for any person to operate or to be an operator of or worker at a sexually oriented business or an adult entertainment establishment which has not first obtained a license which is applicable for said establishment or business pursuant to this Article; or to continue to operate or be an operator of or worker at a sexually oriented business or an adult entertainment establishment where that person knows or has reason to know that the license of the establishment or business is under suspension, has been revoked or has lapsed. The operation of a sexually oriented business or an adult entertainment establishment without a valid license, where applicable, is unlawful and shall be grounds for the closing of the establishment or business upon a finding of fact by a court or other body with proper jurisdiction that the establishment does not have a valid license.

(b) **Licensing Office.** Unless the City Manager designates in writing an office to administer the provisions of this Article, he shall serve as the licensing office. The City Manager may modify his designation from time to time in writing. When the phrase "City Manager or his designee" is used in this Article, the designee referred to shall be the office designated in writing pursuant to this Subsection.

(c) **Classifications.** Adult entertainment establishment and sexually oriented business licenses referred to in this Article shall be classified as follows:

    (1)  Adult bookstore/adult video store;

    (2)  Adult performance establishment;

    (3)  Adult motel;

    (4)  Adult theater;

    (5)  Commercial Bodily Contact Establishment;

    (6)  Escort Service.

(d) **Single License/Single Classification of License.** Only one (1) license may be issued for a location and only under a single classification.

### Section 14-77. Responsibilities of other offices and departments.

The City Commission is the legislative branch of the City of Casselberry government. Ultimate responsibility for the administration of this Article is vested in the City Manager or his designee as set forth in this Article. Other departments having responsibility under this Article are as follows:

(a) The Community Development Department is responsible for granting, denying, revoking, renewing, suspending and canceling occupational licenses in accordance with State law

(b) The Police Chief is responsible for verifying information contained on applications for inspecting proposed or existing adult entertainment establishments and sexually oriented businesses in order to ascertain compliance with applicable criminal statutes and ordinances including, but not limited to, those set forth in this Article, for determining whether license applicants have been convicted of a felony or a specified criminal act within the previous five (5) years and for enforcing applicable criminal statutes and ordinances including, but not limited to, those set forth in this Article.

(c) The Building Official is responsible for inspecting establishments in order to ascertain compliance with all applicable building codes, statutes, ordinances and regulations.

(d) The Fire Chief is responsible for inspecting establishments and businesses in order to ascertain compliance with all applicable fire codes, statues, ordinances and regulations.

(e) The Community Development Department is responsible for ascertaining whether the location of proposed sexually oriented businesses or adult entertainment establishments comply with all separation, distance, zoning and location requirements of the Land Development Regulations of the City of

Casselberry and whether compliance with all applicable zoning regulations and land use laws is maintained.

### Section 14-78.  License application and application fee.

Any person desiring to engage in the business of operating an adult entertainment establishment or a sexually oriented business shall file with the City Manager or his designee a sworn application on forms supplied by the City.  The application shall contain the information and documents as provided in this Article and shall be accompanied by an application fee as established in this Article.  The application shall be signed by the applicant and verified by the applicant before an officer authorized to take oaths and acknowledgments.

### Section 14-80.  Contents of application.

(a)  The completed application. shall be accompanied by the following documents and shall be accompanied by a non-refundable application fee of TWO HUNDRED AND NO/100 DOLLARS ($200 00) which shall be used to defray the costs of the application review process by various offices and departments; provided, however, that the fee shall be applied as a credit toward the annual license fee for licensing under this Article:

(b)  If the applicant is:

(1) an individual. the individual shall state his or her legal name to include any and all aliases, residential street address, residential telephone number, an address where all correspondence from the City should be mailed, and submit proof that he is eighteen (18) years of age by providing a copy of a valid driver's license, voter's registration card or another State issued identification card; or a certified copy of a birth certificate; or

(2) a partnership or trust, the partnership or trust shall state its complete name, and the names. residential street addresses, and telephone numbers of all partners. whether the partnership is general or limited or trustees. the name and residential street address of at least one (1) person authorized to accept service of process and, if in existence, a copy of the partnership agreement; or

(3) a corporation, the corporation shall provide a copy of its articles of incorporation stating its complete name, the date of its incorporation. evidence that the corporation is in good standing, the names, residential street addresses, telephone numbers and capacity of all officers, directors and principal stockholders. and, if applicable, the name of the registered corporate agent and the legal street address of the registered office for service of process.

(4)  Any other entity, the entity shall state its complete name. the date of formation, the names, residential address. telephone numbers and capacity of all principal owners, and the name and residential street address of one (1) person authorized to accept service of process.

(c) If the applicant intends to conduct activities in the establishment or business under a name other than that of the applicant, the applicant shall state the establishment's or business' fictitious name or names and the county of registration under Section 865.09, *Florida Statutes*, or its successor and all business names and telephone numbers to be used by the establishment or business.

(d) The applicant shall state whether the applicant or any of the other individuals listed on the application has, within the five (5) year period immediately preceding the date of the application, been convicted of a specified criminal act, and, if so, the specified criminal act involved, the date of conviction and the place of conviction.

(e) The applicant shall state whether the applicant or any of the other individuals listed pursuant to subsection (b) has had a previous license under this Article suspended or revoked including the name and location of the establishment for which the license was suspended or revoked, the date of the suspension or revocation, and whether the applicant or any other individuals listed pursuant to subsection (b) has been a partner in a partnership or an officer, director or principal stockholder of a corporation whose license under this Article has previously been suspended or revoked, including the name and location of the establishment for which the license was suspended or revoked, as well as the date of the suspension or revocation.

(f) The applicant shall state whether the applicant or any other individuals listed pursuant to subsection (b) holds any other licenses under this Article and, if so, the names and locations of such other licensed establishments.

(g) The applicant shall state the single classification of license for which the applicant is filing.

(h) The applicant shall state the location of the proposed establishment or business including a street address, the name and address of the real property owner of the site, a notarized statement of consent from the real property owner authorizing a sexually oriented business or adult entertainment establishment on the site, and a legal description of the property on which the establishment is to be located.

(i) The applicant shall provide the names of the workers for the proposed establishment or business, if known, or, if presently unknown a statement to that effect.

(j) The applicant shall submit a plan drawn to appropriate scale of the proposed licensed premises indicating the areas to be covered by the license, all windows, doors, entrances and exits and the fixed structural features, walls, stages, partitions, projection booths, admission booths, adult booths, concession booths, stands, counters and similar structures of the establishment or business to which the proposed license pertains. The term "fixed structural features" shall include immovable partitions and counters and similar structures that are intended to be permanent.

(k) The applicant shall provide a mailing address, and, if different, a designated return address where all future correspondence from the City may be sent and the applicant's telephone number where communications and inquiries can be made.

(l) The applicant shall provide a recent color photograph of the applicant in passport size if an individual and of each officer, director and principal stockholder if a partnership, corporation or other similar entity

(m) The applicant shall provide the weight, height, color of eyes, date of birth and gender of the applicant if an individual and of each officer, director and principal stockholder or owner if a partnership, corporation or other similar entity.

(n) The applicant shall provide the applicant's social security account number or employer's tax identification number and either the applicant's drivers license number or the number of a Federal or State issued identification card if an individual and of each officer, director and principal stockholder or owner if a partnership, corporation or other similar entity

(o) The applicant shall provide a complete set of the applicant's fingerprints if an individual and of each officer, director and principal stockholder or owner if a partnership, corporation or other similar entity.

(p) The applicant shall provide a copy of the most recent lease or deed of conveyance, whichever is applicable, indicating the applicant's interest in the proposed establishment

(q) The applicant shall provide a statement of the hours of operations of the establishment or business.

(r) The applicant shall provide a notarized statement that the applicant has complied with the applicable laws of Florida relating to corporations, partnerships and fictitious names

(s) It is unlawful for any person applying for an adult entertainment establishment or sexually oriented business license to make a false statement which is intended to facilitate the issuance of a license or to provide false information which is intended to facilitate the issuance of a license.

**Section 14-81.   Continuing duty/false or misleading information.**

(a) Each applicant shall be under a continuing duty and obligation to disclose to the City Manager or his designee any and all changes or alterations in the information or disclosures required by this Article. It is the duty of each applicant to correct changed, false or erroneous information provided in an application. It is unlawful for an applicant to fail to disclose changes in information provided or to fail to correct false or erroneous information given in an application immediately upon the applicant knowing or being in such a position that he or she should have known that the information provided has changed or was false or erroneous when provided.

(b) It is unlawful for any person applying for an adult entertainment establishment or sexually oriented business license to make a false or misleading statement or provide false or misleading information which is intended to facilitate the issuance of a license.

**Section 14-82.   Consent.**

By applying for a license under this Article, the applicant shall be deemed to have consented to the provisions of this Article.

## Section 14-83. Investigation of applicant.

Upon receipt of an application properly filed with the City Manager or his designee and upon payment of the non-refundable application fee, the application shall be time and date stamped and a copy of the application shall be forwarded to the Police Chief, the Fire Chief, the Building Official, and the Community Development Department. Each recipient entity shall promptly conduct an investigation of the applicant, application and the proposed establishment within fifteen (15) days from the date that the application was filed. At the conclusion of its investigation, each recipient entity shall indicate to the City Manager or his designee its investigative findings relating to the application and the reasons therefor.

## Section 14-84. Issuance or denial of license.

(a) Upon the completion of the investigation and a review of the application as required; upon determination that the applicant meets the requirements of this Article and upon payment of the appropriate license fee by the Applicant, the City Manager or his designee shall within thirty (30) days of the application being filed issue the license.

(b) If after review and investigation as provided herein the City Manager or his designee determines that one (1) or more of the reasons for denial set forth in Section 14-85 exist, the application shall be denied, within thirty (30) days of the date that the application is filed, and the City Manager or his designee shall issue a written and dated notice of the denial and the reasons therefor. A copy of the notice shall be sent to the applicant by certified mail to the designated return address on the application within five (5) days of the date of denial.

(c) If an application has neither been affirmatively issued or denied within thirty (30) days after the application was filed, the establishment or business shall be allowed to open and operate unless and until the application is denied by the City Manager or his designee.

(d) The denial of an application shall be final. No further exhaustion of administrative remedies shall be necessary for judicial review of the administrative action.

(e) An applicant whose application is denied may immediately appeal as a matter of right to a court of competent jurisdiction, which court shall promptly review said application.

## Section 14-85.  Reasons for denial of application of license.

The application for a license shall be denied if one (1) or more of the following reasons is found:

(a) The application does not comply with the requirements of this Article.

(b) The application contains material false information.

(c) The applicant or any of the individuals stated in Section 14-80 of this Article has a license under this Article which is under suspension.

(d) The applicant or any of the individuals stated in Section 14-80 of this Article is or was at the time of suspension an officer, director or principal stockholder in an entity who has a license under this Article which is under suspension.

(e) The applicant or any of the individuals stated in Section 14-80 of this Article had a license under this Article which had been revoked within the preceding two (2) years.

(f) The applicant or any of the individuals stated in Section 14-80 of this Article is or was at the time of suspension an officer, director or principal stockholder in an entity who had a license under this Article which had been revoked within the preceding two (2) years.

(g) The granting of the application would violate a statute or ordinance or an order from a court of law which effectively prohibits the applicant from obtaining an adult entertainment establishment or sexually oriented business license.

(h) The applicant has failed to comply with Chapter 607, *Florida Statutes*, relating to corporations, Chapter 620, *Florida Statutes*, relating to partnerships, or Section 865 09, *Florida Statutes*, relating to fictitious names.

**Section 14-86. Reapplication after denial.**

The applicant may not reapply for a license for a period of nine (9) months from the date of denial unless there has been an intervening change in the circumstances which may lead to a different decision regarding the former reason(s) for denial.

**Section 14-87. Annual license fee.**

(a) There shall be collected under this Article annual license fees for the following classifications of adult entertainment establishments and sexually oriented businesses:

(1) Adult bookstore/adult video store - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($750.00);

(2) Adult theater - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($750.00);

(3) Adult performance establishments - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS

($750 00);

(4) Adult motel - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($750 00);

(5) Commercial bodily contact establishment - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($750 00), and

(6) Escort Service - SEVEN HUNDRED FIFTY AND NO/100 DOLLARS ($750 00).

(b) The annual license fees are declared regulatory in nature. collected for the purpose of examination and inspection of adult entertainment establishments and sexually oriented businesses under this Article and the administration thereof. These regulatory fees are in addition to. and not in lieu of. the occupational licenses taxes imposed by the Casselberry City Code or State law and other land development or regulatory fees associated with general commercial activities and locations.

### Section 14-88. Contents of license. term of license. renewals. expiration. lapse.

(a) **Contents.** An adult entertainment establishment or sexually oriented business license shall state on its face the name of the licensee. the name of the establishment. the street address of the establishment. the classification of the license. the date of issuance. and the date of expiration.

(b) **Term.** All licenses issued under this Article shall be annual licenses which shall commence running on October 1. on which date they shall have been paid for, and shall expire on September 30 of the following year. If a license is issued after October 1, but by March 31 of the following year, the applicant shall pay the appropriate license fee in full. If a license is issued after March 31, but by October 1 of the same year, the applicant shall pay one-half the appropriate license fee.

(c) **Expiration/Renewal/Lapse.** Each license shall expire on September 30 of each year and may be renewed only by making an application for a license in accordance with the provisions of this Article. Applications for renewal shall be made at least thirty (30) days before the expiration date of the license. Failure to make application at least thirty (30) days before the expiration date will not suspend the expiration of the license. If the application for a renewal is denied, the applicant may immediately appeal to a court of competent jurisdiction, which court shall provide prompt judicial review of said appeal.

(d) **Currently Licensed Establishments.** An adult entertainment establishment licensed by the City of Casselberry on the effective date of this ordinance may continue to operate under its current license until September 30, 1999, but shall apply for a new license on or before August 31, 1999, and shall be immediately subject to all requirements and provisions of this Article upon the effective date of this Article.

### Section 14-89. Records and reports.

Each licensee shall keep such records and make such reports as may be required by this Article.

**Section 14-90.  Transfer of license.**

It is unlawful for a licensee to transfer his, her or its license to another person or entity or surrender posses-sion, control, and operation of the licensed establishment to such other person or entity

**Section 14-91.  Establishment name change.**

It is unlawful for a licensee to change the name of an adult entertainment establishment or sexually oriented business unless and until the following requirements are satisfied:

(a)  The City Manager or his designee is given thirty (30) days' notice in writing of the proposed name change; and

(b)  The change of name fee in the amount of FIVE HUNDRED AND NO/100 DOLLARS ($500 00) is paid; and

(c)  The licensee has complied with Section 865 09, *Florida Statutes.*; and

(d)  The licensee has complied with the provisions of Chapter 607, *Florida Statutes*; and

(e)  The licensee has complied with the provisions of Chapter 620, *Florida Statutes*

**Section 14-92.  Suspension and Revocation of License.**

The City Manager or his designee shall suspend a license when he or his designee determines that any one (1) of the following has occurred:

(a)  For purposes of this Section 14-92, the term "violation" shall mean an incident having occurred at, or by, an adult entertainment establishment or sexually oriented business which is prohibited by the provisions of this Article or made unlawful by Chapters 561, 562, 563, 564, 565, 794, 796, 800, 826, 827, 847, 893 or 895, Florida Statutes, or an analogous federal statute.

(b)  <u>Inspection of Records and Premises</u>.  In the event that the City Manager or his designee determines that the licensee or an operator at or of the licensee has refused to allow any inspection of records or premises as required by this Article; the City Manager or his designee may suspend the license for a period not to exceed thirty (30) days.

(c)  <u>Illegal Activity/Suspension</u>.
    (1)  In the event three (3) or more violations occur within a two (2) year period, and convictions result from at least three (3) of the violations, the City Manager or his designee shall, upon the date of the third conviction, notify the licensee that the license shall be suspended for a period of thirty (30) days unless good cause is shown in accordance with this Article, that the violations have not occurred. For purposes of calculating this two (2) year period, the two (2) year period shall be deemed to be those twenty-four (24)

months occurring immediately prior to the violation occurrence date for which the thirty (30) day suspension is sought.

(2) In the event one (1) or more violations occur within a two (2) year period from the date of the last violation occurrence date from which the conviction resulted in a thirty (30) day suspension pursuant to subsection (b)(1), but not including any time during which the license was effectively suspended, and a conviction results from one (1) or more of the violations, the City Manager or his designee shall, upon the date of the latest conviction, provide notice to the licensee that the license shall be suspended for a period of ninety (90) days unless good cause is shown in accordance with this Article that the violation has not occurred.

(3) In the event one (1) or more violations occur within a two (2) year period from the date of the last violation occurrence date from which the conviction resulted in a ninety (90) day suspension pursuant to subsection (b)(2), but not including any time during which the license was effectively suspended, and a conviction results from one (1) or more of the violations, the City Manager or his designee shall, upon the date of the latest conviction, provide notice to the licensee that the license shall be suspended for a period of One Hundred Eighty (180) days unless good cause is shown in accordance with this Article that the violation has not occurred.

(c) **Revocation.** The City Manager or his designee shall revoke a license when he or his designee determines that any one (1) of the following has occurred:

(1) There has been one (1) or more violations that have occurred within a two (2) year period from the date the last violation occurrence date from which the conviction resulted in a One Hundred Eighty (180) day suspension pursuant to (c)(3), but not including any time during which the license was effectively suspended, and a conviction results from one (1) or more of the violations, the City Manager or his designee shall, upon the date of the latest conviction, provide notice to the licensee that the license shall be revoked unless good cause is shown in accordance with this Part that the violation has not occurred.

(2) The licensee or any person on its or his behalf or any person listed on the application pursuant to Section 14-80(b) of this Article, gave false or misleading information in the material submitted during the application process.

(3) The licensee or any person on its or his behalf or any person listed on the application pursuant to Section 14-80(b) of this Article has knowingly allowed possession, use, or sale of controlled substances on the premises of the establishment or business or when with a customer.

(4) The licensee or any person on its or his behalf or any person listed on the application pursuant to Section 14-80(b) of this Article has knowingly allowed prostitution on the premises of the establishment or business or when with a customer.

(5) The licensee or any person on its or his behalf or any person listed on the application pursuant to Section 14-80(b) of this Article knowingly operated the adult entertainment establishment or sexually oriented business during a period when the licensee's license was suspended.

(6) Except in the case of an adult motel, the licensee or any person on its or his behalf or any person listed on the application pursuant to Section 14-80 of this Article has knowingly allowed any specified sexual activities to occur on the premises of the establishment or business.

(d) **Effective Dates of Suspensions and Revocations.** Except as otherwise provided in this Article, all periods of suspension and revocation shall become effective fifteen (15) days after the City Manager or his designee posts the notice of suspension or revocation at the licensee's establishment, or on the date that the licensee turns in his, her or its license, whichever happens first. The suspension or revocation shall be abated in the event that the licensee files a timely challenge to the suspension or revocation in accordance with the procedures set forth in this Article or upon order of a court of competent jurisdiction. If an adult entertainment establishment or sexually oriented business license is revoked, the licensee shall not be issued another adult entertainment establishment or sexually oriented business license for a period of two (2) years running from the date the revocation actually takes effect after all abatement periods have lapsed.

(e) **Other Remedies.** Notwithstanding the provisions of this Section, the City may pursue any and all other available remedies through any and all other available processes and procedures available to correct violations of City codes. Included within such remedies are the enforcement actions set forth in this Article, actions in a court of competent jurisdiction for injunctive or other appropriate relief, criminal prosecution, code enforcement proceedings, the issuance of citations, the suspension or revocation of permits relating to health or safety matters, and any and all other remedies available under the laws of the State of Florida and the United States.

**Section 14-93.   Suspension and revocation proceedings.**

(a) Challenge to Suspension or Revocation. If the City Manager or his designee notifies a licensee in writing of the pending suspension or revocation of a license as provided in Section 14-92 of this Article, then the suspension or revocation shall become final and effective fifteen (15) days after mailing to the licensee's record address, posting at the licensed establishment, or actual delivery of the notice to the licensee, unless the licensee first files with the City Manager or his designee a written response stating the reasons why the suspension or revocation is alleged to be in error or inappropriate and a written notice of intent to challenge the suspension or revocation requesting a hearing to determine whether the suspension or revocation will become effective. The suspension or revocation shall be abated in the event that a licensee files a timely challenge to the suspension or revocation in accordance with the procedures of this Article or upon an order of a court of competent jurisdiction. A suspension or revocation already in effect, but not previously challenged in a suspension or revocation hearing, may be challenged in the same manner but is not abated during the proceedings.

(b) Hearing on Suspension or Revocation. When a licensee files a written response and notice of intent to challenge a pending or existing suspension or revocation then a public hearing to determine if the pending suspension or revocation will become effective and final shall be held by the City Commission. The City Manager or his designee shall notify the City Attorney and any appropriate City offices who shall schedule and provide notice of the hearing date and time.

(1) The suspension or revocation hearing shall be held within thirty (30) days of the City Manager's receipt of a written challenge and request for a hearing by the aggrieved licensee.

(2) The participants before the City Commission shall be the licensee, any witnesses of the licensee, the City Manager or his designee and any witnesses of the City Manager or his designee. All witnesses shall provide their legal name, mailing addresses and telephone number

(3) The procedures used shall be those typically used in a civil case with the City Manager or his designee having the burden of proof by preponderance of the evidence

(4) Testimony and evidence may be submitted by any witness but shall be limited to matters directly relating to the grounds for suspension or revocation. Irrelevant, immaterial, or unduly repetitious testimony or evidence shall be excluded.

(5) All testimony shall be under oath. The City Commission shall decide all questions of procedure and standing. Unless otherwise mutually agreed to between the licensee and the City Manager or his designee, the order of presentation of testimony and evidence shall be as follows

    (A) The City Manager or his designee and any witnesses of the City Manager or his designee.

    (B) The licensee and any witnesses of the licensee.

    (C) Rebuttal witnesses from the City Manager or his designee.

    (D) Rebuttal witnesses from the licensee.

    (E) Summation by the City Manager or his designee.

    (F) Summation by the licensee.

(6) The City Commission may also call and question witnesses or request additional evidence as the City Commission deems necessary and appropriate.

(7) To the maximum extent practicable, the hearing shall be informal. Reasonable cross examination of witnesses shall be permitted, but questioning shall be confined as closely as possible to the scope of direct testimony.

(8) If the City Commission comes to believe that any facts, claims, or allegations necessitate additional review or response by either the licensee or the City Manager or his designee, then the City Commission may order the hearing continued until an announced date certain, not to exceed thirty (30) days from the date of continuance. The City Commission shall render a final decision on the appeal within sixty (60) days of the City Manager's receipt of licensee's written notice of challenge.

(9) The City Commission shall render a written decision determining whether the suspension or revocation will become or remain effective at the conclusion of the hearing at which the appeal is decided or as soon as practicable thereafter

(c) Filing of Decision. The original of the written decision of the City Commission shall be filed with the City Clerk and copies shall be delivered or mailed to the licensee, the City Manager or his designee and the City Police Department.

(d) Judicial Review. Any person who participated in a suspension or revocation hearing before the City Commission and who is aggrieved by the decision of the City Commission may immediately challenge the decision in any court of competent jurisdiction pursuant to the Rules of Procedure of that court. The record of the hearing shall consist of the complete record of the proceedings before the City Commission. The City Commission's decision shall be promptly reviewed by the court.

(e) Requirement of Exhaustion Procedures. Judicial review of a suspension or revocation, or related hearing or appeal proceedings, shall be available only after the administrative procedures and remedies set forth in this Section have been exhausted.

(f) Notice of Final Suspension or Revocation. If no response or request for a suspension or revocation hearing is filed within fifteen (15) days of the notice of a pending suspension or revocation, or if the licensee who requested the hearing does not appear at the suspension or revocation hearing after notice, or if the City Commission decides after a hearing that a pending suspension or revocation will become final, then the City Manager or his designee shall issue to the licensee notice of final suspension or revocation of the adult entertainment license and mail or arrange delivery of the notice to the licensee's record address.

(g) Effective Date of Suspension or Revocation. The suspension or revocation of a license shall take effect the day after delivery of a notice of final suspension or revocation to the licensee in person, by posting on the licensed establishment, or by mail to the licensee's record address, or on the date the licensee surrenders the license, whichever happens first. The licensee shall immediately return and surrender a revoked license to the City Manager or his designee or surrender the revoked license, upon demand, to a member of the Police Department.

**Section 14-94. Worker records.**

(a) Each adult entertainment establishment and sexually oriented business, regardless of whether it is licensed under this Article, shall create, establish and maintain a record of all workers of the establishment or business. The record shall contain the worker's full legal name and any aliases and all past or current aliases of the worker; his or her date of birth; his or her residential address; his or her residential telephone number (if any) and all pager numbers and other similar numbers used; his or her driver's license number and a photocopy of the license; his or her state or federally issued identification card number including the worker's social security account number; the employment status of the worker including, but not limited to, whether the worker is a salaried employee, an independent contractor, a lessee, a sub-lessee, a

subcontractor allowed to work at the establishment. or such other arrangement as may be in place: whether income taxes are withheld for the worker: and a recent passport type photograph of the worker as of the date of association with the establishment which accurately reflects the date on which the photograph was taken. Said records shall be maintained for a period of no less than two (2) years from the date the worker is separated from employment.

(b) The original records required by subsection (a) or true and exact photocopies thereof. shall be kept at the adult entertainment establishment or sexually oriented business at all times including clear photographs.

(c) All operators of an adult entertainment establishment or sexually oriented business shall be responsible for knowing the location of the original records, or the true and exact photocopies thereof.

(d) All operators of an adult entertainment establishment or sexually oriented business shall. upon request by a law enforcement officer or the City Manager or his designee. make available for immediate inspection the original records, or the true and exact photocopies thereof at any time when the establishment or business is open for business.

## Section 14-95. General requirements for all adult entertainment establishments and sexually oriented businesses.

(a) Each adult entertainment establishment and sexually oriented business, regardless of whether it is licensed under this Article, shall observe the following general requirements:

(1) Conform to, comply with and abide by all applicable safety. employer related, building, fire, health, zoning or land use statutes, codes, ordinances, rules and regulations, whether Federal, State or local.

(2) Keep the adult entertainment establishment or sexually oriented business license posted and prominently displayed in a conspicuous place at the establishment or business at all times, which license shall be available for inspection upon request at all times by the public. any law enforcement officer and the City Manager, or his or her designee, when the establishment or business is open for business.

(3) Opaquely cover each non-opaque area where a person outside the adult entertainment establishment or sexually oriented business may otherwise see inside the establishment or business.

(4) Provide to any law enforcement officer and the City Manager or his designee. during all hours of operation or when an operator is present at the establishment, access through the main entrance and into all areas of the establishment where customers are permitted without the necessity of using a key, computer entry, password or seeking clearance from a worker or customer to obtain entry through an electronically operated door or entryway.

(5) Install, construct. keep. maintain or allow only those signs at the establishment or building exterior which comply with the provisions relating to signage in the Land Development Regulations of the City of Casselberry.

(6) Not allow any person under eighteen (18) years of age to be present when services are provided to or performed for a customer or when the establishment or business is open for business.

(7) Not employ or provide goods or services to any person under eighteen (18) years of age.

(8) Not provide, offer or engage in any services to any person when not licensed to do so under this Article.

(9) Not operate when a license issued pursuant to this Article has been suspended. revoked or canceled or when the license is expired.

(10) Not permit any animal except seeing eye dogs accompany a worker or customer when services are provided or performed.

(11) Not place, operate or contain video cameras. transmitting or taping equipment anywhere on the premises except where customers are advised in advance by posted notice.

(12) Not advertise the presentation of any activity prohibited by any law, rule or regulation whether Federal, State or local.

(13) Ensure that the view areas specified in this Article remains unobstructed by any doors, walls, merchandise, display racks or other materials at all times that any customer is present in the premises so as to ensure that no customer is permitted access to any area of the premises which has been designated as an area in which non-workers will not be permitted.

(14) Ensure that at least one (1) operator is on duty and present at the establishment or business when the establishment or business is open for business who is responsible and knows the whereabouts of all records required by this Article. Said operator's name shall be conspicuously posted on the premises at all times the business or establishment is open for business.

(15) Ensure that at least one (1) operator is situated in each manager's station. when required by this Article, at all times that any customer is present inside the premises.

(16) Ensure that the premises are equipped with overhead lighting fixtures of sufficient intensity to illuminate every place to which customers are permitted access at an illumination of not less than fifteen to twenty (15-20) average maintained foot candles as measured thirty-five inches (35") above the floor level. The light shall be maintained at all times any customer is present in the premises.

(17) Not alter or otherwise change the contents of an adult entertainment establishment or sexually oriented business license.

(18) Ensure that each exterior entrance and exit door for use by customers and interior doors which permit entrance to the interior and exit to the interior from any interior foyer area shall remain unlocked when any person who is not a worker is inside the establishment.

(19) Establish, create and maintain worker records as required by this Article.

## Section 14-96. Sexually oriented businesses.

In addition to the general requirements for adult entertainment establishments and sexually oriented businesses contained in this Article, a sexually oriented business shall, regardless of whether it is licensed thereunder, comply with the following general requirements:

(a) Post in an open and conspicuous place a list of services provided by the sexually oriented business which services shall be described clearly in the English language along with a specification as to the cost of each service.

(b) Provide each customer, in advance of any service being provided, with a written customer contract, written clearly in the English language, setting forth the service or services to be rendered, the cost of such service or services, the actual full name of the worker providing the service and actual full name, address and date of birth of the customer as reflected on a State or Federally issued identification card or drivers license and the customer's telephone number.

(c) Create, establish and maintain a daily register in a format provided by the City Manager, or his or her designee, containing the actual full names and addresses of all customers as reflected on a State or Federally issued identification card or drivers license, the services performed, the time expended, the mode of payment and the full name of the worker providing the service.

(d) Not allow any worker of the sexually oriented business to accept any tip or gratuity, directly or indirectly, from a customer in addition to the service fee specified in the customer contract.

(e) Maintain all customer contracts and daily registers for a period of two (2) years following the customers date of service.

## Section 14-97. Adult theater provisions.

In addition to the general requirements relating to adult entertainment establishments and sexually oriented businesses contained in Section 14-95 of this Article, an adult theater, regardless of whether it is licensed under this Article, shall:

(a) If the adult theater contains an auditorium or hall, comply with each of the following provisions:

(1) have individual and separate seats (not couches, benches, or other seating configurations allowing or providing for the seating of multiple persons on the same item of furniture) to accommodate the maximum number of persons who may occupy the area.

(2) have a continuous main aisle alongside of the seating areas in order that each person seated in the areas shall be visible from the aisle at all times;

(3) have a sign posted in a conspicuous place at or near each entrance to the auditorium or hall which lists the maximum number of persons who may occupy the auditorium or hall area, which number shall not exceed the number of seats within the hall or auditorium area; and

(4) be illuminated at an illumination of not less than fifteen to twenty (15-20) foot candles average maintained as measured at thirty-five inches (35') above the floor level and shall maintain the light at all times so that any customer present in the hall or auditorium may be seen.

(b) If the adult theater contains adult booths, each adult booth shall comply with each of the following provisions:

(1) have a sign posted in a conspicuous place at or near the entrance which states the maximum number of persons who may occupy the booth, which number shall correlate with the number of seats in the booth;

(2) have a permanently open entrance not less than three feet (3') wide and not less than six feet (6') high, not capable of being closed or partially closed by any curtain, door, or other partition which would be capable of wholly or partially obscuring any person situated in the booth; provided, however, that the requirements of all building and related codes shall also be complied with;

(3) have individual, separate seats (which are not couches, benches, or other seating configurations allowing or providing for the seating of multiple persons on the same item of furniture) which correlate with the maximum number of persons who may occupy the booth;

(4) have a continuous main aisle alongside the booth in order that each person situated in the booth shall be visible from the aisle at all times;

(5) have an illuminated and continuous main aisle in which workers and customers can be seen from one end to the other; and

(6) have, except for the entrance, walls or partitions of solid construction without any holes or openings in such walls or partitions.

(c) Have one (1) or more manager's stations.

(d) Configure the interior of the premises in such a manner that there is an unobstructed view from a

manager's station of every area of the premises to which any customer is permitted access for any purpose excluding restrooms.

(e) If the premises has two (2) or more manager's stations designated, configure the interior of the premises in such a manner that there is an unobstructed view of each area of the premises to which any customer is permitted access for any purposes from at least one (1) of the manager's stations. The view required in this subsection shall be by direct line of sight from the manager's station.

(f) If the adult theater is designed to permit outdoor viewing by persons seated in automobiles, cause the motion picture screen so situated, or the perimeter of the establishment so fenced, such that the material to be seen by those persons may not be seen from any public right of way, property assigned a residential zoning classification or assigned a residential land use designation, any religious institution or church, any educational institution or school, or from a park.

(g) Cover the floors of areas accessible to customers with smooth and non-permeable flooring material which can withstand frequent effective cleaning with industrial strength cleaning agents. Carpeting of any type is prohibited.

(h) Use smooth and non-permeable upholstery material, which can withstand frequent cleaning with industrial strength cleaning agents, to cover furniture permitted by this Article for the use of customers

(i) Have, in areas accessible to customers, interior wall surfaces which can withstand frequent cleaning with industrial strength cleaning agents.

(j) Use only those shades and blinds which can withstand frequent cleaning with industrial strength cleaning agents. (Draperies are prohibited).

(k) Maintain areas accessible to customers in a clean and sanitary condition.

(l) Keep all furniture upholstery material free from holes and rips.

(m) Utilize an appropriate and effective adaptation of the U.S. Center for Disease Controls universal precautions for the storage and transmission of the HIV virus and other diseases when cleaning or sanitizing the establishment.

**Section 14-98. Adult performance establishment provisions.**

(a) In addition to the general requirements for adult entertainment establishments and sexually oriented businesses contained in Section 14-95 of this Article, an adult performance establishment shall, regardless of whether it is licensed under this Article, have: a stage provided for the expressive display or exposure of any worker's specified anatomical areas to a customer consisting of a permanent platform (or other similar permanent structure) raised a minimum of eighteen inches (18") above the surrounding floor and encompassing an area of at least one hundred (100) square feet. The stage shall be located at least three

feet (3') from the nearest table. chair. area or other accommodation where customers are seated or otherwise located: provided. however. that a table at which any customer is seated or served shall not be used as a stage.

(b) Notwithstanding the stage requirement in subsection (a), an adult performance establishment may also have smaller stages for the expressive display or exposure of a worker's specified anatomical areas to a customer consisting of permanent or removable platforms raised a minimum of eighteen inches (18") above the surrounding floor from where customers are seated or located: provided. however. that a table at which any customer is seated or served shall not be used as a stage.

(c) In addition to the general requirements for adult entertainment establishments and sexually oriented businesses contained in this Article, an adult performance establishment shall. regardless of whether it is licensed under this Article:

(1) In any area in which a private performance occurs. have a permanently open entrance not less than three feet (3') wide and not less than six feet (6') high, which entrance shall not have any curtain rods. hinges, rails or the like which would allow the entrance to be closed or partially closed by any curtain, door. or other partition: provided. however, that the requirements of all building and related codes shall also be complied with; and

(2) In any area in which a private performance occurs. have a wall to wall. floor to ceiling partition of solid construction without any holes or openings, which partition may be completely or partially transparent. and which partition separates the worker from the person viewing the displays.

(3) Post a sign which is clearly legible and located in a conspicuous place setting forth that straddle dancing is strictly prohibited.

(4) Not place or permit the placement of a bed or mattress in the establishment.

## Section 14-99. Commercial bodily contact establishments provisions.

In addition to all general requirements of this Article pertaining to adult entertainment establishments and sexually oriented businesses as set forth in Section 14-95 and Section 14-96 of this Article, a commercial bodily contact establishment, regardless of whether it is licensed under this Article, shall:

(a) Operate only from a fixed physical location which is set forth on its sexually oriented business license and all required occupational licenses.

(b) Not advertise, offer or provide any other service other than services which are posted.

(c) Provide clean linen and towels for each customer when towels and linens are used during the course of providing services to a customer: provided, however, that heavy white paper may be substituted for sheets if such paper is used for only one (1) customer and then discarded into a sanitary receptacle.

(d) Store clean linen. towels and other materials used in connection with providing commercial bodily contact in closed cabinets.

(e) Disinfect and sterilize non-disposable instruments after each use on a customer.

(f) Cause all workers to conceal their specified anatomical areas with an opaque covering at all times when on the premises of the business by wearing an opaque surgical type gown

(g) Not encourage, allow or permit any customer to consume food or beverages in the business.

(h) Provide commercial bodily contact in an area wherein such area is visible at all times from common areas in the establishment. No contact may occur in a separate or individual cubicle, room, booth or area which is not visible from common areas of the establishment and a receptionist area; provided, however. that if male and female customers are provided services at the same time. separate work areas shall be established for each gender.

(i) Not advertise, display. publish. exhibit place. distribute or promote on any advertising matter or signage services that are not posted or a suggestion that services not posted will be provided.

(j) Not advertise, display, publish. exhibit. place. distribute or promote on any advertising matter or signage any suggestion that workers will be dressed in any manner other than as required in this Article.

(k) Not begin a meeting or service with a customer between 10 00 p m. of any day of the week and 9 00 a.m. the following day.

(l) Not provide services at any place other than a physical location licensed to provide commercial bodily contact under the provisions of this Article.

(m) Not place or permit the placement of any bed, mattress or sofa at the business: provided, however, that a sofa may be placed in the reception area open to the public at the main entrance of the business and cots or padded mats may be used when providing commercial bodily contact.

### Section 14-100. Escort service.

In addition to all general provisions of Section 14-95 and Section 14-96 of this Article pertaining to adult entertainment establishments and sexually oriented businesses, an escort service, regardless of whether licensed under this Article, shall:

(a) Not advertise, offer or perform any other service than services which are posted.

(b) Cause all workers and escorts to conceal their specified anatomical areas with an opaque covering at all times when on the premises of the escort service.

) Not advertise, display, publish. exhibit. place. distribute or promote on any advertising matter or gnage services that are not posted or a suggestion that services not posted will be provided.

i) Not begin a meeting or service with a customer between 10:00 p.m. of any day of the week and 9:00 m. the following day.

e) If offering or providing escorts or escort service within the City of Casselberry. each escort service hall notify the Community Development Department and the City Manager or his designee of an authorized hysical location, which may or may not be within the City. from where the escort service operates and iispatches escorts.

f) Include in all advertising or promotional literature posted. placed. published. or distributed within the City of Casselberry the number of a valid sexually oriented business license issued by the City unless the escort service does not refer. send. or dispatch escorts to any location within the jurisdictional limits of the City of Casselberry

(g) Each escort service shall ensure that every escort and worker of the escort service is provided with a copy of the escort service's license and carries it while working as an escort for the service. and displays said license upon the request of any law enforcement officer or the City Manager or his designee. In addition to a copy of the escort service's license, each escort service shall ensure that each escort has an occupational license to engage in the occupation of escort within the City and that they carry said license while working, and displays said license upon the request of any law enforcement officer or the City Manager or his designee. Notwithstanding the foregoing, an escort or worker of an escort service who is a paid employee for whom taxes and social security payments are withheld and paid by the licensed escort service and who is not an independent contractor may substitute and carry a copy of the sexually oriented business/escort service license of the employing escort service only. provided that worker records as required by this Article are created and maintained by the licensed escort service.

(h) If a meeting with or the service of a customer occurs at a location not open to the public, then the escort shall check in with the on duty manager of the premises in person where the meeting or service occurs or begins prior to meeting or servicing a customer and advise the manager of the following: names of the escort(s), the escort service and customer(s); the escort's time of arrival and estimated time of departure; and a copy of the escort service's sexually oriented business license and the escort's own occupational license, if applicable, and the location of the meeting within the structure.

## Section 14-101.  Engaging in prohibited activity: customers.

(a) It is unlawful for any customer in or for an adult entertainment establishment or sexually oriented business regardless of whether licensed pursuant to this Article to do any of the following acts:

(1) To engage or participate in a straddle dance at the establishment or business.

(2) To offer, contract or otherwise agree to engage or participate in a straddle dance with a person at the establishment or business.

(3) To engage or participate in any specified sexual activity at the establishment or business or while in the presence of a worker.

(4) To display or expose while in the presence of a worker or when at the establishment or business any specified anatomical area.

(5) To offer or deliver a tip or gratuity to any worker of an establishment or business before, during or after the provision of services except at an adult performance establishment.

(6) If a worker is a female, to intentionally touch, fondle or manipulate her on her clothed or unclothed breast(s), either directly or through a medium.

(7) To intentionally touch, fondle, massage, or manipulate any specified anatomical area of a worker, a customer, or himself or herself, whether clothed or unclothed, on the premises of the establishment or business.

(8) To intentionally touch, fondle, massage or manipulate a worker on any specified anatomical area when at or receiving services from the adult entertainment establishment or sexually oriented business.

(9) To intentionally touch, fondle, massage or manipulate the clothed or unclothed breast(s) of a female worker, or to touch the clothed or unclothed body of a worker at any point below the waist and above the knee of the worker when at an adult entertainment establishment or sexually oriented business.

(10) To occupy an adult booth in which booth there are more people than that specified on the posted sign required by this Article.

(11) To otherwise violate or aid or abet a violation of this Article.

(12) To encourage or solicit any worker to engage in any specified sexual activity.

(b) It is unlawful for any customer at or of a sexually oriented business to do any of the following acts regardless of whether the establishment is licensed pursuant to this Article:

(1) To intentionally touch, massage or manipulate, directly or indirectly or through a medium while on the premises of the establishment or when with a worker, the customer's specified anatomical areas.

(2) To solicit any worker to provide a service not posted.

(3) To solicit or receive any service not indicated and contracted for in the written customer contract.

(4) To provide to the worker providing the service either directly. indirectly or through a medium. any tip, gratuity or other consideration beyond the fee specified in the customer contract.

(5) To expose any specified anatomical area to the view of a worker.

## Section 14-102.  Engaging in prohibited activity: workers / operators.

(a) It is unlawful for any worker of an adult entertainment establishment or sexually oriented business. regardless of whether licensed under this Article. to do any of the following acts or for an operator of an adult entertainment establishment or sexually oriented business. regardless of whether licensed hereunder. to knowingly permit, suffer, aid, allow or encourage any worker to do any of the following acts:

(1) To engage or participate in a straddle dance with a customer at the establishment or business.

(2) To offer, contract or otherwise agree with a customer to engage or participate in a straddle dance with a person at the establishment or business.

(3) To engage or participate in any specified sexual activity or activities at the establishment or business with a customer. him or her self or a worker.

(4) To display or expose at the establishment or business specified anatomical areas except in accordance with the provisions of this Article and other applicable law

(5) To request or accept a tip or gratuity from a customer except at an adult performance establishment.

(6) To work in an adult entertainment establishment or sexually oriented business that he or she knows or should know is not licensed under this Article, or which has a license which is under suspension, has been revoked or canceled, or has expired, regardless of whether he. she or it has applied for and obtained a license under this Article.

(7) To display or expose specified anatomical areas while engaging in personal advertising, pandering, or solicitation, whether passive or otherwise, on behalf of the worker, any other worker. or the establishment or business while situated outside any structure at the establishment or business. or at a place at the establishment or business where the worker is visible from any public right-of-way or sidewalk. "Personal advertising" means encouraging or enticing, by whatever direct or indirect means, potential customers outside the doors of the establishment or business to enter the establishment or business.

(8) To suffer, permit, or allow any door of the business or establishment that is visible from a public right-of-way or sidewalk to be opened or remain opened except when a person is entering or exiting the establishment or business.

(9) To allow or encourage a customer to intentionally touch or fondle, either directly or through a

medium. any specified anatomical area of the customer. a worker or another customer.

(10) If the worker is a female, to allow herself to be intentionally touched on her clothed or unclothed breast(s) by a customer.

(11) If a worker is a female. to allow herself to be intentionally touched by a customer on any portion of her body below the waist and above the knee.

(12) To display or expose any specified anatomical area unless such worker is in an area described in Subsections 14-98(a) or 14-98(b) of this Article. and the stage on which the worker is located is not located between the legs of a customer.

(13) To provide or engage in any private performance unless such worker is in an area described in Subsection 14-98(c) of this Article.

(14) To remain in the presence of a customer who is exposing specified anatomical areas at the establishment or in the presence of a worker or another customer.

(15) To violate or aid or abet in a violation of the provisions of this Article

(16) To encourage or knowingly permit any customer to intentionally touch. fondle, massage or manipulate, either directly or indirectly through a medium. any of the customer's specified anatomical areas on the premises of the establishment or when in the presence of another customer or worker.

(17) To encourage or solicit any customer to engage in any specified sexual activity.

(18) To intentionally touch, fondle, massage or manipulate any customer on the customer's clothed or unclothed body between the waist and above the knee.

(b) It is unlawful for any worker of a sexually oriented business. regardless of whether it is licensed under this Article, to do any of the following acts, or for an operator of a sexually oriented business. regardless of whether it is licensed under this Article, to knowingly or with reason to know permit suffer or allow any worker to commit any of the following acts:

(1) To accept a tip or gratuity from or on behalf of a customer in addition to the service fee stated in the written customer contract.

(2) To begin a meeting or service. continue a meeting or service, solicit a meeting or service or make or solicit a sale between the hours of 10:00 p.m. of any particular day and 9:00 a.m. the following day.

(3) Provide commercial bodily contact except at the physical structure of the establishment which has a commercial bodily contact establishment license.

(4) To provide any service not posted as required by this Article.

(5) To provide any service without first executing a customer contract.

(c) It is unlawful for any worker of an adult entertainment establishment or sexually oriented business, regardless of whether licensed pursuant to this Article, to knowingly permit, suffer, aid, allow or encourage any customer to do any of the following acts:

(1) To intentionally touch, fondle, massage or manipulate, either directly or indirectly through a medium, any of the customer's specified anatomical areas when at the establishment or business or while in the presence of a worker or anther customer.

(2) To intentionally touch, fondle, massage or manipulate, either directly or indirectly through a medium, any specified anatomical area of another customer or a worker when at the establishment or business or while in the presence of a worker or customer.

(3) To engage in any specified sexual activities at the establishment or business with a worker, customer, him or her self or with another customer.

(4) To expose the customer's specified anatomical areas at the establishment or business or when receiving services or when in the presence of a worker or another customer.

(5) To engage or participate in a straddle dance.

(6) To intentionally touch, fondle, massage or manipulate a worker at any point below the waist and above the knee.

(7) To intentionally touch a female worker on the clothed or unclothed breast.

### Section 14-103. Operation without license.

(a) It is unlawful for any person to be an operator of or at or to be a worker for an adult entertainment establishment or sexually oriented business where the person knows or should know:

(1) that the establishment or business does not have an adult entertainment establishment or sexually oriented business license for the applicable classification.

(2) that the establishment or business has a license which is under suspension.

(3) that the establishment or business has a license which has been revoked, canceled or has expired.

### Section 14-104. Operation contrary to operational requirements.

(a) It is unlawful for any person to be an operator of an adult entertainment establishment or sexually oriented business which does not satisfy all of the general requirements of Section 14-95 of this Article, regardless of whether the establishment is licensed thereunder.

(b) It is unlawful for any person to be an operator of a sexually oriented business which does not satisfy all of the general requirements of Section 14-96 of this Article regardless of whether the establishment is licensed thereunder.

(c) It is unlawful for any person to be an operator of an adult performance establishment which does not satisfy all of the special requirements of Section 14-98 of this Article regardless of whether licensed thereunder.

(d) It is unlawful for any person to be an operator of an adult theater which does not satisfy all of the special requirements of Section 14-97 of this Article regardless of whether the establishment is licensed thereunder.

(e) It is unlawful for any person to be an operator of an escort service which does not satisfy all of the special requirements of Section 14-100 of this Article regardless of whether licensed thereunder.

(f) It is unlawful for any person to be an operator of a commercial bodily contact establishment which does not satisfy all of the special requirements of Section 14-99 of this Article regardless of whether the establishment is licensed thereunder.

**Section 14-105. Use of restrooms or dressing rooms.**

(a) Notwithstanding any provision in this Article indicating to the contrary, it is not unlawful for any worker of an adult entertainment establishment or sexually oriented business, regardless of whether it is licensed under this Article, to expose any specified anatomical area during the worker's bona fide use of a dressing room or bath room which is occupied at the time only by workers of the same sex.

(b) Notwithstanding any provision in this Article indicating to the contrary, it shall not be unlawful for any customer of an adult entertainment establishment or sexually oriented business, regardless of whether it is licensed under this Article, to expose any specified anatomical area during the customer's bona fide use of a bath room which is occupied at the time only by customers of the same sex.

(c) It is unlawful to be an operator of an adult performance establishment which has a dressing room for use by its workers, that is accessible to customers.

(d) It is unlawful to be an operator of a sexually oriented business which has a dressing room for use by its customers that is accessible to workers.

(e) Notwithstanding any provision of this Article to the contrary, a worker engaged in the work of a rest room attendant or valet may occupy a rest room which is also occupied by customers provided that the

valet or attendant does not expose any specified anatomical area to the view of a customer and is of the same sex of the customer occupying the rest room.

(f) Notwithstanding any provision of this Article to the contrary, it is not unlawful for a worker or customer to touch their own specified anatomical areas during their *bona fide* use of a rest room, dressing room or bath room when such touching is necessary and inherent to the activity of changing clothes or excretory functions.

### Section 14-106. Minors - unlawful provisions.

It is unlawful for an operator or worker of an adult entertainment establishment or sexually oriented business regardless of whether licensed under this Article, to knowingly or with reason to know, permit, suffer or allow:

(a) Admittance to the establishment or business of a person under eighteen (18) years of age when the establishment or business is open for business.

(b) A person under eighteen (18) years of age to remain at the establishment or business when the establishment or business is open for business.

(c) A person under eighteen (18) years of age to purchase goods or services from the establishment or a worker at the establishment or business.

(d) A person under eighteen (18) years of age to be a worker at or for the establishment or business.

### Section 14-107. Records - unlawful provisions.

(a) It is unlawful to be an operator or worker of an adult entertainment establishment or sexually oriented business, regardless of whether it is licensed under this Article, if the current and valid adult entertainment establishment or sexually oriented business license is not conspicuously displayed on the premises of the establishment or business.

(b) It is unlawful to be an operator of an adult entertainment establishment or sexually oriented business, regardless of whether licensed under this Article, which does not create, establish and compile worker records, maintain worker records or where such records are not produced for inspection by a law enforcement officer upon request when the establishment or business is open for business.

(c) It is unlawful to be an operator of a sexually oriented business, regardless of whether it is licensed under this Article, at which customer contracts, daily registers and a list of services have not been compiled, maintained or are not produced for inspection by a law enforcement officer upon request when the establishment or business is open for business.

(d) It is unlawful for a worker at or of an adult entertainment establishment or sexually oriented business,

regardless of whether licensed under this Article, to fail to obtain, carry or produce for inspection by a law enforcement officer upon request, an occupational license for the occupation in which the worker is engaged; provided, however, that a worker of an adult entertainment establishment or sexually oriented business who is a paid employee for whom income taxes and social security payments are withheld and paid by the establishment and who is not an independent contractor shall not be required to obtain an occupational license or their own adult entertainment establishment/sexually oriented business license.

(e) It is unlawful for an escort, regardless of whether they are a paid employee for whom income taxes and social security payments are withheld and paid by the escort service, to fail to carry and produce for inspection by a law enforcement officer a copy of the sexually oriented business license of the employing escort service when working as an escort or providing the services of escort.

(f) It is unlawful for any person or any person on their behalf applying for a license under this Article to make a false or misleading statement or provide false or misleading information which is intended to facilitate the issuance of a license.

(g) It is unlawful for any worker, customer or operator to provide false or misleading information in any worker record, customer contract or daily register required by this Article.

(h) It is unlawful to be an operator or worker at an adult entertainment establishment or sexually oriented business which does not have conspicuously posted the name of the operator on duty while the establishment is open for business.

(i) It is unlawful for an operator of an adult entertainment establishment to fail to produce for inspection any worker record required by this Article, when requested by a law enforcement officer or the City Manager or his designee when the establishment or business is open for business.

(j) It is unlawful for an operator of a sexually oriented business to fail to produce for inspection any worker record, customer contract or daily register required by this Article when requested by a law enforcement officer or the City Manager or his designee when the establishment or business is open for business.

**Section 14-108.  Hours of operation - unlawful provisions.**

(a) It is unlawful for any operator of an adult entertainment establishment, regardless of whether licensed pursuant to this Article, to allow such establishment to remain open for business or to knowingly allow any worker to engage in a performance, solicit a performance, make a sale, solicit a sale, provide a service or solicit a service between the hours of 2:00 a.m. and 9:00 a.m. of any particular day.

(b) It is unlawful for any operator of a sexually oriented business, regardless of whether licensed pursuant to this Article, to allow such business to remain open for business or to permit any worker to engage in a performance, solicit a performance, make a sale, solicit a sale, begin, continue or provide a service or solicit a service between the hours of 10:00 p.m. and 9:00 a.m. of any particular day.

(c) It is unlawful for any worker of an adult entertainment establishment, regardless of whether licensed pursuant to this Article, to engage in a performance, solicit a performance, make a sale, solicit a sale, provide a service or solicit a service between the hours of 2:00 a.m. and 9:00 a.m. of any particular day.

(d) It is unlawful for any worker of a sexually oriented business, regardless of whether licensed pursuant to this Article, to provide a service, solicit a service, engage in a performance, solicit a performance, make a sale, solicit a sale, begin a service or continue a service between the hours of 10:00 p.m. and 9:00 a.m. of any particular day.

**Section 14-109. Special prohibitions relating to escorts and escort services - unlawful provisions.**

It is unlawful for any escort, escort service or worker of an escort service, regardless of whether licensed under this Article, to commit any of the following acts or for an operator of an escort service regardless, of whether licensed thereunder, to knowingly permit, suffer, aid, assist or allow any escort or escort service worker to commit any of the following acts:

(a) To enter a hotel, motel or other place of temporary lodging for the purpose of meeting or providing services to a customer without immediately upon entering such hotel, motel or other place and prior to meeting the customer making personal face-to-face contact with the on duty manager at the front desk or reception area and providing that person with the following information:

(1) the time of arrival and estimated time of departure;

(2) a copy of the escort service's sexually oriented business license and, if applicable, the escort's occupational license;

(3) the name of the escort, the escort service and the customer being met/served; and

(4) the location of the meeting or service within the structure including the room number.

(b) To require, entice or solicit any customer to remove any article of clothing.

(c) To display or expose any specified anatomical area to a customer.

(d) To begin a meeting or service without first meeting the customer in a public place such as a bar or restaurant before accompanying the customer to any place not open to the public such as a hotel room or residence.

(e) To meet with or provide services to a customer in any place not open to the public such as a hotel room, motel room or residence without first executing the customer contract as required by this Article.

(f) To provide services to a customer even in a public place without first executing the customer contract as required by this Article, immediately following the meeting of the customer.

(g) To solicit a tip or gratuity from a customer in exchange for a promise or suggestion that any act or service not contracted for in the customer contract will be performed.

(h)  To accept any compensation or payment except that which is provided in the customer contract.

**Section 14-110.  Special prohibited acts - commercial bodily contact - unlawful provisions.**

It is unlawful for a worker of a commercial bodily contact establishment, regardless of whether licensed pursuant to this Article, to commit any of the following acts or for the operator of a commercial bodily contact establishment, regardless of whether licensed thereunder, to knowingly or with reason to know, permit, suffer, aid, assist or allow any worker to commit any of the following acts:

(a) To provide commercial bodily contact or to be present at the premises of the business when open for business unless covering their specified anatomical areas by wearing an opaque surgical type gown.

(b)  To display or expose any specified anatomical area to a customer.

(c) To allow a customer to expose or display the customers specified anatomical areas in the presence of a worker.

(d) To allow a customer to engage in any specified sexual activity with him or herself, another customer or with a worker.

(e) To perform or provide commercial bodily contact except at the premises of a commercial bodily contact establishment licensed under this Article.

(f)  To engage in or offer to engage in private modeling or the activities of an escort with any customer.

(g) To provide commercial bodily contact or service to a customer without first executing a customer contract as required by this Article.

(h) To intentionally touch, fondle, manipulate or massage the specified anatomical area of any customer.

(i) To allow any customer to intentionally touch, fondle, manipulate or massage any specified anatomical area of any worker or the body of any worker below the waist and above the knee, directly, indirectly or through a medium.

(j) To remain in the presence of any customer who is displaying, exposing, intentionally touching, fondling or manipulating any specified anatomical area.

(k) To allow any customer to intentionally touch, massage or manipulate any specified anatomical area while on the premises of the business or when in the presence of a worker.

(l) To solicit or require a customer to remove any item of clothing as a prerequisite to providing commercial bodily contact.

(m) To accept or solicit any tip, remuneration, consideration or gratuity in excess of the fee provided in the executed customer contract.

(n) To accept or solicit any tip, remuneration, consideration or gratuity in exchange for any enhanced service.

(o) To fail to require a customer to cover such customers' specified anatomical areas with a towel, robe, undergarment, bathing suit or other similar fully opaque material while on the premises of the business.

(p) To engage in or offer to engage in any private performance or act as an adult model.

**Section 14-111. Commercial bodily contact establishments - prohibited; savings provision.**

(a) Notwithstanding any provision of this Article, it is unlawful to operate, or be a worker for or at a commercial bodily contact establishment which engages in commercial bodily contact.

(b) Notwithstanding the provisions of subsection (a), in the event that subsection (a), prohibiting commercial bodily contact establishments is found to be unconstitutional, or otherwise invalid by a court of competent jurisdiction or should an injunction be issued relative to the enforcement of subsection (a), then all provisions set forth this Article applicable to commercial bodily contact establishments and sexually oriented businesses shall apply to businesses and establishments engaged in commercial bodily contact.

**Section 14-112. Occupational licenses/home occupations.**

(a) The Community Development Department of the City of Casselberry may take such steps as may be necessary to ensure that the occupational license tax is paid by only such individuals and entities that are lawfully permitted in accordance with the provisions of this Article.

(b) Adult entertainment establishments and sexually oriented businesses shall not be approved as home occupations.

**Section 14-113. Sexual encounter businesses prohibited/prohibited acts - unlawful provisions.**

(a) It is unlawful to be an operator of or be a worker at a sexual encounter business.

(b) It is unlawful to cause, encourage, or allow a person under eighteen (18) years of age to be present at a sexual encounter business.

(c) It is unlawful to aid or abet a person causing, encouraging or allowing a person under eighteen (18) years of age to be present at a sexual encounter business.

## Section 14-114.  Immunity from prosecution.

The City and any and all of its officers, departments or agents and any law enforcement officer shall be immune from prosecution, civil or criminal, for the reasonable, good-faith trespass upon an adult entertainment establishment or sexually oriented business while acting within the scope of the authority set forth in this Article.

**Section 14-74.**  *** (existing Section 14-74)

**Section 14-75.**  *** (existing Section 14-75)

**Section 14-76.**  *** (existing Section 14-76)

**Section 14-79.**  *** (existing Section 14-79)

## SECTION. II.  REPEAL.

Upon this Ordinance taking effect, Chapter 14, Article III Section 14-66, 14-67, 14-68, 14-69, 14-70, 14-71, 14-72, 14-73, 14-77, 14-78, 14-80, 14-81, 14-82, 14-83, 14-84, 14-96, 14-97, 14-98, 14-99, 14-100, 14-101, 14-102, 14-103, 14-104, 14-105, 14-106, 14-107, and 14-108 of the existing Casselberry City Code are hereby repealed.

## SECTION III.  SEVERABILITY.

If any Section or portion of a Section of this Ordinance proves to be invalid, unlawful, or unconstitutional, it shall not be held to invalidate or impair the validity, force, or effect of any other Section or part of this Ordinance.

## SECTION IV.  CODIFICATION.

It is the intention of the City Commission of the City of Casselberry, Florida, and it is hereby ordained, that the provisions of this Ordinance shall become and be made a part of the Code of Ordinances of the City of Casselberry, Florida; that the Sections of this Ordinance may be renumbered or relettered to accomplish such intention; that the word, "Ordinance," may be changed to "Section," "Article," or other appropriate word.

## SECTION V.  ADDITIONAL LEGISLATIVE INTENT.

The City Commission of the City of Casselberry, Florida, hereby finds and declares that this Ordinance is in addition and supplemental to the Seminole County Public Decency Ordinance and the City of

Casselberry adult entertainment code and City of Casselberry Ordinance No. 98-922 and that this Ordinance in no way whatsoever is intended to conflict with the Seminole County Public Decency Ordinance and City of Casselberry City Commission finds and declared that this Ordinance shall not be construed as opting the City of Casselberry out of the Seminole County Public Decency Ordinance. This Section V shall not be codified.

## SECTION VI. EFFECTIVE DATE.

This Ordinance shall become effective ten days after its passage and adoption.

FIRST READING this _17th_ day of _May_, A.D 1999

SECOND READING this _7th_ day of _June_, A.D. 1999

FINAL READING AND ADOPTION this _7th_ day of _June_ A.D 1999

_Bruce A. Pronovost_
Bruce A. Pronovost, Mayor

ATTEST.

_Thelma McPherson_
Thelma McPherson, City Clerk



ORDINANCE NO. 99-<u>21</u>                                    SEMINOLE COUNTY, FLORIDA

> AN ORDINANCE OF THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SEMINOLE, STATE OF FLORIDA, TO BE KNOWN AS THE "SEMINOLE COUNTY NUDITY AND ALCOHOL SEPARATION ORDINANCE"; PROVIDING FOR NEW PROVISIONS TO THE SEMINOLE COUNTY CODE; PROVIDING FOR LEGISLATIVE FINDINGS; ADOPTING LEGISLATIVE FINDINGS FROM ORDINANCE NUMBER 98-49; PROVIDING FOR A TITLE; PROVIDING FOR DEFINITIONS; PROVIDING FOR THE ADOPTION OF THE DEFINITIONS SET FORTH IN ORDINANCE NUMBER 98-49; PROVIDING THAT THE DEFINITION OF TERM "NUDE" SHALL BE USED INTERCHANGEABLY FOR THE DEFINITION OF THE TERM "NUDITY"; PROHIBITING AND MAKING UNLAWFUL THE CO-MINGLING OF ALCOHOL AND NUDITY; MAKING CERTAIN ACTS OR OMISSIONS UNLAWFUL RELATIVE TO THE CO-MINGLING OF ALCOHOL AND NUDITY OR THE ACT OF BEING NUDE; PROVIDING FOR EXEMPTIONS; PROVIDING FOR PENALTIES AND OTHER REMEDIES IN ACCORDANCE WITH STATE LAW AND GENERAL CODE PROVISIONS;   PROVIDING FOR SEVERABILITY; PROVIDING FOR CODIFICATION; AND PROVIDING AN EFFECTIVE DATE.

**WHEREAS,** the Board of County Commissioners of Seminole County, Florida finds and declares that nudity, coupled with the sale, presence or use of alcoholic beverages in public places, encourages undesirable behavior and is not in the best interests of the public health, safety, welfare and morals of the citizens of Seminole County; and

**WHEREAS,** the Board of County Commissioners of Seminole County, Florida has chosen to address the disturbances associated with mixing alcohol and nudity by means of a reasonable restriction upon any establishment, licensee, premises or bottle club licensed under the laws of Florida to sell or allow the consumption of alcoholic beverages and upon any person present at any establishment, licensee, premises or bottle club licensed under the laws of Florida to sell or allow the consumption of alcoholic beverages; and

CERTIFIED COPY
MARYANNE MORSE
CLERK OF CIRCUIT COURT
SEMINOLE COUNTY, FLORIDA
BY_____
DEPUTY CLERK

Effective: 6-28-99                    1              Exhibit D

WHEREAS, pursuant to Section 562.45, *Florida Statutes*, and Article VIII, Section 1, *Constitution of the State of Florida*, the Board of County Commissioners of Seminole County, Florida has the power and right to enact ordinances regulating the type of entertainment and conduct permitted in any establishment licensed by the State of Florida to sell alcoholic beverages for consumption on the premises of any bottle club, establishment, licensee or similar business which is located within Seminole County, see *City of Miami Springs v. J. J. T., Inc.*, 437 So. 2d 200 (Fla. 3rd DCA 1983); *Board of County Commissioners of Lee County v. Dexterhouse, 348 So. 2d 916 (Fla. 2d DCA 1977), affirmed 364 So. 2d 449, appeal dismissed 441 U.S. 918 (1979)*; and

WHEREAS, as of the effective date of the Seminole County Public Decency Ordinance, that Ordinance has been applicable Countywide and is generally intended to prohibit a person from intentionally or recklessly appearing or being nude or causing another person to appear or be nude in a public place and in other places which may reasonably be observed by the public within Seminole County; and

WHEREAS, the Board of County Commissioners of Seminole County, Florida hereby finds and declares that this Ordinance is in addition and supplemental to the Seminole County Public Decency Ordinance and the provisions of State law such as Chapter 800, *Florida Statutes*; and

WHEREAS, this Ordinance is a general ordinance regulating conduct and is not an ordinance that affects the use of land as contemplated by Section 125.66, *Florida Statutes*; and

WHEREAS, the Board of County Commissioners of Seminole County, Florida, finds that this Ordinance is supported by Federal and State case law, see e.g., *California*

*v. LaRue*, 409 U.S. 109 (1972); *44 Liquormart, Inc. v. Rhode Island,* _____ U.S.

_____, 116 S. Ct. 1495 (1996); *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F. 3d 993

(11ᵗʰ Cir. 1998); and *City of Daytona Beach v. Del Percio*, 476 So. 2d 197 (Fla. 1985); and

**WHEREAS,** the Board of County Commissioners of Seminole County, Florida,

finds and determines that this Ordinance is in the best interests of the public health,

safety, welfare and morals of the citizens of Seminole County; and

**WHEREAS,** the Board of County Commissioners finds and determines that this

Ordinance is consistent with the provisions of State law and applicable County

ordinances; and

**WHEREAS,** an Economic Impact Statement has been prepared and made

available in accordance with the requirements of the Seminole County Home Rule

Charter,

**NOW, THEREFORE, BE IT ORDAINED BY THE BOARD OF COUNTY
COMMISSIONERS OF SEMINOLE COUNTY, FLORIDA, THAT:**

**SECTION 1. LEGISLATIVE FINDINGS.**

(a)     The above recitals are hereby adopted as legislative findings for this

Ordinance.

(b)     Additionally, the recitals set forth in Ordinance Number 98-49 are also

adopted as legislative findings.

**SECTION 2.  TITLE.**  This Ordinance shall be known as the "Seminole County

Nudity and Alcohol Separation Ordinance".

**SECTION 3. DEFINITIONS.**  The definitions enacted in Ordinance Number 98-49

are hereby adopted and shall apply to the provisions of this Ordinance; provided,

however, that the definition of the term "Nude" shall also apply to the term "Nudity".

3

**SECTION 4.   PROHIBITION AGAINST CO-MINGLING OF ALCOHOL AND NUDITY.**  A new Section of the Seminole County Code is created to read as follows:

**Sec. ___ Co-mingling of alcohol and nudity prohibited.**

(a)     It is unlawful within Seminole County for any manager, officer, agent, servant, employee, contractor, person in charge, customer or invitee of any premises, establishment, licensee or bottle club licensed under the laws of the State of Florida to possess, sell or allow the consumption of alcoholic beverages to knowingly, intentionally or recklessly exhibit, suffer, allow, permit, engage in, participate in, or be connected with nudity at or upon the licensed premises.

(b)     It is unlawful within Seminole County for any person to be nude or to knowingly, intentionally or recklessly exhibit, suffer, allow, permit, engage in, participate in, or be connected with nudity upon the licensed premises in any bottle club, establishment, licensee or similar business licensed under the laws of the State of Florida to possess, sell or allow the consumption of alcoholic beverages.

(c)     The combination of nudity and the possession or consumption of alcoholic beverages at any licensed location as set forth is Subsections (a) and (b) and the act of permitting, condoning or allowing the possession, sale or consumption of alcoholic beverages within the County is hereby strictly prohibited and made unlawful.

(d)     It is not a violation of this Ordinance for any person to engage in the ordinary and customary *bona fide* use of an enclosed single sex public restroom, enclosed single sex functional shower or enclosed single sex locker and/or dressing room facilities.  It is also not a violation of this Ordinance for a mother to breast feed her baby.

4

### SECTION 5. PENALTIES/OTHER REMEDIES.

(a) Consistent with Section 1.8 of the Seminole County Code, any person who violates any provision of this Ordinance may be punished in accordance with Section 125.69, Florida Statutes.

(b) Consistent with Section 1.9 of the Seminole County Code, injunctive relief may be sought from a Court of competent jurisdiction to enforce the provisions of this Ordinance and to enjoin conduct inconsistent with the requirements of this Ordinance.

### SECTION 6.   SEVERABILITY.   If any section, subsection, sentence, clause, phrase, word or provision of this Ordinance is for any reason held invalid or unconstitutional by any court of competent jurisdiction, whether for substantive, procedural, or any other reason, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions of this Ordinance.

### SECTION 7.   CODIFICATION. It is the intention of the Board of County Commissioners that the provisions of this Ordinance shall become and be made a part of the Seminole County Code and the word "Ordinance" may be changed to "Section," "Article," or other appropriate word or phase and that the sections of this Ordinance may be renumbered or relettered to accomplish such intention; provided, however, that Sections 5, 6, 7 and 8 shall not be codified.

### SECTION 8. EFFECTIVE DATE.   This Ordinance shall become effective immediately upon the filing of a certified copy of this Ordinance with the Department of State by the Clerk of the Board of County Commissioners.

**ENACTED** this *22* day of *June*, 1999.

BOARD OF COUNTY COMMISSIONERS
OF SEMINOLE COUNTY, FLORIDA

BY: _____

CARLTON D. HENLEY, Chairman

LG/gn
6/2/99
Nud-Alch.doc



# NOTICE OF INTENT TO FILE CLAIM
## PURSUANT TO
## THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT


TO:  S. Kevin Grace
     Seminole County Administrator

     Robert McMillan
     Seminole County Counselor

     Carlton Henley
     Seminole County Commissioner


Notice is hereby given that Pinter Enterprises, Inc., Michael E. Pinter, Jr., Mary C. Pinter & Michael E. Pinter, Jr., Joint Trustees, Claimants, intend to file a claim for relief against Seminole County pursuant to the Bert J. Harris, Jr., *Private Property Rights Protection Act* (hereinafter referred to as the "Act"), Florida Statutes §70.001, *et al*. Claimant's address is: Michael E. Pinter, Jr., Pinter Enterprises, Inc., 6150 S. Hwy. 17-92, City of Casselberry, Seminole County, Florida, 32370. All communications and notices should be directed to Claimant's attorney of record: Jay Small, of Wilson Leavitt & Small, 437 N. Magnolia Avenue, Orlando, Florida 32801-1524, with copies to Robert H. Freilich, Lead Counsel, Freilich, Leitner & Carlisle, 1000 Plaza West, 4600 Madison, Kansas City, Missouri 64112-3012.


## A. CAUSE OF ACTION

This claim arises from the adoption by Seminole County of Ordinance 98-49, *Seminole County Public Decency Ordinance* (adopted November 10, 1998) and Ordinance 99-21, *Seminole County Nudity and Alcohol Separation Ordinance* (adopted June 22, 1999).

As a direct result of the adoption of the above-referenced Ordinances, private property of Claimants has been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property.

As a direct result of the adoption of the above-referenced Ordinances, the vested property rights to a specific use of the subject real property of Claimants have been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the vested right to a specific use of the subject real property.

Exhibit E

As a direct result of the adoption of the above-referenced Ordinances, Claimants are left with existing or vested uses that are unreasonable such that Claimant's will bear a permanent, disproportionate share of the burden imposed by Seminole County for the good of the public which in fairness should be borne by the public-at-large.

## B.   LEGAL BASIS FOR CLAIM

It being the intent of the Legislature to provide property owners with a separate and distinct cause of action from the law of takings, Claimants seek relief or payment of compensation from Seminole County for adoption of the above-referenced Ordinances which unfairly and inordinately affects Claimants' real property.   The Bert J. Harris, Jr., Private Property Rights Protection Act. Florida Statutes §70.001(1).

It is well established that a taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of his title to the property or any interest therein. Any substantial interference with the free use and enjoyment of property constitutes a taking of property within the meaning of the Constitutional provision. 2 Nichols, Eminent Domain §6.01[1] (3d ed. 1983).   When courts face a claim of just compensation due to alleged taking of private property resulting from governmental regulation of property, an appropriate inquiry is directed to the extent of interference or deprivation of the economic use. *State Dept. of Environmental Protection v. Burgess*, 667 So.2d 267 (1995).

To determine whether a taking occurred, Florida courts are to consider whether: (1) the economic impact of the regulation on Claimant; and (2) the extent to which the regulation has interfered with reasonable investment- backed expectations. *Gardens Country Club, Inc., v. Palm Beach County*, 712 So.2d 398 (1998).   An alternative test utilized in Florida courts considers: (1) whether there was a denial of economically viable use of the property as a result of the regulatory imposition; (2) whether the property owner had distinct investment- backed expectations; and (3) whether it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine. *Golf Club of Plantation, Inc., v. City of Plantation*, 717 So.2d 166 (1998).

Applying the facts to Claimants' present situation indicates that the adoption of the Ordinances did result in a regulatory taking of vested property rights, did impact Claimants' investment-backed expectations for the property by substantially decreasing the market value, the income stream and the net present value of the property.

It is well established that investment- backed expectations are one of the factors courts are to consider when applying a multi-factor balancing test to land use taking cases. *Penn Cent. Transp.*

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

*Co. v. City of New York*, 438 U.S. 104 (1978). As noted in the aforementioned case, *Penn Central*, investment- backed expectations are a factor courts are to consider when determining whether a takings occurred. In fact, Claimants have a stronger claim for a taking based on investment- backed expectations than *Penn Central* because the historical landmark designation in *Penn Central* did not interfere with the "primary expectation concerning the use of the parcel" as a railroad terminal. Claimants' use of the property was not a supplementary or secondary uses such as the "historical" designation noted in *Penn Central.*

Claimants have investment-backed expectations in the property in question and Florida courts have considered the extent to which the regulation in question curtails an investment-backed expectation when determining whether a regulatory taking has occurred. *Graham v. Estuary Properties*, 399 So.2d 1374 (Fla. 1981). There are various degrees of investment-backed expectations; there is no established test for determining to what extent the expectation must be investment-backed. However, Florida courts have ruled that: (1) an investment-backed expectation must be reasonable, and (2) the expectation must not be merely a unilateral expectation or an abstract need. *Namon v. State*, 558 So.2d 504 (Fla. 1990).

Claimants purchased, maintained and invested in the real property for the sole and exclusive purpose of conducting an adult entertainment facility. Claimants' expectations at the time of purchase (and re-investment) are the most important factors to consider when determining the extent of the landowners investment- backed expectations. D. Mandelker, *Investment- Backed Expectations in Takings Law*, 27 Urb. Law. 215 (1995). A landowner who purchases property with a reasonable expectation of residential or commercial development has suffered a taking if regulatory constraints allow him to use his land only in its natural state without any economically viable alternative use thereof. *Gil v. Inland Wetlands*, 593 A.2d 1368 (Conn. 1991). The limited marketability of Claimants' property (land: on- and off-site parking, building: purpose-built structural and design elements) and significant costs to convert preclude alternative economically viable opportunities.

Claimants' limited alternative economically viable opportunities are due to the special-purpose nature of the property. Generally, fair market value is the only consideration when granting compensation. Courts value land in rem, not in personam, and must consider and value of the land itself, applying an objective standard that disregards particular circumstances which are only significant to the individual owner. However, if the land is adaptable for a special purpose or use, that fact may be considered as an element of value. This applies unless it is an illegal use, or unless the landowner, after receiving knowledge that the land is to be condemned, puts it to a special use merely for the purpose of increasing the compensation or damages. 26 Am. Jur. Em Dom § 325.

As a special-purpose property, Claimants' property is of a class which is not commonly bought or sold, but under ordinary conditions Claimants would be unable to sell for an amount approximating its real value. As market value presupposes a willing buyer, such that such property has no market value. *Congregation of Sons of Israel v. State*, 387 N.Y.S.2d 738 (N.Y. 1976). In such a case, it is acknowledged that it is necessary to deviate from the comparable sales method of determining value and to consider the loss of profits. *Department of Transp. v. A.R.C.*, 380 S.E.2d 712 (Ga. 1989). Claimants' property possesses a special value to the owner which can be measured in monetary terms. As a result the owner has the right to have that value considered in the estimate of compensation and damages. *La Plata Electric Assoc v. Cummins*, 703 P.2d 592 (Colo App 1985); *Petition of Ziegler*, 97 N.W.2d 748 (Mich. 1959); *In re Appropriation of Easement for Highway Purposes*, 162 NE2d 190 (Ohio 1958). This special value of a special-purpose property is comprised of two elements sufficiently intertwined to be inseparable: (i) the market value of the subject property land and improvements, and (ii) the entitlement value owing to its special-purpose nature.

## C. BACKGROUND AND SUPPORTING INFORMATION

**Property Description, Ownership and Use.** The subject property is identified by the address of 6150 S. Hwy. 17-92, City of Casselberry, Seminole County, Florida; and further described as parcels 17-21-30-508-OAOO-0040, 17-21-30-509-OBOO-0040, 17-21-30-509-OBOO-0050, 17-21-30-509-OBOO-006A, 17-21-30-509-OBOO-0060 and 17-21-30-509-OBOO-0070.

Claimants hold legal title to and are the property owners of the subject real property. The subject property has been owned by Claimants since the late-1960's, and was owned by Claimants at the time of the adoption of the above-referenced Ordinances.

Claimants operate an existing, adult entertainment business on the subject property, and have, continually, since the late-1960s. The existing adult entertainment use includes nude dancing, drink and food sales and some retail.

**Special-Purpose Property.** The nature and unique character of the adult entertainment use qualifies the subject property as a special-purpose property (described, below), because "adult uses" are effectively treated as a semi-monopoly by local governments due to the level of regulatory control (*e.g.*, locational - distance from critical uses, use density, number of uses; structural - viewing areas, signage, lighting; operational - ownership disclosure, security, hours of operation). Claimants' adult entertainment use is a special-purpose property. As is the case with special-purpose properties generally, traditional property analysis and valuation methodologies will not adequately address

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

[their] unique issues.  Alternative methodologies are utilized to achieve the same goal of traditional methodologies – to provide accurate and credible information.  Special conditions and circumstances exist because Claimants' property (land, improvements and use) is a *special-purpose property* (*see* J.D. Eaton, Real Estate Valuation In Litigation, 2nd ed., at 227), as evidenced by the following:

   a.    *Claimants' property (land and building) has physical design features peculiar to a specific use.*  The property is comprised of two (2) lots – the primary lot contains the structures housing primary business operations, the satellite lot is located across Pine Street and provides needed parking for the primary business operations.  There are few commercial uses that can operate with off-site parking (limited primarily to adult entertainment, bars, nightclubs, *etc.*).  The property's two (2) structures are the nightclub/boutique and an office/storage structure.  Both structures are essential to primary business operations on the property.

      As noted in a recent appraisal (dated October 25, 1999),  most of the other commercial buildings in the subject's neighborhood are at the end of their useful economic life and have been redesigned and remodeled for some type of alternate use.  While other properties in the area have deteriorated, Claimants have continued to reinvest and expand.  In 1992, Claimants invested over $800,000 in remodeling.  The property has been improved specifically and solely for its existing use – the nightclub/boutique structure is unique, designed and remodeled with the sole purpose of providing for the existing adult entertainment use, with features that are not transferable to other, alternative uses (features include purpose-built dance areas, multiple bar/serving areas, windowless, shielded entryway, *etc.*).

   b.    *Claimants' property (land and building) has no apparent market other than to an owner-user.*  Due to the nature and risk associated with adult entertainment and nightclub uses, they predominantly are owner-occupied and owner-operated.  There are no adult entertainment uses in the metro area which are not owner-operated.  Though some adult entertainment facility owner-users lease, their property rights include the leasehold, as well as the business, interest.  Further, the market for owner-users is very limited – recent trends indicate that existing adult entertainment uses in the area have expanded to meet additional demand, rather than new uses entering the

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

market; there have been no recorded sales of adult entertainment uses (land and building) in the metro area within recent history.

c.   *Claimants' property (land and building) has no feasible economic alternate use.* The structure is solely designed to be used for adult entertainment uses. The satellite parking lot does not hamper the use. Remodeling the existing structure for an alternate use would be extremely costly – purpose-built design elements would need to be removed, furnishings would need to be sold or scrapped and structural changes would be required.

Categorizing Claimants' adult entertainment use as a special-purpose property identifies it as having distinct characteristics. One distinction is based on valuation – there is no universally-accepted method to value special use properties. The value of a special-purpose property is comprised of two elements sufficiently intertwined to be inseparable: (i) the market value of the subject property land and improvements, and (ii) the entitlement value owing to its special-purpose nature.

The Uniform Eminent Domain Code indicates that fair market value should be determined by "any method of valuation that is just and equitable." The Appraisal Foundation issued an advisory opinion (AO-15, 1996) that special purpose properties may require alternative valuation approaches, so long as the value is credible.

Courts and communities also have realized the limitations of relying on comparable market sales to determine value for special-purpose properties when there is an absence of market data, as is the situation for Claimants' property in the metro area. Though additional, but not conflicting, methodologies and concepts are required to calculate and describe property value, they remain based on the best information available for a property, in a given location, at a given time to determine the property's *intrinsic value* or *value in use*. For special-purpose properties, the cost and income-based approaches to value offer more evidence of property value. Purchases of commercial property are investments. Investors/owners acquire property with the anticipation of receiving a future benefits in the form of a cash flow and a revenue stream.

**Damages.** Claimants are not limiting the power of the County to *reasonably* regulate, but seeks relief because governmental actions have created circumstances that burden, restrict and limit Claimants' private property and vested rights in real property such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property. The ordinances force Claimants to bear a disproportionate share of the burden imposed

by the state for the good of the public, which in fairness should be borne by the public-at-large. Claimants are seeking no additional rights or privileges than Claimants possessed prior to the adoption of the ordinances. Specifically, Claimants seeks the return on his investment-backed expectations.

Claimants have undertaken all reasonable efforts to protect and improve the value of his special use property investment – repairs, remodeling and updating and other reinvestment have occurred. In 1992, Claimant performed extensive remodeling on the property, investing approximately $800,000 in improvements, for which all applicable City permits were requested and approved. Forcing Claimant to make additional, unnecessary design changes at this time is unreasonable and creates significant financial hardship for Claimant.

The loss incurred by Claimants was estimated using the following methodology: a real property appraisal is provided which indicates the market value of the underlying real estate before and after adoption of the ordinances, an accountants report is provided which indicates the net present value of the special use income stream generated on the special-purpose property, and a fractional appraisal is provided which indicates the value of the movable assets. As indicated in the real property appraisal, it is limited in scope due to the nature of Claimants' special-purpose property: (i) there is an absence of market data in the metro area, and (ii) the limited appraisal did not calculate the entitlement value of the special-purpose property. The real property appraisal determines the market value of the property only as a commercial site. Though comparisons to other adult entertainment uses are referenced (both were located in retail shopping centers), their probative value is limited to determining the value of Claimants' property as a commercial use, not as a special-purpose use. Claimants reserve the right at any subsequent hearing or trial to furnish supplemental studies and appraisals relating to the value of the underlying real property and to its entitlement value as a special-purpose property.

As indicated in the appraisal of the subject property, provided in **Exhibit A**, the market value of the subject property prior to adoption of the Ordinances was $842,000. Post-adoption, the market value potentially decreased to $498,000, a reduction of $344,000.

Similarly but more dramatically, since adoption, the cash flow generated by the special-purpose property has decreased significantly. As shown in Claimants' accountant's report, provided in **Exhibit B**, net operating income (NOI) before owner's compensation for an eight-month period [ending 7/31/98] prior to adoption of the ordinances yielded $502,977. This is comparable to a weighted-average, annual NOI before owner's compensation for the five-year period pre-adoption of $574,388. Prior to adoption of the ordinances, Claimant's were experiencing the best financial year since beginning operations in the late-1960s. If the situation had not changed dramatically,

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

Claimant's could have seen an annualized pre-adoption NOI before owner's compensation of over $750,000. Unfortunately, there was a net operating loss before owner's compensation for an eight-month period [ending 7/31/99] after adoption of $219,720 – a reduction of $722,247 from the previous year.

It should be noted that there were no extraordinary events that occurred during the post-adoption period to inflate the loss. Setting aside one's personal opinion about the nature or type of economic activity offered, the dramatic, negative change in Claimant's special-purpose property (the adult entertainment use) income stream was due to the elimination of the property's primary economic attraction (of which there are very few competitors) – offering drinks and nude dancing. Post-ordinance, property's primary economic attraction was severely limited to offering drinks or nude dancing.

For purposes of calculating the value of the property, based on the lost income stream of the special-purpose property, the value of the pre-adoption income stream (using the 5-year average NOI before owner's compensation) generated by the special-purpose property (at a 20% capitalization rate) yields a present value of $2,871,940.

Claimant has invested significant sums to maintain and operate a first-rate facility, as evidenced by the value of the property's movable assets, as identified in a fractional appraisal, conducted July 29, 1999, provided in **Exhibit C**. If Claimant were to relocate to another location and replace the business' assets, the *replacement cost new* is $522,305. The *total value in place* of the business' assets (movable and immovable), as of July 29, 1999, is $294,090, which represents the depreciated value of the replacement cost new of existing assets, but does not include removal, moving and installation costs. If Claimant is forced to cease operations and abandon the site, the *salvage value* of the business assets is only $22,390.

Thus, the direct result of the ordinances adopted by the County is to effectively "shut down" Claimants' existing adult entertainment business, which has otherwise been lawfully operating in the same location for over 30 years. Claimants' real property and vested property rights have been permanently and inordinately burdened, restricted and limited by County governmental action such that Claimants' investment-backed investment has resulted in a loss of $3,487,640.

**Compliance w/ Local Regulations.** Claimants' property complies with the ULDR and the Comprehensive Plan. The site is appropriately zoned "CG" General Commercial for this commercial use and is designated on the City Future Land Use Map as being appropriate for commercial uses in the City's Comprehensive Plan. The CG zoning district was established "to implement

Comprehensive Plan land use policies for areas designated 'Commercial' on the Comprehensive Plan Future Land Use Map." City of Casselberry Code §2-5.3(B)(3). Claimant's use of the property is consistent with existing and future uses, does not conflict with the ULDR and the Comprehensive Plan, and complies with the purpose and intent of the ULDR and the Comprehensive Plan.

The Comprehensive Plan indicates that special exceptions (variances) shall be "consistent with the Future Land Use Map or character of the surrounding area" (Comprehensive Plan Policy FLU C (3)). Claimants' site complies with both parameters -- the site is zoned CG and is consistent commercial uses identified in the Plan; the site is located within an urban commercial activity center, not a residential neighborhood.

The Comprehensive Plan also indicates that "properties designated as commercial shall be designed to minimize negative impacts upon adjacent residential areas and the function of arterial roadways" and that "other uses may be permitted which are compatible with and do not adversely affect the character of the neighborhood (Comprehensive Plan Policy FLU A (7)). Claimant's use is consistent with an urban commercial activity center.

Claimants' property also is not injurious to the neighborhood and will not be injurious or otherwise detrimental to the public welfare. The site is located within the Central City District, which the Plan indicates is a redevelopment area and for which Claimant's operations are consistent with stated CRA work plan guidelines, including but not limited to, "eliminate and prevent the development or spread of blight, provide for the redevelopment of blighted areas, compel the repair and rehabilitation of deteriorating structures, and revitalize the Central City's economic structure" (Comprehensive Plan Policy FLU A (16)).

Claimants have utilized the property to its highest and best use. The neighborhood possesses constraints that discourage other commercial uses, including but not limited to transportation system congestion and improvement impacts, commercial vacancies, and nearby blight conditions. The site possesses a significant constraint to other commercial uses – off-site parking. The building possesses constraints that discourage other commercial uses, including but not limited to its design as a special purpose facility for alcohol and/or adult uses (no windows, limited interior lighting, "built-in" bar and stage areas, etc.). These constraints limit alternative uses and discourage potential purchasers. Should none come forward, abandonment and/or demolition would add to neighborhood blight conditions. Claimants' existing, operating business provides the City and County with revenue and the neighborhood with a commercial anchor. Claimants' existing business is a reasonable and appropriate use of the site.

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

**Conclusion.**  As a direct result of the adoption by Seminole County of Ordinance 98-49, *Seminole County Public Decency Ordinance* (adopted November 10, 1998) and Ordinance 99-21, *Seminole County Nudity and Alcohol Separation Ordinance* (adopted June 22, 1999):

- Private property of Claimants has been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property;

- The vested property rights to a specific use of the subject real property of Claimants have been been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the vested right to a specific use of the subject real property; and

- Claimants are left with existing or vested uses that are unreasonable such that Claimants will bear a permanent, disproportionate share of the burden imposed by Seminole County for the good of the public which in fairness should be borne by the public-at-large.

The direct result of the ordinances adopted by the County is to effectively "shut down" Claimants' existing adult entertainment business, which has otherwise been lawfully operating in the same location for over 30 years.  Claimants' real property and vested property rights have been permanently and inordinately burdened, restricted and limited by County governmental action such that Claimants' investment-backed investment has resulted in a loss of **$3,487,640**, calculated in the following manner:

| | |
|---|---|
| **Difference in Market Value of Real Property Before and after County Adoption of Ordinances** | **$344,000** |
| **Loss in Value of Movable Assets after County Adoption of Ordinances** | **$271,700** |
| **Net Present Value of Property Based on 5-year Weighted Average NOI** | **$2,871,940** |
| **TOTAL LOSS** | **$3,487,640** |

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

RESPECTFULLY SUBMITTED

By: _____

Jay W. Small, Esq.
WILSON LEAVITT & SMALL
Attorneys for Michael Pinter
437 N. Magnolia Avenue
Orlando, Florida 32801-1524
(407) 843-4321
(407) 423-1505 Fax

_____

Robert H. Freilich, Lead Counsel
FREILICH, LEITNER & CARLISLE
Attorneys for Michael Pinter
4600 Madison, Suite 1000
Kansas City, Missouri 64112
(816) 561-4414
(816) 561-7931 Fax

Original Filed with:

S. Kevin Grace, Seminole County Administrator

Copies To:

Robert McMillan, Seminole County Counselor

Carlton Henley, Seminole County Commissioner



# NOTICE OF INTENT TO FILE CLAIM
## PURSUANT TO
### THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

TO:   Bruce Provonost, Mayor
        City of Casselberry

        Jack Schluckbier, City Manager
        City of Casselberry

        Donna Mcintosh, City Attorney
        City of Casselberry

Notice is hereby given that Pinter Enterprises, Inc., Michael E. Pinter, Jr., Mary C. Pinter & Michael E. Pinter, Jr., Joint Trustees, Claimants, intend to file a claim for relief against the City of Casselberry pursuant to the Bert J. Harris, Jr., *Private Property Rights Protection Act* (hereinafter referred to as the "Act"), Florida Statutes §70.001, *et al.* Claimant's address is: Michael E. Pinter, Jr., Pinter Enterprises, Inc., 6150 S. Hwy. 17-92, City of Casselberry, Seminole County, Florida, 32370. All communications and notices should be directed to Claimant's attorney of record: Jay Small, of Wilson Leavitt & Small, 437 N. Magnolia Avenue, Orlando, Florida 32801-1524, with copies to Robert H. Freilich, Lead Counsel, Freilich, Leitner & Carlisle, 1000 Plaza West, 4600 Madison, Kansas City, Missouri 64112-3012.

## A. CAUSE OF ACTION

This claim arises from the adoption by the City of Casselberry of Ordinance 98-922 *Nudity Prohibited Upon Alcohol Licensed Premises and Bottle Clubs* (codified as §10-8; adopted January 4, 1999) and Ordinance 98-934 Sexually Oriented Business and Adult Entertainment Establishment Ordinance (codified as §14-6, *et al;* adopted June 6, 1999).

As a direct result of the adoption of the above-referenced Ordinances, private property of Claimants has been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property.

As a direct result of the adoption of the above-referenced Ordinances, the vested property rights to a specific use of the subject real property of Claimants have been inordinately burdened,

Exhibit F

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the vested right to a specific use of the subject real property.

As a direct result of the adoption of the above-referenced Ordinances, Claimants are left with existing or vested uses that are unreasonable such that Claimant's will bear a permanent, disproportionate share of the burden imposed by the City of Casselberry for the good of the public which in fairness should be borne by the public-at-large.

## B. LEGAL BASIS FOR CLAIM

It being the intent of the Legislature to provide property owners with a separate and distinct cause of action from the law of takings, Claimants seek relief or payment of compensation from City of Casselberry for adoption of the above-referenced Ordinances which unfairly and inordinately affects Claimants' real property. The Bert J. Harris, Jr., Private Property Rights Protection Act, Florida Statutes §70.001(1).

It is well established that a taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of his title to the property or any interest therein. Any substantial interference with the free use and enjoyment of property constitutes a taking of property within the meaning of the Constitutional provision. 2 Nichols, Eminent Domain §6.01[1] (3d ed. 1983). When courts face a claim of just compensation due to alleged taking of private property resulting from governmental regulation of property, an appropriate inquiry is directed to the extent of interference or deprivation of the economic use. *State Dept. of Environmental Protection v. Burgess*, 667 So.2d 267 (1995).

To determine whether a taking occurred, Florida courts are to consider whether: (1) the economic impact of the regulation on Claimant; and (2) the extent to which the regulation has interfered with reasonable investment- backed expectations. *Gardens Country Club, Inc., v. Palm Beach County*, 712 So.2d 398 (1998). An alternative test utilized in Florida courts considers: (1) whether there was a denial of economically viable use of the property as a result of the regulatory imposition; (2) whether the property owner had distinct investment- backed expectations; and (3) whether it was an interest vested in the owner, as a matter of state property law, and not within the power of the state to regulate under common law nuisance doctrine. *Golf Club of Plantation, Inc., v. City of Plantation*, 717 So.2d 166 (1998).

Applying the facts to Claimants' present situation indicates that the adoption of the Ordinances did result in a regulatory taking of vested property rights, did impact Claimants'

investment-backed expectations for the property by substantially decreasing the market value, the income stream and the net present value of the property.

It is well established that investment-backed expectations are one of the factors courts are to consider when applying a multi-factor balancing test to land use taking cases. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978). As noted in the aforementioned case, *Penn Central*, investment-backed expectations are a factor courts are to consider when determining whether a takings occurred. In fact, Claimants have a stronger claim for a taking based on investment-backed expectations than *Penn Central* because the historical landmark designation in *Penn Central* did not interfere with the "primary expectation concerning the use of the parcel" as a railroad terminal. Claimants' use of the property was not a supplementary or secondary uses such as the "historical" designation noted in *Penn Central*.

Claimants have investment-backed expectations in the property in question and Florida courts have considered the extent to which the regulation in question curtails an investment-backed expectation when determining whether a regulatory taking has occurred. *Graham v. Estuary Properties*, 399 So.2d 1374 (Fla. 1981). There are various degrees of investment-backed expectations; there is no established test for determining to what extent the expectation must be investment-backed. However, Florida courts have ruled that: (1) an investment-backed expectation must be reasonable, and (2) the expectation must not be merely a unilateral expectation or an abstract need. *Namon v. State*, 558 So.2d 504 (Fla. 1990).

Claimants purchased, maintained and invested in the real property for the sole and exclusive purpose of conducting an adult entertainment facility. Claimants' expectations at the time of purchase (and re-investment) are the most important factors to consider when determining the extent of the landowners investment-backed expectations. D. Mandelker, *Investment-Backed Expectations in Takings Law*, 27 Urb. Law. 215 (1995). A landowner who purchases property with a reasonable expectation of residential or commercial development has suffered a taking if regulatory constraints allow him to use his land only in its natural state without any economically viable alternative use thereof. *Gil v. Inland Wetlands*, 593 A.2d 1368 (Conn. 1991). The limited marketability of Claimants' property (land: on- and off-site parking, building: purpose-built structural and design elements) and significant costs to convert preclude alternative economically viable opportunities.

Claimants' limited alternative economically viable opportunities are due to the special-purpose nature of the property. Generally, fair market value is the only consideration when granting compensation. Courts value land in rem, not in personam, and must consider and value of the land itself, applying an objective standard that disregards particular circumstances which are only

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

significant to the individual owner. However, if the land is adaptable for a special purpose or use, that fact may be considered as an element of value. This applies unless it is an illegal use, or unless the landowner, after receiving knowledge that the land is to be condemned, puts it to a special use merely for the purpose of increasing the compensation or damages. 26 Am. Jur. Em Dom § 325.

As a special-purpose property, Claimants' property is of a class which is not commonly bought or sold, but under ordinary conditions Claimants would be unable to sell for an amount approximating its real value. As market value presupposes a willing buyer, such that such property has no market value. *Congregation of Sons of Israel v. State*, 387 N.Y.S.2d 738 (N.Y. 1976). In such a case, it is acknowledged that it is necessary to deviate from the comparable sales method of determining value and to consider the loss of profits. *Department of Transp. v. A.R.C.*, 380 S.E.2d 712 (Ga. 1989). Claimants' property possesses a special value to the owner which can be measured in monetary terms. As a result the owner has the right to have that value considered in the estimate of compensation and damages. *La Plata Electric Assoc v. Cummins*, 703 P.2d 592 (Colo App 1985); *Petition of Ziegler*, 97 N.W.2d 748 (Mich. 1959); *In re Appropriation of Easement for Highway Purposes*, 162 NE2d 190 (Ohio 1958). This special value of a special-purpose property is comprised of two elements sufficiently intertwined to be inseparable: (i) the market value of the subject property land and improvements, and (ii) the entitlement value owing to its special-purpose nature.

## C. BACKGROUND AND SUPPORTING INFORMATION

**Property Description, Ownership and Use.** The subject property is identified by the address of 6150 S. Hwy. 17-92, City of Casselberry, Seminole County, Florida; and further described as parcels 17-21-30-508-OAOO-0040, 17-21-30-509-OBOO-0040, 17-21-30-509-OBOO-0050, 17-21-30-509-OBOO-006A, 17-21-30-509-OBOO-0060 and 17-21-30-509-OBOO-0070.

Claimants hold legal title to and are the property owners of the subject real property. The subject property has been owned by Claimants since the late-1960's, and was owned by Claimants at the time of the adoption of the above-referenced Ordinances.

Claimants operate an existing, adult entertainment business on the subject property, and have, continually, since the late-1960s. The existing adult entertainment use includes nude dancing, drink and food sales and some retail.

**Special-Purpose Property.** The nature and unique character of the adult entertainment use qualifies the subject property as a special-purpose property (described, below), because "adult uses" are effectively treated as a semi-monopoly by local governments due to the level of regulatory control

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

(*e.g.*, locational - distance from critical uses, use density, number of uses; structural - viewing areas, signage, lighting; operational - ownership disclosure, security, hours of operation).  Claimants' adult entertainment use is a special-purpose property.  As is the case with special-purpose properties generally, traditional property analysis and valuation methodologies will not adequately address [their] unique issues.  Alternative methodologies are utilized to achieve the same goal of traditional methodologies – to provide accurate and credible information.  Special conditions and circumstances exist because Claimants' property (land, improvements and use) is a *special-purpose property* (*see* J.D. Eaton, Real Estate Valuation In Litigation, 2nd ed., at 227), as evidenced by the following:

    a.    *Claimants' property (land and building) has physical design features peculiar to a specific use.*  The property is comprised of two (2) lots – the primary lot contains the structures housing primary business operations, the satellite lot is located across Pine Street and provides needed parking for the primary business operations.  There are few commercial uses that can operate with off-site parking (limited primarily to adult entertainment, bars, nightclubs, *etc.*).  The property's two (2) structures are the nightclub/boutique and an office/storage structure.  Both structures are essential to primary business operations on the property.

        As noted in a recent appraisal (dated October 25, 1999),  most of the other commercial buildings in the subject's neighborhood are at the end of their useful economic life and have been redesigned and remodeled for some type of alternate use.  While other properties in the area have deteriorated, Claimants have continued to reinvest and expand.  In 1992, Claimants invested over $800,000 in remodeling.  The property has been improved specifically and solely for its existing use – the nightclub/boutique structure is unique, designed and remodeled with the sole purpose of providing for the existing adult entertainment use, with features that are not transferable to other, alternative uses (features include purpose-built dance areas, multiple bar/serving areas, windowless, shielded entryway, *etc.*).

    b.    *Claimants' property (land and building) has no apparent market other than to an owner-user.*  Due to the nature and risk associated with adult entertainment and nightclub uses, they predominantly are owner-occupied and owner-operated.  There are no adult entertainment uses in the metro area which are not owner-operated.

Though some adult entertainment facility owner-users lease, their property rights include the leasehold, as well as the business, interest. Further, the market for owner-users is very limited – recent trends indicate that existing adult entertainment uses in the area have expanded to meet additional demand, rather than new uses entering the market; there have been no recorded sales of adult entertainment uses (land and building) in the metro area within recent history.

c.   *Claimants' property (land and building) has no feasible economic alternate use.* The structure is solely designed to be used for adult entertainment uses. The satellite parking lot does not hamper the use. Remodeling the existing structure for an alternate use would be extremely costly – purpose-built design elements would need to be removed, furnishings would need to be sold or scrapped and structural changes would be required.

Categorizing Claimants' adult entertainment use as a special-purpose property identifies it as having distinct characteristics. One distinction is based on valuation – there is no universally-accepted method to value special use properties. The value of a special-purpose property is comprised of two elements sufficiently intertwined to be inseparable: (i) the market value of the subject property land and improvements, and (ii) the entitlement value owing to its special-purpose nature.

The Uniform Eminent Domain Code indicates that fair market value should be determined by "any method of valuation that is just and equitable." The Appraisal Foundation issued an advisory opinion (AO-15, 1996) that special purpose properties may require alternative valuation approaches, so long as the value is credible.

Courts and communities also have realized the limitations of relying on comparable market sales to determine value for special-purpose properties when there is an absence of market data, as is the situation for Claimants' property in the metro area. Though additional, but not conflicting, methodologies and concepts are required to calculate and describe property value, they remain based on the best information available for a property, in a given location, at a given time to determine the property's *intrinsic value* or *value in use*. For special-purpose properties, the cost and income-based approaches to value offer more evidence of property value. Purchases of commercial property are investments. Investors/owners acquire property with the anticipation of receiving a future benefits in the form of a cash flow and a revenue stream.

6

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

**Damages.** Claimants are not limiting the power of the County to *reasonably* regulate, but seeks relief because governmental actions have created circumstances that burden, restrict and limit Claimants' private property and vested rights in real property such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property. The ordinances force Claimants to bear a disproportionate share of the burden imposed by the state for the good of the public, which in fairness should be borne by the public-at-large. Claimants are seeking no additional rights or privileges than Claimants possessed prior to the adoption of the ordinances. Specifically, Claimants seeks the return on his investment-backed expectations.

Claimants have undertaken all reasonable efforts to protect and improve the value of his special use property investment – repairs, remodeling and updating and other reinvestment have occurred. In 1992, Claimant performed extensive remodeling on the property, investing approximately $800,000 in improvements, for which all applicable City permits were requested and approved. Forcing Claimant to make additional, unnecessary design changes at this time is unreasonable and creates significant financial hardship for Claimant.

The loss incurred by Claimants was estimated using the following methodology: a real property appraisal is provided which indicates the market value of the underlying real estate before and after adoption of the ordinances, an accountants report is provided which indicates the net present value of the special use income stream generated on the special-purpose property, and a fractional appraisal is provided which indicates the value of the movable assets. As indicated in the real property appraisal, it is limited in scope due to the nature of Claimants' special-purpose property: (i) there is an absence of market data in the metro area, and (ii) the limited appraisal did not calculate the entitlement value of the special-purpose property. The real property appraisal determines the market value of the property only as a commercial site. Though comparisons to other adult entertainment uses are referenced (both were located in retail shopping centers), their probative value is limited to determining the value of Claimants' property as a commercial use, not as a special-purpose use. Claimants reserve the right at any subsequent hearing or trial to furnish supplemental studies and appraisals relating to the value of the underlying real property and to its entitlement value as a special-purpose property.

As indicated in the appraisal of the subject property, provided in **Exhibit A,** the market value of the subject property prior to adoption of the Ordinances was $842,000. Post-adoption, the market value potentially decreased to $498,000, a reduction of $344,000.

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

Similarly but more dramatically, since adoption, the cash flow generated by the special-purpose property has decreased significantly. As shown in Claimants' accountant's report, provided in Exhibit B, net operating income (NOI) before owner's compensation for an eight-month period [ending 7/31/98] prior to adoption of the ordinances yielded $502,977. This is comparable to a weighted-average, annual NOI before owner's compensation for the five-year period pre-adoption of $574,388. Prior to adoption of the ordinances, Claimant's were experiencing the best financial year since beginning operations in the late-1960s. If the situation had not changed dramatically, Claimant's could have seen an annualized pre-adoption NOI before owner's compensation of over $750,000. Unfortunately, there was a net operating loss before owner's compensation for an eight-month period [ending 7/31/99] after adoption of $219,720 – a reduction of $722,247 from the previous year.

It should be noted that there were no extraordinary events that occurred during the post-adoption period to inflate the loss. Setting aside one's personal opinion about the nature or type of economic activity offered, the dramatic, negative change in Claimant's special-purpose property (the adult entertainment use) income stream was due to the elimination of the property's primary economic attraction (of which there are very few competitors) – offering drinks and nude dancing. Post-ordinance, property's primary economic attraction was severely limited to offering drinks or nude dancing.

For purposes of calculating the value of the property, based on the lost income stream of the special-purpose property, the value of the pre-adoption income stream (using the 5-year average NOI before owner's compensation) generated by the special-purpose property (at a 20% capitalization rate) yields a present value of $2,871,940.

Claimant has invested significant sums to maintain and operate a first-rate facility, as evidenced by the value of the property's movable assets, as identified in a fractional appraisal, conducted July 29, 1999, provided in Exhibit C. If Claimant were to relocate to another location and replace the business' assets, the *replacement cost new* is $522,305. The *total value in place* of the business' assets (movable and immovable), as of July 29, 1999, is $294,090, which represents the depreciated value of the replacement cost new of existing assets, but does not include removal, moving and installation costs. If Claimant is forced to cease operations and abandon the site, the *salvage value* of the business assets is only $22,390.

Thus, the direct result of the ordinances adopted by the County is to effectively "shut down" Claimants' existing adult entertainment business, which has otherwise been lawfully operating in the same location for over 30 years. Claimants' real property and vested property rights have been

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

permanently and inordinately burdened, restricted and limited by County governmental action such that Claimants' investment-backed investment has resulted in a loss of **$3,487,640**.

**Compliance w/ Local Regulations.** Claimants' property complies with the ULDR and the Comprehensive Plan. The site is appropriately zoned "CG" General Commercial for this commercial use and is designated on the City Future Land Use Map as being appropriate for commercial uses in the City's Comprehensive Plan. The CG zoning district was established "to implement Comprehensive Plan land use policies for areas designated 'Commercial' on the Comprehensive Plan Future Land Use Map." City of Casselberry Code §2-5.3(B)(3). Claimant's use of the property is consistent with existing and future uses, does not conflict with the ULDR and the Comprehensive Plan, and complies with the purpose and intent of the ULDR and the Comprehensive Plan.

The Comprehensive Plan indicates that special exceptions (variances) shall be "consistent with the Future Land Use Map or character of the surrounding area" (Comprehensive Plan Policy FLU C (3)). Claimants' site complies with both parameters -- the site is zoned CG and is consistent commercial uses identified in the Plan; the site is located within an urban commercial activity center, not a residential neighborhood.

The Comprehensive Plan also indicates that "properties designated as commercial shall be designed to minimize negative impacts upon adjacent residential areas and the function of arterial roadways" and that "other uses may be permitted which are compatible with and do not adversely affect the character of the neighborhood (Comprehensive Plan Policy FLU A (7)). Claimant's use is consistent with an urban commercial activity center.

Claimants' property also is not injurious to the neighborhood and will not be injurious or otherwise detrimental to the public welfare. The site is located within the Central City District, which the Plan indicates is a redevelopment area and for which Claimant's operations are consistent with stated CRA work plan guidelines, including but not limited to, "eliminate and prevent the development or spread of blight, provide for the redevelopment of blighted areas, compel the repair and rehabilitation of deteriorating structures, and revitalize the Central City's economic structure" (Comprehensive Plan Policy FLU A (16)).

Claimants have utilized the property to its highest and best use. The neighborhood possesses constraints that discourage other commercial uses, including but not limited to transportation system congestion and improvement impacts, commercial vacancies, and nearby blight conditions. The site possesses a significant constraint to other commercial uses -- off-site parking. The building possesses constraints that discourage other commercial uses, including but not limited to its design as a special

purpose facility for alcohol and/or adult uses (no windows, limited interior lighting, "built-in" bar and stage areas, etc.). These constraints limit alternative uses and discourage potential purchasers. Should none come forward, abandonment and/or demolition would add to neighborhood blight conditions. Claimants' existing, operating business provides the City and County with revenue and the neighborhood with a commercial anchor. Claimants' existing business is a reasonable and appropriate use of the site.

**Conclusion.** As a direct result of the adoption by the City of Casselberry of Ordinance 98-922 *Nudity Prohibited Upon Alcohol Licensed Premises and Bottle Clubs* (codified as §10-8; adopted January 4, 1999) and Ordinance 98-934 Sexually Oriented Business and Adult Entertainment Establishment Ordinance (codified as §14-6, *et al*; adopted June 6, 1999).

- Private property of Claimants has been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the existing use of the subject property;

- The vested property rights to a specific use of the subject real property of Claimants have been been inordinately burdened, restricted and limited such that Claimants are permanently unable to attain the reasonable, investment-backed expectation for the vested right to a specific use of the subject real property; and

- Claimants are left with existing or vested uses that are unreasonable such that Claimants will bear a permanent, disproportionate share of the burden imposed by City of Casselberry for the good of the public which in fairness should be borne by the public-at-large.

The direct result of the ordinances adopted by the County is to effectively "shut down" Claimants' existing adult entertainment business, which has otherwise been lawfully operating in the same location for over 30 years. Claimants' real property and vested property rights have been permanently and inordinately burdened, restricted and limited by County governmental action such that Claimants' investment-backed investment has resulted in a loss of **$3,487,640**, calculated in the following manner:

### NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
### THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

| | |
|---|---|
| Difference in Market Value of Real Property Before and after County Adoption of Ordinances | $344,000 |
| Loss in Value of Movable Assets after County Adoption of Ordinances | $271,700 |
| Net Present Value of Property Based on 5-year Weighted Average NOI | $2,871,940 |
| **TOTAL LOSS** | <u>$3,487,640</u> |

NOTICE OF INTENT TO FILE CLAIM PURSUANT TO
THE BERT J. HARRIS, JR., PRIVATE PROPERTY RIGHTS PROTECTION ACT

RESPECTFULLY SUBMITTED

By: _____

Jay W. Small, Esq.
WILSON LEAVITT & SMALL
Attorneys for Michael Pinter
437 N. Magnolia Avenue
Orlando, Florida 32801-1524
(407) 843-4321
(407) 423-1505 Fax

_____

Robert H. Freilich, Lead Counsel
FREILICH, LEITNER & CARLISLE
Attorneys for Michael Pinter
4600 Madison, Suite 1000
Kansas City, Missouri 64112
(816) 561-4414
(816) 561-7931 Fax

Original Filed with:

Bruce Provonost, Mayor, City of Casselberry

Copies To:

Jack Schluckbier, City Manager, City of Casselberry

Donna Mcintosh, City Attorney, City of Casselberry

SEMINOLE COUNTY CIRCUIT COURT

### I.   Case Style

Plaintiff s  SEMINOLE COUNTY and the

CITY OF CASSELBERRY

Case No._____

Judge _____

VS.

Defendant s PINTER ENTERPRISES, INC.,
MICHAEL E. PINTER, JR.,
MARY C. PINTER and MICHAEL E
PINTER, JR., as Joint Trustees

### II.   Type of Case (Place an X in one box only.  If the case fits more than one type of case -- select the most definitive.)

| DOMESTIC RELATIONS - DIV. "A" | TORTS - DIV. "D" | OTHER CIVIL |
|---|---|---|
| _____ Simplified Dissol. (Kit) | _____ Profess. Malpractice | _____ Contracts - Div. D |
| _____ Dissolution | _____ Products Liability | _____ Condominium - Div. D |
| _____ Support - IV-D | _____ Auto Negligence | _____ Real Property - Div. C  Mortg. Foreclosure |
| _____ Support - Non IV-D | _____ Other Negligence | _____ Eminent Domain -  Div. D |
| _____ URESA - IV-D | | _____ Const. Law - Div. - B  Bond Validation |
| _____ ADOPTION | | |
| _____ URESA - Non IV-D | | X  Accounting - Div.  Declaratory Judge-ments, Specific Performance - Div - C |
| _____ Domestic Violence | | _____ Other - Div. |
| _____ Other Domestic Relations | | |
| _____ Name Change | | |

### II.   Is Jury Trial Demanded in Complaint?

_____ Yes

__X__ No

### III.   Time Standard Applicable ( Insert date that time standard expires)

Date:_1 - 26 - 0 0_

SIGNATURE OF ATTORNEY FOR PARTY
INITIATING ACTION

BY:_____
F. SCOTT PENDLEY